UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        :        CRIMINAL NO. 3:02CR7 (JBA)

V.

WILFREDO PEREZ        :        APRIL 29, 2005

DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR NEW TRIAL

I.    INTRODUCTION

The use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril...By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom... Because the government decides whether and when to use [rewarded criminals as witnesses], and what, if anything, to give them for their service, the government stands uniquely positioned to guard against perfidy.  By its action the government can either contribute to or eliminate the problem. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery.... Our judicial history is speckled with cases where informants falsely pointed the finger of guilt at suspects and defendants, creating the risk of sending innocent persons to prison.

United States v. Bernal-Obeso, 989 F.2d 331, 333-34 (9th Cir. 1993) (citations omitted).

It is obvious to all who participate in the federal system that cooperating witnesses have increasingly become the engine that drives the system.  Defendant Perez does not make a wholesale attack on that system.  Rather, it is the specifics of what happened here that warrant a new trial.  This is a case where the government relied principally upon the testimony of three such cooperating witnesses, in its effort to seek the death penalty (or, short of that, a life sentence) against Wilfredo Perez.  Far from taking "all reasonable

measures to safeguard the system against treachery," the government extended and created opportunities for these (and other) witnesses to lie. Desperate to gain sufficient evidence to get an Indictment almost six years after the offense, the government pressured its central cooperator, Oligabeth Berrios, to provide information that would implicate Wilfredo Perez. It gave him a deal he literally could not refuse: testify against the Perezes and you will not be prosecuted, and ... we will even move to reduce your existing drug sentence, if you are "truthful." It was exceedingly easy for Berrios to inject Wilfredo Perez into the case; all he had to do was testify about all he (Berrios) had done (essentially participate in every step of the planning and execution of the Casiano murder), and then add that he did it because "Wilfredo authorized it," or "Wilfredo gave me the money." Ultimately, Berrios' trial testimony was inconsistent with that of the other two main cooperators regarding several material issues. These material inconsistencies between the cooperators cannot simply be shrugged off as "the type of inconsistencies that show they are telling the truth." The inconsistencies are so glaring that the only rational conclusion is that the witnesses lied about events. Some "events," such as the burning of a photo and payment of money to Mr. Feliciano, were simply made of whole cloth. In sum, the witnesses were so unreliable that the jury verdict is itself unreliable.

In addition to the lack of credibility of the cooperators, and directly connected to that reality, was the lack of proper supervision of the cooperators. This was revealed in its most graphic form by the willingness of the case agent, Chris Matta, to perjure himself in this case at a removal hearing before a federal magistrate judge in Miami, Florida. He committed this perjury in the presence of the lead prosecutor in this case, David Ring, who made no effort of any kind to advise the Florida judge of the misleading and inaccurate

nature of the Matta testimony.  The lies were so unnecessary that they underscore the absolute willingness of the case agent to "protect" his cooperators at any cost.  If a case agent is willing to misstate the truth to a federal judge in a trivial hearing to protect his cooperators, and the prosecutor is willing to stand mute in the face of such lies, the unanswered remaining question is whether there are any limits to how far they will go in the effort to seek a conviction.  If the case agent is willing to deceive a federal judge in a public hearing in open court, then what is he willing to do when by himself with one of his cooperators, where there is no tape recorder, no court reporter, and no real chance of being caught?  So much for safeguarding the system from treachery.

As detailed below, the lack of reliability of the cooperators, coupled with the lack of adequate supervision and objectivity, rendered this trial fundamentally unfair.  This Court has substantial discretion to order a new trial in this case, and the fundamental problems surrounding the government's case here fully warrant such an order.

## II.    THE RULE 33 STANDARD

The applicable standard in determining the merits of a Rule 33 motion for new trial was set forth in United States v. Ferguson, 246 F.3d 129 (2d Cir. 2001):

> Rule 33 itself states that the court may grant a new trial to [a] defendant if the interests of justice so require.  The rule by its terms gives the trial court broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.  The district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury.  Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.  An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

246 F.3d at 133-4 (internal quotation marks and citations omitted).

A less stringent standard applies to Rule 33 motions than to Rule 29 motions for judgment of acquittal. In the Rule 33 context, the evidence is *not* viewed in the light most favorable to the government, but rather "the district court may evaluate witness credibility and draw some inferences against the government in deciding whether a new trial is warranted." United States v. Autori, 212 F.3d 105, 121 (2d Cir. 2000) (citation omitted). Additionally, "[w]here a court concludes that despite abstract sufficiency of the evidence to sustain a verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." United States v. Clemente, 2004 U.S. Dist. LEXIS 627, *22 (S.D.N.Y. 2004) (Memorandum and Order) (granting motion for new trial)(internal quotation marks and citations omitted). Moreover, "principles of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice. If convinced that there has been a miscarriage of justice then it is the trial judge's duty to set aside the verdict." United States v. Landau, 155 F.3d 93, 104-5 (2d Cir. 1998) (internal quotation marks and citations omitted); United States v. Hurley, 281 F.Supp. 443, 449 (D. Conn. 1968) (granting a new trial in part because FBI

Agent's testimony was inconsistent with defendant's, and independent documentary evidence corroborated defendant's version, casting doubt on FBI Agent's credibility).[1]

## III.    ARGUMENT

The government's evidence of Wilfredo Perez' alleged involvement in the murder-for-hire of Teddy Casiano rested almost exclusively on the testimony of its three main cooperating witnesses: Ollie Berrios, Santiago Feliciano and Mario Lopez. Berrios was the centerpiece of the government's case. It was his testimony that principally established any alleged connection between the murder-for-hire plot and Wilfredo Perez. Specifically, Berrios testified that despite his own ability and motive to set up and carry out the assassination of Teddy Casiano, it was Wilfredo Perez who requested that Berrios arrange for the contract murder and who provided the money to pay Lopez and Gonzalez.

Berrios' story was troubling in many respects. Apart from the fact that it was established at trial that Berrios had a history of lying to the government and the courts to benefit himself, and that he had the means, motive, and opportunity to carry out Teddy Casiano's murder on his own, Berrios' story about Wilfredo Perez' alleged participation in the murder plot was completely contradicted by the testimony of Mario Lopez, a witness in a unique position to testify about the identity of the "hirer" in the murder-for-hire.

---

[1] Furthermore, any principles of deference should be tempered in this case by the fact that the liability phase of Wilfredo Perez' trial was decided by a death-qualified jury. As at least one court has noted, the most current data available "overwhelmingly shows that death-qualified jurors are significantly more conviction prone than jurors who are not death qualified." United States v. Green, 343 F.Supp.2d 23, 34-5 (D. Mass. 2004) (Memorandum and Order re: Bifurcation) (finding the fact that death qualified jurors are "skewed to be conviction-prone" to be additional good cause justifying bifurcating the juries in the liability and penalty phase, in order to facilitate a fair trial on the issue of guilt).

####     A.  Mario Lopez

Lopez testified that on two occasions, he traveled to Hartford and met with "the owner" of Perez Auto.  Vol. IV, 949, 965-6.  Lopez testified that the owner was the person who discussed with Lopez and Gonzalez the matter of Casiano's murder.  Vol. IV, 950, 956, 959, 965-66.  Lopez spoke with the owner on both days that he came to Hartford. The owner escorted Lopez around Perez Auto and showed him several of his vehicles, including a Grand National and a black Corvette. Vol. IV, 955-7.  Lopez discussed with the owner where the murder was to take place and the terms of the payment.  Vol. IV, 959, 966.  Lopez observed the owner handle and count the money that was eventually paid to Lopez and Gonzalez.  Vol. IV, 966.  Lopez also stood with the owner outside of the garage in broad daylight while Raymond Pina demonstrated his skill with motorcycles by performing wheelies and endos.  Vol. IV, 956-58.

While Lopez' account of what occurred at Perez Auto on those two days was similar in some respects to that of Berrios, it differed in at least one very crucial aspect:  the owner to which Lopez continually referred throughout his testimony was *not* Wilfredo Perez.  Not only did Lopez conclusively testify at trial that Wilfredo Perez was not the person with whom he met and dealt with at Perez Auto, and that Wilfredo Perez was not even present for any of the events that took place at Perez Auto, but Lopez also positively identified who "the owner" was:  Wilfredo's brother, Tony Perez.  Vol. V, 1016, 1019-22, 1042-44, 1057; Vol. VI, 1231.

Over the course of his two trips to Perez Auto, Lopez had ample and extensive opportunities to observe and interact with the owner, the person who hired him to kill Teddy Casiano.  Lopez' original description of the owner to Agent Matta was a dark-skinned male

that was about 8 years older than Lopez (who was 32 in May of 1996), a little taller than Mario Lopez (who is about 5' 6" or 5' 7"), about 175 - 190 pounds, with long hair and no facial hair.  Vol. V, 1035-37, 1069.  In every material respect, this physical description matches Tony Perez, not Wilfredo Perez.  While Lopez added more details to his description regarding, for example, clothing and jewelry, Lopez was unequivocal that Tony Perez was the person that he had met with on those two occasions at Perez Auto; that stood next to Lopez outside of Perez Auto in the daylight while Raymond Pina performed motorcycle stunts; that told Lopez that he owned the Grand National and the Corvette; that Lopez saw on the second day in the bay area of the garage; that took money out of his pocket, counted it, put a rubber band around it and gave it to Berrios; that told Gonzalez which way Casiano was going to turn leaving the garage.  Vol V. 1016; 1038, 1042-45. Lopez went even further on re-cross examination and specifically testified that the man he saw in court, Wilfredo Perez, was **not** the person that he met with at Perez Auto; the person Lopez met was Tony Perez.  Vol. VI, 1231.

In fact, when he was shown Tony Perez' photo in an ID procedure conducted by Agent Matta, Lopez readily picked Tony Perez out as the owner that he had contracted with at Perez Auto.  Vol. V, 1019-20, 1056-57; Vol. IV, 951.  Additionally, Lopez testified that at the time that Agent Matta presented Lopez with a photo array that included Wilfredo Perez' picture, Lopez knew that Wilfredo was not the owner that he had met.  Vol. V, 1021-22.  Not only was the contradiction between Berrios' and Lopez' testimony regarding Wilfredo Perez' alleged involvement in the Casiano murder apparent years before this trial, but Lopez has also consistently maintained throughout the duration of this case that Tony Perez, and **not** Wilfredo Perez, was the person that was involved in the murder plot and

that hired Lopez to kill Casiano.  Vol. V, 1044.

The government's explanation to the jury for this gross inconsistency in the testimony of Berrios and Lopez was that Lopez had "melded" Wilfredo and Tony in his mind.  This claim is unpersuasive.  A meld is when two observed objects are merged into one and the final product contains recognizable characteristics of the two prior objects. Here, every material characteristic that Lopez identified regarding the "owner" is demonstrably a reference to Tony Perez.  Not only did Lopez' physical description of the owner match Tony Perez and not Wilfredo Perez, but it was undisputed that Tony Perez was the owner of the Grand National and the black Corvette about which Lopez testified.[2] Given the government's theory of the case regarding Wilfredo Perez' alleged dealings with the killers at Perez Auto over the course of the two days, one would expect that Wilfredo's characteristics would be the dominant ones in any resulting "meld" in the mind of Lopez. But if Wilfredo Perez really was the person that dealt with Lopez at the garage, there is no reasonable explanation for why the characteristics of the owner which Lopez remembers are uniformly skewed in the direction of Tony Perez.  Furthermore, the "meld" theory simply does not explain why, even when confronted with Wilfredo Perez in the flesh at trial, Lopez continued to maintain that Wilfredo Perez was not a person that he saw at Perez Auto at

---

[2] Although Lopez provided some testimony about the owner's clothing, this was not a unique descriptor.  Similarly, Lopez' testimony regarding the motorcycles shown to him by the owner indicated that those were different motorcycles than the ones later photographed at Perez Auto: Lopez testified that the motorcycles he had seen at Perez Auto were "soft-tails," whereas the motorcycles in Gov't. Ex. 136A were "fatboys."  Vol. VI, 1232-33.  Additionally, the motorcycles in the government exhibit were inconsistent with the characteristics which Lopez had previously identified: pinstripes on the gas tank and a mural of a woman.  Vol. V, 1073, 1078.  Regardless, Lopez' testimony at trial was unequivocal that Wilfredo Perez was not the owner about which he had testified.  Vol. VI, 1231.

any time in the course of setting up and carrying out the murder plot.  The "meld" theory does not fit the facts of the case.[3]

Clearly, Lopez had no incentive to testify falsely that Wilfredo Perez was not involved in the murder plot.  Nor does Lopez' testimony leave room to infer that both Tony and Wilfredo dealt with Lopez at Perez Auto, and that Lopez merely "forgot" about Wilfredo.   Lopez' memory of the events of the two days does not appear to be vague or hazy with respect to who was there and who he met.[4]  Lopez testified that he saw only two people at Perez Auto, other than those who accompanied him from New York; the owner and Francisco Chaparro.   Vol. V, 1044-45.  When asked to perform an in-court identification of "the owner" by defense counsel on re-cross examination, Lopez was absolutely clear that Wilfredo Perez was not present at Perez Auto during the events to which he had testified, and that Wilfredo Perez was not the person that hired him to kill Teddy Casiano.  Vol. VI, 1231.

There is simply no good explanation for the contradiction between Lopez' and Berrios' testimony about Wilfredo Perez' alleged involvement in the murder plot other than that one of them is  not telling the truth.  Lopez obviously had no reason to take Wilfredo

---

[3] As is discussed further *infra*, the government's "meld" argument is a powerful example of its tunnel vision in this case.  The government was so committed to its theory of the case that when faced with a glaring contradiction, it disingenuously chose to revise the facts to fit the theory, rather than the other way around.

[4] It is notable, for example, that Lopez remembered seeing Francis Chaparro at the garage. Vol. V, 1044-5.  It seems highly unlikely that Lopez would remember Francis, with whom Lopez had no interaction at the garage, but somehow completely forget the person that allegedly showed Lopez around the shop and discussed with him the murder-for-hire and the terms of the payment.

Perez out of the picture if Wilfredo was, in fact, at Perez Auto and participating in the murder-for-hire scheme. Berrios, however, had significant incentives to testify falsely regarding Wilfredo Perez. As will be discussed *infra*, Berrios was well aware very early in the cooperation process that: (1) the government believed Wilfredo Perez was connected to Casiano's murder; (2) without Berrios' testimony, the government had no case against Wilfredo Perez; and (3) if Berrios implicated Wilfredo Perez, not only would Berrios avoid a possible death sentence for his extensive role in Casiano's killing, he would avoid prosecution entirely, as well as receive the possibility of credit for time served on his drug case, and a new job, home and identity when he walked out the prison doors. Given Berrios' history of lying in federal court when it served his interests, it is not hard to imagine that Berrios would falsely shift blame onto Wilfredo Perez in order to get the benefit of the best possible deal one could ever hope to receive from the government under his circumstances.

### B.  Santiago Feliciano

The government produced a second cooperating witness at trial in an attempt to corroborate Berrios' story: Santiago Feliciano. Feliciano's testimony about Wilfredo's alleged involvement in the murder-for-hire plot, however, was weak. The bulk of Feliciano's testimony on that subject is actually attributable to statements made to him by Berrios, not anything that he directly observed Wilfredo say or do. Additionally, the numerous inconsistencies between Feliciano's testimony and the other trial witnesses, in addition to Feliciano's own prior inconsistent statements, strongly undermine the credibility of Feliciano's testimony in its entirety. It appears that throughout Feliciano's cooperation with the government and his testimony at trial, Feliciano attempted to tell a story that on

the one hand minimized his culpability for Casiano's death, and on the other hand maximized the culpability of the Perezes.

The chronology of Feliciano's cooperation with the government strongly suggests that at the time of his arrest, Feliciano knew that his ability to work out a favorable deal with the government was compromised by the fact that he was the last person to start cooperating.  Prior to his arrest, Feliciano had learned from Ricky Ruiz that Gonzalez and Lopez had been arrested, Vol.  III, 573, and Feliciano already knew that Berrios was in prison.  Vol. III, 575.  As Feliciano admitted at trial, at the time that he saw the indictment in this case and saw that Berrios and Lopez weren't charged, Feliciano thought it was highly likely that it was because they were cooperating.  Vol.  III, 587-89.  In fact, Feliciano had heard from Ruiz that Lopez was cooperating.  Vol. III, 582-83.  As the last one to the cooperation trough, Feliciano would have known that he would be of very little use to the government unless he added something to its case that it didn't already have from its other cooperating witnesses.  If Feliciano were to have any shot of cutting a deal with the government that included the possibility of a §5K1 motion to avoid a mandatory sentence of life imprisonment without the possibility of parole, Feliciano knew he would have to provide information that would be deemed "substantial assistance."  To that end, Feliciano testified to a number of alleged incidents which were designed to establish a link between Wilfredo Perez and the Casiano murder plot.  However, the multiple inconsistencies between Feliciano's testimony and that of the other cooperating witnesses, as well as his own prior inconsistent statements, greatly call into question the credibility and authenticity of the alleged incidents about which he testified.

-11-

_____(1) The alleged post-murder meeting at Perez Auto

Perhaps the most significant inconsistency was Feliciano's testimony regarding an alleged meeting between Wilfredo Perez, Tony Perez, Berrios and Feliciano shortly after the murder at an office at Perez Auto.  Feliciano testified that a short time after the murder, he and Berrios went to Perez Auto on a day that the garage was closed.  Berrios met with Tony and Wilfredo in an office while Feliciano waited outside.  Berrios then called Feliciano into the office.  Feliciano claimed that, in the presence of Berrios, Wilfredo paid Feliciano $1,000 for driving the bike back to New York after the murder.  Additionally, Feliciano claimed that Tony Perez lit a Polaroid picture of Casiano on fire and said: "You got what you deserve."  Vol. II, 462-65; Vol. III, 569.

Inexplicably, Berrios had no recollection of this post-murder meeting with Feliciano and the Perezes, much less any recollection of Feliciano being paid[5] or Casiano's picture being burned.  Vol. VIII, 1669-70.  Berrios' inability to corroborate this incident strongly calls into question the veracity of Feliciano's testimony.  The government may argue that Berrios simply didn't recall the incident given the amount of time that had passed since Casiano's

---

[5]   The inference that Feliciano is lying about being paid is even stronger if Berrios is to be believed that Feliciano never actually drove the bike back to New York after the murder.  According to Berrios, he never saw Feliciano at the pizza shop in New York when he dropped off Lopez and Gonzalez.  Vol. VIII, 1677.  Additionally, Berrios conceded at trial, after being confronted with his grand jury testimony, that after the murder, Feliciano told Berrios that Feliciano had driven the bike  home and didn't know what to do with it because it was "hot," and that Berrios never saw the bike or Feliciano at the pizza shop after the murder.  Vol. VIII, 1678-80.  Berrios also claimed that he and Feliciano talked in the days following the murder about how to get the motorcycle back to New York.  Vol. VIII, 1678-80.  This was not only in direct conflict with the testimony of Feliciano, but also with Berrios' own prior testimony at the Tony Perez trial, where he then claimed under oath that he picked up Feliciano at El Cubano after the murder, and they then drove back to Connecticut.  Vol. VIII, 1683-84.

murder.  That is a convenient, but ultimately unpersuasive explanation.  Observing the burning in effigy of the person that kidnaped and held you at gunpoint, and that you had then arranged to be murdered, is certainly not a common occurrence.  If anything would qualify as a memorable event, one would surely expect this one to fit the bill.  Moreover, if Wilfredo paid Feliciano, wouldn't Berrios, who testified that he was never paid anything for all his involvement in the murder, have not only remembered this, but demanded money for himself?  Vol. VIII, 1669-70.  The clear inference to be drawn is that this incident never occurred.  Feliciano concocted this dramatic story out of whole cloth, likely in an effort to curry favor with the government and make himself a more attractive candidate for cooperation.

### (2)  The First Trip Up To Connecticut

A second glaring inconsistency in Feliciano's testimony concerns whether or not he traveled from New York to Connecticut with Berrios, Lopez and Gonzalez the first time that they went to Hartford with the purpose of killing Casiano.  Feliciano testified under oath that after driving with Berrios to New York to pick up the killers, he remained behind at the pizza shop while the others drove to Hartford to carry out the murder because he "wanted nothing to do with it."  Vol. II, 439.  According to Feliciano, he waited at the pizza shop all afternoon until Berrios, Lopez and Gonzalez returned.  Vol. II, 439; Vol. III, 553-57.

Feliciano's story is flatly contradicted by his own prior statement to law enforcement agents, as well as the testimony of Berrios and Lopez.  As D.E.A. Agent Michael Schatz testified, Feliciano had stated in his May 20, 2002 interview that he had indeed traveled to Connecticut with Berrios, Lopez, Gonzalez and Pina on the first trip up to Connecticut.  Vol. X, 2298-2300.  Additionally, both Berrios and Lopez testified that Feliciano was with them

on the drive to Connecticut, and the drive back to New York after their unsuccessful attempt at locating Casiano. Vol. VI, 1374-75, 1381-82; Vol. IV, 945, 962. There is no clear reason for why both Berrios' and Lopez' version of events would so significantly diverge from Feliciano's version on this point. None of the three hesitated or showed any sign of confusion or a faulty memory in their respective accounts of whether Feliciano was there. The most obvious explanation for the inconsistency is that Feliciano was lying in an effort to minimize the extent of his role in the murder. Feliciano sought to portray himself as someone who merely introduced Berrios to Lopez and Gonzalez, and then was reluctantly roped into participating in the murder plot on the second trip to Connecticut after Raymond Pina failed to show. However, this portrait is belied by the fact that Feliciano had a significant prior relationship with Ricky Ruiz, Lopez and Gonzalez, and he was involved in nearly every aspect of the arrangements in New York regarding the murder for hire. Vol. III, 509-10, 541; Vol. II, 425-26.

### (3) The Cadillac vs. The Astro van

Another glaring example of Feliciano's attempt to curry favor with the government by providing "information" which inculpated the Perezes was his testimony with respect to the vehicle in which he and Berrios traveled to and from New York. At trial, Feliciano testified that each time he and Berrios traveled to New York, they drove in Tony Perez' Cadillac. Vol. II, 432, 440; Vol. III, 550-52, 560. Feliciano's trial testimony, however, is contradicted both by his own prior statement to law enforcement and the trial testimony of Berrios and Lopez.

On cross-examination, Feliciano claimed that he did not recall telling the government during his May 20, 2002 interview that he and Berrios traveled to New York

in Berrios' Astro van the first time they went to pick up the killers.   Vol. III, 550-51.
Feliciano's failure of memory appears disingenuous when viewed in connection with the
testimony of Berrios and Lopez.  Both Berrios and Lopez testified that the vehicle used to
go from New York to Connecticut the first time was Berrios' Astro van.  Vol. VI, 1371-75;
Vol. VII, 1640-43; Vol. IV, 944-45, 962; Vol. V, 1088-89.  Additionally, Berrios and Lopez
contradicted Feliciano's claim that on the second trip to Connecticut they drove in Tony
Perez' Cadillac; Berrios and Lopez both testified that they used the Astro van on that trip.
Vol. VI, 1374-83; Vol. V, 1089.

        The significance of this particular inconsistency in Feliciano's story is that it is part
of a pattern in which Feliciano sought to curry favor with the government by giving a story
that directly implicated the Perezes.   The clear purpose of testifying that Tony Perez'
Cadillac was used on every trip to New York was to suggest that the Perezes were involved
with and sanctioned the trips to and from New York by lending the Cadillac for those trips.
While the government might argue that this is merely a case of Feliciano's memory being
impaired on account of the time that has passed since the events in question, that
explanation is unsatisfactory.  Feliciano did not evince any confusion or hesitation in his
testimony on this issue.  In fact, he was twice asked by defense counsel whether or not it
was actually Berrios' van that was used as opposed to the Cadillac, and Feliciano insisted
that it was the Cadillac, even testifying on one occasion that he was absolutely certain of
that fact.  Vol. III, 552, 560.  As with his story about being paid $1,000 for driving the bike
after the murder, and witnessing Tony Perez burn Casiano's photo, Feliciano testimony is
uncorroborated and likely a product of his efforts at making himself a more attractive
candidate for cooperation in the eyes of the government because of his willingness to

-15-

testify to "facts" which implicated the Perezes.

_____**(4) The Payment of Gonzalez and Lopez**

At trial, Feliciano testified that he made a trip alone to the pizza shop in New York sometime prior to Casiano's murder. Vol. III, 541. At that time, Feliciano negotiated the price of $6,000 with Gonzalez, which Feliciano then reported to Berrios upon his return to Connecticut. Vol. III, 541-43. Then, at Perez Auto on the day of the murder, Feliciano testified that he observed Wilfredo Perez hand money to Berrios, who in turn handed the money to Lopez prior to the murder. Vol. II, 453-54. Feliciano's testimony on this issue was inconsistent both with his own prior statements to law enforcement, as well as the testimony of the other cooperating witnesses. First, Berrios contradicted the claim that Feliciano had reported to Berrios a price of $6,000 after meeting with Gonzalez alone. According to Berrios, the first time a price was ever mentioned was on the day of the murder; Berrios claimed that he approached Lopez and Gonzalez prior to Casiano arriving at Perez Auto and only at that time received a price from them.[6] Vol. VIII, 1670-71. Berrios also specifically stated that Feliciano had never told Berrios anything about what the price would be. Vol. VIII, 1671-72.

Second, Feliciano's claim that he witnessed Berrios pay Lopez at the garage prior

---

[6] Berrios' claim that there were no discussions at all regarding the amount to be paid until the day of the murder appears false. Would the killers come to Connecticut (on two separate occasions) without any discussion of payment at all? If Wilfredo was involved, would he authorize Berrios to hire killers, have them come up to Connecticut and have no discussions at all about payment, even including on the day they were attempting to lure Casiano to Perez Auto to kill him? It is absurd to conclude that is what happened, under the Berrios story which inculpates Wilfredo. The far more reasonable conclusion is that money was discussed earlier between Berrios, Feliciano and the killers, but that would make Wilfredo less involved, so Berrios lied about the money discussions to protect himself and further implicate Wilfredo.

to the murder was contradicted by both Berrios and Lopez. Berrios specifically testified that he did not give any money to Lopez or Gonzalez prior to the murder; according to Berrios, he did not pay anyone until after the murder was complete. Vol. VI, 1391. And when he did finally pay, Berrios gave the money to Gonzalez, not Lopez. Vol. VI, 1393-94. Similarly, Lopez testified that he was not paid at Perez Auto on the day of the murder. Lopez testified that he did not receive any money until the day after the murder. Vol. IV, 972. Berrios paid Gonzalez in the van on the drive back to New York, and the following day, Gonzalez gave Lopez his cut. Vol. V, 1096-97.

Third, Feliciano gave prior inconsistent statements about when and how payment was made. At trial, Feliciano claimed not to recall that he had previously told law enforcement agents that when Berrios and Feliciano first went to the pizza shop together, Berrios paid Lopez and Gonzalez half of the money prior to the murder. Vol. III, 564-65. However, when Agent Schatz took the stand, he confirmed that in a May 20, 2002 interview, Feliciano had indeed stated that prior to the murder, Berrios had gone to New York and paid Lopez and Gonzalez half of the money. Vol. X, 2301.

Fourth, Feliciano testified that he saw Wilfredo Perez hand money directly to Berrios. Vol. II, 453. Feliciano made no mention of Wilfredo Perez counting out the money in front of the others, wrapping it in a rubber band, placing it in a paper bag, or telling Berrios not to pay Gonzalez and Lopez until the job was complete.[7]

---

[7] Berrios and Lopez similarly were inconsistent with each other on this issue. Lopez claimed that the owner pulled the money directly out of his pocket, counted it in front of Lopez and Gonzalez, then put a single rubber band around the money and handed it to Berrios. Vol. IV, 966; Vol. V, 1042-43; 1211. According to Berrios, though, Wilfredo Perez never counted any money in front of the others; he merely handed Berrios a paper bag. Vol. VI, 1391. Berrios testified that it wasn't until they drove down to New York that he

_____(5)  The Murder Weapon

At trial, Feliciano testified that on the day of the first attempt to kill Casiano, he and Berrios drove to New York and went to Gonzalez' home in the Bronx.  Vol. II, 432. Gonzalez was there with Pina.  According to Feliciano, Gonzalez told Pina to go get the gun.  Feliciano then claimed he saw Pina go around a corner and then return shortly thereafter with a black helmet.  Vol. II, 434-36.  The version that Feliciano told at trial was contradicted by multiple prior statements he had given to law enforcement agents.  Agent Schatz testified that at the May 20, 2002 proffer session, Feliciano never said anything about a gun coming from Pina.  Vol. X, 2301.  On July 31, 2002 and September 10, 2000, Feliciano met with DEA Agent Matta.  Feliciano did not state at either of those proffer sessions that he saw Pina get the gun.  Matta testified that he did indeed ask Feliciano who it was that got the gun, and Feliciano replied that he didn't remember, but that it was someone standing in the street.  Vol X., 2310-11.

Feliciano's testimony regarding the murder weapon once again demonstrates his willingness to alter his story so that it is more favorable to the government's theory of the case.  In none of his prior statements to law enforcement agents did Feliciano ever tie Raymond Pina directly into the murder plot.  Yet after three proffer sessions in which Pina is not the one who got the gun, at Pina's trial Feliciano for the first time places a gun in his hand.  The intended inference is that Pina had full knowledge that the purpose of the trip to Connecticut the first time was to commit a murder.  There is no credible explanation for

_____

opened the bag and saw that the amount was $6,000.  Vol. VI, 1391.  Also, he claimed that the money was not bound by a single rubber band, but rather, was packaged in packets of $1,000.  Vol. VI, 1393-94.

why Feliciano would have left out such a crucial detail over the course of three proffer sessions.  Considering the multiple other inconsistencies in Feliciano's trial testimony, as well as his significant incentive to curry favor with the government to get the benefit of a §5K1 motion, it is quite likely that Feliciano's testimony is fabricated.

The government will likely argue that these inconsistencies are not only irrelevant, but that they prove that the cooperating witnesses did not have an opportunity to collude, and are therefore telling the truth.  This argument has been properly rejected by other federal courts.  "In fact, a long list of crucial, irreconcilable conflicts in their testimony supports exactly the opposite conclusion: The testimony leaves the impression that two perjurers made up facts about a murder without having had a chance to get their stories straight."  United States v. D'Angelo, 2004 U.S. Dist. LEXIS 2239, *61 (E.D.N.Y. 2004) (Memorandum and Order) (granting motion for judgment of acquittal, and, in the alternative, motion for new trial).  The government argued throughout the trial that the only fact that matters is that Wilfredo Perez was consistently identified as participating in the murder plot.  Not only is this untrue, as Lopez' testimony starkly demonstrates, but it is a self-serving argument which seeks to draw attention away from inconsistencies that are too significant in quantity and quality to be mere mistakes by the cooperating witnesses.  And, as is discussed more fully *infra*, the fact that some of the cooperating witnesses fingered Wilfredo Perez is more a function of Agent Matta's questionable investigation techniques, and the large incentives for the cooperators to conform their testimony to the government's theory of the case, than it is a matter of the cooperators providing truthful testimony.

### C. Raul Filigrana

The government sought to bolster Berrios' story regarding Wilfredo's alleged involvement in the murder-for-hire plot with one other witness, Raul Filigrana. Specifically, Filigrana testified that: (1) at the beginning of 1995, Filigrana met with Wilfredo and Tony Perez at a residence at Pope Park, where Filigrana observed the Perezes armed with about four or five guns, and heard Wilfredo say that as a result of a fight at a bar, the Perezes were preparing for a war with Teddy Casiano; and (2) shortly after Teddy Casiano kidnaped Berrios and stole the drugs and money from Berrios' apartment, Wilfredo met with Filigrana in the basement of the house at Perez Auto and told Filigrana that he would kill Casiano.

Filigrana testified that at the "beginning of 1995," he delivered drugs to Wilfredo Perez at an apartment near Pope Park in Hartford. Filigrana claims that he saw Wilfredo and Tony Perez holed up in the apartment with about four or five different firearms, and that Wilfredo said that there were some problems at a bar with Casiano, so they were preparing for a war. Vol. IX, 2127-31. Filigrana testified that this was a memorable event, and that his memory of this event was clear. Vol. X, 2214-16. Filigrana's story, however, is demonstrably false.

At the "beginning of 1995," Casiano couldn't have been involved in any problems at a bar with the Perezes because he was locked up in a federal prison. As the parties had stipulated in this case, Casiano was incarcerated in 1991 and was not released from prison until April 19, 1995. Filigrana's story is patently incredible. *See* United States v. Robinson, 2003 U.S. Dist. LEXIS 8016, *7 (N.D.N.Y. 2003) (Memorandum-Decision and Order)(granting new trial in part because testimony of cooperating witness that he saw

defendant at a certain apartment packaging cocaine in 1995, 1996 and 1997 was patently incredible given that the defendant was incarcerated from July 1994 to June 1997).

Additionally, there was no evidence of any bar fight between Casiano (and/or the Savage Nomads) and the Perezes at the beginning of 1995.  Not only was Casiano incarcerated until April 19, 1995, but according to the government's theory of the case, the fight at the Hour Glass Café between the Perezes and the Nomads didn't occur until after Casiano kidnaped Berrios and robbed the Perezes of drugs and money.  The fight was the consequence of tensions resulting from the Berrios kidnaping and robbery, which didn't occur until the fall of 1995.  While the government will no doubt argue that the phrase "beginning of 1995" is ambiguous enough to  include a date after April 19, 1995, it strains credulity to suggest that this phrase could encompass a date occurring in the fall of 1995, or sometime thereafter. We know from Filigrana's own testimony that it is unlikely he would designate a date in late April as being at the "beginning" of the year.   During cross-examination, Filigrana was asked about his audacious chase of an undercover agent in New Britain in mid-May of 1995.  When asked if he would consider May 18, 1995 to be in the "middle" of 1995, Filigrana answered affirmatively.  Vol. X, 2170.

Furthermore, Filigrana's testimony about both the Pope Park incident and the alleged threat made by Wilfredo Perez in the basement are highly suspect, given the fact it was about eight years into Filigrana's cooperation with the government before he ever mentioned either of these alleged events.   Vol. X, 2216-18.   Filigrana's entirely unconvincing explanation as to why he never previously mentioned these alleged incidents in his numerous interviews with law enforcement agents was that those agents simply didn't ask him any questions about it.  Filigrana, however, is not some unwitting criminal

with no idea of how investigations operate.  He was a police office in Colombia for four years prior to illegally entering the United States; he knew how the system worked, what information was important for the police to have and how to conduct an investigation.  Vol. X, 2152-13.  Given his background in law enforcement, Filigrana would have known better than most people the evidentiary significance of both the Pope Park incident and the alleged threat made by Wilfredo.  This is especially true, given that Filigrana began his cooperation and discussed Wilfredo Perez at debriefing sessions with the government both before and after Casiano's murder.  Filigrana would have understood the necessity of bringing both of these incidents to the attention of law enforcement, and would have grasped instantly how helpful this would be to his efforts to a gain a reduced sentence.

Filigrana was interviewed by the government on June 4th, August 6th and September 10th of 1996, and on each of those dates he was asked questions about Wilfredo Perez. Vol. X, 2201; 2210; 2211.  Given that Filgrana had learned of Casiano's murder in jail soon after it occurred, it does not stand to reason that Filgrana would have refrained from disclosing either of these alleged incidents to the government.   It is clear that at each of these meetings Filigrana attempted to be as complete as possible in his proffers, even offering inconsequential information such as details about the jet skis that Wilfredo Perez owned.  Vol. X, 2201-07.  Who could believe that Filigrana, a former law enforcement officer trained in investigation techniques, failed to disclose two highly significant incidents which were clear in his memory, solely because he wasn't asked the right questions by his interviewers?   Vol. X, 2198, 2207, 2209, 2211, 2214-16.  Furthermore, Filigrana's testimony that he was never asked any open-ended questions about the Perezes during his interviews, for example, whether he had anything else to tell the government about

Wilfredo Perez that might be helpful, Vol. X, 2215-16, is incredible, to say the least. The notion that Filigrana wouldn't have realized the evidentiary significance of either of these alleged incidents to the Casiano murder investigation, and therefore, wouldn't have mentioned it to the government unless asked about it, should be rejected.

It was very apparent at trial that Filigrana had significant incentives to stay within the good graces of the government. As a result of Filigrana's federal drug conviction, he faced mandatory deportation once he completed his sentence. Vol. X, 2137-38. The deportation order was suspended, however, because the U.S. Attorney's Office in Connecticut filed an S-Visa application. Vol. IX, 2105-07. The S-Visa is literally the only thing preventing the deportation order from going into effect. As Filigrana conceded at trial, the government, therefore, ultimately controls whether Filigrana stays in the United States or not. Vol. X, 2149, 2188-93, 2218. Given that Filigrana testified that if he were ever to return to Colombia, he believes he would be killed, Vol. X, 2139-40, it is not difficult to imagine that Filigrana would testify falsely if he believed it would allow him to remain in the United States.

### D. Fernando Colon

The government called Fernando Colon as a witness to establish that the catalyst for the murder-for-hire plot was a threat made by Teddy Casiano, which was conveyed to the Perezes by Fernando Colon. Specifically, Colon testified that Casiano told Colon that he wanted to rob Wilfredo Perez. On that same day, Colon called Wilfredo Perez, told him that he needed to talk to him, and then went to Perez Auto. Colon met with Tony and Wilfredo Perez in the pool room and told them that Casiano was planning on robbing them again. Wilfredo Perez then allegedly said that he "wanted to do something about it," at

which point Colon left.  A day or two after this conversation, Casiano was killed.  Vol. IX, 1961-14, 2035-36.

Fernando Colon is a problematic witness for the government for several reasons. First, if Colon's testimony is true,[8] Colon's chronology significantly undermines the government's theory of the case.  The government contends that the precipitating event that led Wilfredo Perez to charge Berrios with the task of finding contract killers was the warning from Colon that Casiano planned to rob the Perezes again.  However, it is clear from the testimony of the other witnesses at trial that Feliciano and Berrios reached out to Ricky Ruiz, Lopez and Gonzalez well before Colon ever allegedly communicated Casiano's threat to Wilfredo Perez.  Feliciano testified that about two months before Casiano's murder, Berrios asked Feliciano if Feliciano knew anyone who could do a murder, and "a while after that" Feliciano traveled to New York to talk to Gonzalez.  Vol.  II, 423-6.[9] Similarly, Berrios did not testify that the first time he went to New York to make inquiries about murder-for-fire was only days before the murder; his testimony was that the first trip could have been two weeks or two months before the murder.  Vol. VII, 1632-33.

Second, Colon's testimony contradicted the government's theory of Wilfredo Perez'

_____

[8]  The first time Colon ever mentioned to law enforcement agents the substance of his alleged conversations with Casiano and the Perezes was in 2000.  Vol. IX, 2066-7, 2057-62.  Significantly, Colon testified pursuant to a court order and under immunity; considering that he had never been charged with the kidnaping of Berrios, or any other kidnaping he had committed, Vol. IX, 2053-54, Colon had an obvious interest to remain in the good graces of the government.

[9]  Although Feliciano later conveniently backtracked the next day on cross-examination and claimed he could not now recall whether if the first meeting with Gonzalez took place two months before the murder, Vol. III, 543-44, it is at a minimum clear from Feliciano's testimony that he was making inquiries about the murder much earlier than two days prior to the murder.

alleged motive to kill Casiano, *i.e.*, lingering tensions from the prior robbery.  Colon testified that although Wilfredo Perez was upset with Casiano after the robbery, the two ended up working things out, and Casiano was satisfied with the respect shown to him thereafter by Wilfredo. Vol. IX, 1999, 2073-34, 2078.  While there were problems from time to time after the kidnaping, Wilfredo and Casiano remained friends – Wilfredo helped Casiano out with setting up a tattoo shop, Casiano hung out at Perez Auto, and the two would see each other socially and get together for a beer or at parties.[10]  Vol. IX, 2017-18.  Similarly, tensions between the Perezes and the Savage Nomads had dissipated as well.  Wilfredo Perez showed respect to the Nomads, Vol. IX, 2008, and the Nomads would bring their cars into Perez Auto to get work done.  Vol IX, 2009-10.  Despite the fact that Colon was involved in the kidnaping of Berrios and the robbery of the Perezes drugs, Wilfredo Perez fronted drugs to Colon, and never threatened to cut him off for selling drugs at the Hour Glass Café.  Vol. IX, 2015-16.  Additionally, Wilfredo Perez visited the memorial site of a Nomad, Louis Silva, that died in a motorcycle; Silva died on April 21, 1996, about a month before Casiano's murder, and Wilfredo Perez was on good terms with the Nomads, as demonstrated by the photographs entered into evidence showing Wilfredo together with other Nomads at the memorial site. Vol. IX, 2019-32.  Clearly, Wilfredo Perez and Casiano had negotiated a peaceful resolution after Berrios' kidnaping, and the only person who wasn't satisfied with that peace was Berrios, who was humiliated, lost respect  and was

---

[10] In a similar vein, Colon testified that after his alleged conversation with the Perezes, Wilfredo Perez never said anything about killing Casiano, nor did it ever cross Colon's mind that anything might happen to Casiano as a result of that conversation; Colon was motivated by interest in keeping the peace because he knew the Perezes and Casiano were friends.  Vol. IX, 2044-45.

robbed of his dignity in the community.  As Colon testified, the kidnaping was no secret –

people at the Hour Glass Café and Rosie's talked about the kidnaping, and specifically

about how Berrios had cried the whole time.  Vol. IX, 1998.  Similarly, Feliciano testified

that he had heard about the kidnaping before he even ever met Berrios, and had even

heard a story about how Casiano had humiliated Berrios by shaving off Berrios' eyebrows.

Vol.  III, 540-41.  It was precisely these sorts of exaggerations that added insult to injury

and made Berrios more determined to exact revenge from Casiano.

### E. Ollie Berrios

The evidence of Wilfredo's alleged involvement, then, rests exclusively on Berrios,

a witness who had everything to gain and nothing to lose by implicating Wilfredo.

### (1) A history of lying in federal court

Berrios has demonstrated time and again that the duty to tell the truth to officers of

the court is for him optional, at best.  Berrios has a history of lying in federal court dating

back to his federal drug charges.  Vol. VI, 1422-23.  Many of Berrios' lies are documented

in the pre-sentence report prepared by the probation office prior to his sentencing in that

federal  drug  case  before  Judge  Squatrito.   As  Berrios  conceded  at  trial,  the  written

statement regarding his version of the offense that he submitted to probation was full of

lies, which he had purposefully done in order to "beat the system" and scam his way out

of going to prison.  Vol. VI, 1435-38; Vol. VII, 1472.  One of the lies Berrios employed was

minimizing the amount of drugs with which he was involved in order to get a minor role

adjustment under the Sentencing Guidelines and receive a lower sentence.  Vol. VI, 1443-

47.  Berrios also lied about a key piece of physical evidence that linked him to the drug

offense with which he was charged, *i.e.*, his fingerprint on a can of inositol used in the drug packaging process; Berrios falsely told the court that the fingerprint must have gotten on the can while he was helping move some items belonging to others into the Ramirez' home.  Vol. VI, 1453-55.  Berrios also lied about his employment; he submitted phony documents to probation and the court indicating that from August 1996 until early 1998, the period of time prior to his sentencing,  he was employed at Ruiz' pizza shop.  Vol. VIII, 1751-12.

This pattern of lying is completely in keeping with Berrios' view, as evinced in the tape recorded calls to his mother, that the criminal justice system is thoroughly corrupt, and therefore one's interest in self-preservation always defeats one's interest in telling the truth. He believed that the government was prepared to fabricate a case against him, and that either way he went, the government was going to win, because they can do anything.  Vol. VII, 1528-30.  He further believed that the government was "dirty," that they would charge him even if he didn't do anything, and that the system was corrupt; in his view, the government can make things up and then have someone found guilty.  Vol. VII, 1537-38, 1562-63.  He also believed, based on his experiences in being repeatedly shipped back to Wyatt, that the government had tremendous power over his life.  Vol. VII, 1502-05. Years before he began cooperating, he was aware that the government was looking for information implicating Wilfredo Perez in the Casiano murder.  Vol. VII, 1505-06.  When he made the decision to cooperate, he was trapped and worn down, and decided to tell the government what he knew they wanted; he decided that it was time for him to work his way out of a situation he had created.  Vol. VII, 1565-66.  He had years in prison to think about all the angles and all the possibilities, and all the possible ways to tell the story of

Casiano's murder.  Vol. VII, 1613-14.  It was now time for Berrios to tell the story that was most likely to benefit him.

Attorney Ring was well aware of Berrios' penchant for self-serving falsehoods, as he had prosecuted  Berrios in the previous drug case – the government even filed a letter with the Court indicating its belief that Berrios had lied in the pre-sentence report.  Vol. VI, 1423; Vol. VII, 1477-80.  Berrios, however, got away with his lies, and ended up receiving a lesser sentence than the one recommended by probation or sought by the government. Vol. VII, 1477-80.  Clearly, the lesson he learned was that it pays to lie because the system can indeed be beaten.

### (2)  Berrios had significant personal motives to kill Teddy Casiano

It is undisputed that Berrios had significant reasons to kill Casiano.  He was kidnaped, stuffed in a car trunk, robbed, and scared to death by Casiano and his cohorts, and he never liked Casiano from the first time he met him.  Vol. VIII, 1761-62.  He then lived with the terror, humiliation and loss of respect on a daily basis.  Vol. VIII, 1764-66. He was upset that Wilfredo was not taking any steps to retaliate, but what made it even worse for Berrios was that Wilfredo remained friendly with Casiano.  Vol. VIII, 1764-66. He told Feliciano that he wanted to kill Casiano, because he had kidnaped and robbed him. Vol. II, 535-36.  He hated Casiano, wanted him to die, and was relieved when he was killed.  Vol. VIII, 1766-67.

In addition, there is evidence that he had an additional personal motive to kill Casiano, namely that he was engaged in his own sale of drugs, which meant that a subsequent Casiano robbery of him would impact on his own drug operations.  While he denied having his own drug business, the record suggests otherwise.  He admitted

supplying drugs to "Manny" and Feliciano a few times, and in 1996 had a good amount of money ($2,010 at his apartment, had recently paid $1,700 for new rims for his van, had recently put in bucket seats, had money to spend on several women and to send to his family, and paid $6,000 to Mario Lopez for a stolen motorcycle shortly after the murder). Vol. VIII, 1689-90, 1692-94, 1697-98. He also had access to large quantities of cocaine, had previously been a drug dealer in New York, and had traveled to Colombia to buy heroin. Vol. VIII, 1699-1701, 1709-12. Moreover, Feliciano testified that Berrios was selling cocaine on his own, on the side. Vol. II, 529. The notion that he might be robbed again by this man that he despised, and that this time his own drugs and money would be vulnerable, no doubt increased his desire to eliminate Casiano.

### (3)  Berrios had his own connections to the Bronx crew, which he intentionally concealed

Berrios was more knowledgeable about Ricky Ruiz and his gang of criminals in the Bronx than he was willing to admit to the government. He conceded at trial that he had known Ricky Ruiz for a "couple of years" before the first trip to El Cubano Pizza with Feliciano. Vol. VIII, 1734-35. He conceded that he had withheld his knowledge of Ruiz from the government and the earlier jury in the trial of Tony Perez, where he claimed that Feliciano introduced him to Ruiz. Vol. VIII, 1735-36. In fact, he conceded that he had previously bought drugs from Ruiz, and that he knew that Ruiz was the hub of lots of illegal activity at the pizza shop. Vol. VIII, 1739-40. While he conceded at trial that he had discussed the murder with Ruiz after the fact, he admitted that he told the grand jury that he had never had any conversations with Ruiz about the murder. Vol. VIII, 1755-58. The ties to Ruiz continued after the murder, and included helping Ruiz buy a motorcycle in

Hartford, and assisting him in getting insurance (including providing him with a phony Hartford address).  Vol. VIII, 1744-48.  As with so much of Berrios' withholding of information and false statements, it is logical to ask why it was so important for him to conceal his connections to Ruiz and his criminal den in the Bronx.

### (4) Inconsistencies and contradictions/Lack of corroboration

Berrios testified that shortly after the murder, he placed a call from his cell phone to Wilfredo Perez' cell phone to ask if everything was alright, and that Wilfredo replied: "Everything is all right, don't call me no more."  Vol. VI, 1393.  Yet, at no time did the government produce any phone records which corroborated this alleged call made by Berrios to Wilfredo Perez' cell phone.  Given the resources available to the government to prosecute this case, this absence of corroborative evidence was conspicuous.  *See* United States v. Huerta-Orozco, 272 F.3d 561 (8th Cir. 2001) (affirming grant of new trial motion; noting that there were gaps in government's case which, given the resources available to government in prosecuting the case, were hard to explain; for example, the government failed to produce any phone records which could corroborate its claim about an alleged cell phone call made by defendant).

Similarly, Berrios testified that the night before the murder, he and Feliciano stayed overnight at a Holiday Inn Hotel in New York.[11]  Vol. VIII, 1680-1, 1683.  Again, the government failed to produce any records corroborating this claim (or corroborating Feliciano's contrary claim that they had stayed at a hotel the night **after** the murder).

Similarly, the government was never able to corroborate the claim that the murder

---

[11] This was inconsistent with the testimony of Feliciano, who claimed that he and Berrios stayed at a motel the night *after* the murder. Vol. II, 462.

weapon had been thrown into a pond off the Berlin Turnpike, despite numerous efforts and specific information from both Berrios and Lopez.

### (5)  Adding and Deleting Alleged Participants

In addition to inserting Wilfredo Perez into the conspiracy, Berrios added or subtracted others from the mix as well.  For almost 1 1/2 years of cooperation, Berrios' story never included a third party (whether using the name Pina or in any other way) who came up with Lopez and Fausto Gonzalez from New York on the first trip to Connecticut.  Then, a third party was suddenly added to the story when Berrios testified before the grand jury on November 7, 2001 (details of this addition detailed *infra*, at p. 40).  And, at around the same time he added Francisco Chaparro to the mix, telling Matta on November 1, 2001 that  Chaparro drove to El Cubano with Feliciano and him the first time they picked up the killers and returned to Connecticut.  Vol. VII, 1650-52; Vol. VIII, 1717-18, 1727-32.  Thus, Berrios showed an ability and willingness to add or subtract people from the case, whenever he deemed it to be in his interest.

The government has and will no doubt continue to argue that Berrios had a lot to lose if he lied about Wilfredo's involvement.  There are at least three problems with the government's argument.  The first is that they have no way to independently corroborate Berrios' story about Wil's participation.  Their only evidence of such comes from Berrios himself.  They simply have no way of proving he is lying, so the threat of revoking his cooperation agreement is an empty one.  Second, the government was so tied to its theory of the case that they had no incentive to challenge Berrios' story.  When they had an opportunity to subject Berrios to a polygraph, they passed on that approach, and told Berrios that the "little test about truth" was no longer necessary.  When they received

conclusive evidence from Lopez that Wilfredo wasn't involved in any of the events at the garage that Berrios had talked about, rather than challenge the veracity of Berrios' story, they made a lame attempt to get Lopez to bring Wilfredo back into the picture with a non-identification.  Berrios controlled the terms of the negotiation process, and one of the government's mistakes was letting him know that.  He was able to, without the help of a lawyer, and in a language in which he was not proficient, work out a deal that, given his extensive involvement in Casiano's murder, is absolutely remarkable.  The government had nothing to bargain with, and was forced into a position of giving Berrios everything he wanted in order to get a witness that could corroborate the government's theory of the case.  Finally, the number of demonstrated lies or omissions by Berrios in this case is substantial, and yet the government did file a § 5K1 motion.  So much for the truth-telling requirements of the government's cooperation agreements.

### F. Christopher Matta

Christopher Matta is an agent who was more concerned about developing witnesses that could prove the government's theory of the case than he was in conducting an objective investigation of the murder of Teddy Casiano.  The government will no doubt argue that any charge of witness influencing or tampering is unfounded.  This is because the government adopts a very naive and narrow definition of "witness tampering."  As was evident by the questions it posed to its witnesses, the government's conception of influencing a witness' testimony is limited to explicitly telling the witness what it wants that witness to say.  We all know better.  As the witnesses themselves testified, the negotiation process is one in which explicit and implicit messages are communicated.  A question as simple as: "Was Wilfredo involved in Teddy's murder" is all one needs to hear to know the

nature of the government's investigation, and the target against whom they desired to proceed.

The evaluation of how Matta conducted himself in this investigation starts with his demonstrated willingness to intentionally mislead another court involved in this case. The falsity of Agent Matta's testimony is made indisputable by the record in this case. One need only examine (1) the statements on recorded conversations between Matta and Berrios, (2) the testimony of Matta at this trial, and (3) the testimony of Matta before the federal magistrate judge in Miami to reach the undeniable conclusion that his testimony in Miami was intentionally false and misleading.

**(1) The Phone Calls**

The Court is familiar with the recorded phone calls between Matta and Berrios in May and June of 2000, and they are part of the trial record. Relevant portions of those calls are excerpted and attached to this memorandum as Exhibit A. Those recorded calls establish without ambiguity that Matta and Berrios were having extensive and ongoing discussions regarding what Berrios hoped to get from the government in exchange for his cooperation, and what the government hoped to get from him. Moreover, these calls represent only a small snippet of the contacts between Matta and Berrios. During this time, they were also meeting on several occasions, while at the same time Matta was meeting with A.U.S.A. Ring, and the conversations establish that they were talking about the very same things at these meetings (*e.g.*, discussions about how Matta spoke to "Dave" about what Berrios wants, and he is OK with all of it).

**(2) Testimony of Matta at Trial**

Before Matta was confronted at trial with his sworn statements in Miami, he was

asked and answered a number of questions relating to the nature of his discussions with

Berrios.  Some of those questions and answers are set forth below:

Q.    And once you got those phone call conversations back, though, you realized that
      that had information that was relevant to this case, right?

A.    Yes.

Q.    Information about the discussions between you and Mr. Lopez (sic) about what he
      was hoping to get, correct?

A.    Yes.

....

Q.    And the discussions in terms of what Berrios was hoping to get out of the case,
      right?

A.    And those are the discussions with his mother, is that what your question is?

Q.    Well, with his mother which reflected his discussions with you, right?

A.    Yes.

Vol. X, 2354-55.  While Matta denied that he ever told Berrios that if he cooperated he

would not be charged in connection with the Casiano murder, he conceded that he

discussed what Berrios might get in a "best case" scenario:

Q.    And if he tells the truth about the whole Teddy Casiano murder, that is the truth as
      you believed it to be, sir, then he could hope, hope, to get out of jail sooner on the
      charge he was facing, right?

A.    I did have a discussion with him about a best case scenario.

Q.    And of course that best case scenario does not include within its framework any
      possibility that he would ever be charged for the murder of Teddy Casiano?

A.    Correct.

**(3) Testimony of Matta at Miami Removal Hearing**

On July 9, 2002, about one year after the meetings and recorded calls with Berrios,

Matta testified under oath at a removal hearing involving Raymond Pina, before U.S.

Magistrate Judge John J. O'Sullivan. The government was represented at that hearing by

Attorney Ring. In that hearing, Matta was asked the following questions by the Assistant

Federal Defender appointed to represent Mr. Pina:

Q.    First of all, what is Berrios getting, or what is he hoping to get in exchange for his
      cooperation with law enforcement?

        Mr. Ring:          Objection to the form of the question.

        The Court:         Overruled.

        The Witness:       What is he hoping to get?

        Ms. Barzee:        Right.

        The Witness:       **I haven't talked to him what he is hoping to get.**

By Ms. Barzee:

Q.    What have you told him he might get?

A.    We never make promises.

Q.    I am not asking about promises. What have you told him he might get in exchange
      for his cooperation?

A.    **I have never told him what he might get.**

7/9/02 Removal Hearing Transcript, *U.S. v. Pina*, No. 02-2815-M-DUBE, at 15 (Def. Ex.

 U) (emphasis added).

These answers were patently false, and that reality was not only known to Matta,

but was also abundantly clear to Attorney Ring.   Yet, there was no effort by Attorney Ring

to correct this obvious misstatement.  The Court has heard the tape of this testimony by Matta in Miami, and has heard the Berrios-Matta phone calls quoted in Exhibit A.  It is not possible to reconcile the sworn statements of "I haven't talked to him what he is hoping to get" and "I have never told him what he might get," with "[Ring] said if, if you decide to do the right thing and give us good information ... the best thing that could happen is time served," and all the other conversations in which Matta and Berrios explicitly discussed what he wanted from the government (sentence reduction, relocation, new home for family, etc.).  The record establishes with clarity that both Matta and Attorney Ring were aware of the false and misleading nature of these answers.

While the jury, inexperienced with removal hearings and other proceedings, might not have fully grasped the significance of these false statements, it surely is not lost on the Court.  A removal hearing is most often a routine, somewhat *pro forma* proceeding, and it would be unusual in the extreme for the government to ever lose such a hearing.  Quite simply, the lies told here were absolutely unnecessary to reach the desired result.  That fact speaks volumes about the lengths to which Matta was willing to go to achieve the goal here (protection of his cooperators and conviction of Wilfredo Perez), and the silence of the lead prosecutor strongly suggests the absence of internal controls.  If Matta was willing to go to this length in a public judicial hearing in this case, what is the likelihood that he felt any constraints when meeting with witnesses on his own, where nothing was recorded and the only "paper trail" (if any existed at all) would be his own notes?

Matta lied to the Florida magistrate judge, and then compounded that lie by denying that he had done so at this trial.  His explanation was entirely unconvincing, and as in most cases, the cover up only makes the initial lie worse.  Once again, the prosecutor not only

-36-

failed to correct the lies, but actively sought by his questioning to convince the jury that

Matta had not lied.  It is the well-established law in this circuit that where a prosecutor

"knew or should have known of the perjury, the conviction must be set aside 'if there is any

reasonable likelihood that the false testimony could have affected the judgment of the

jury.'" *United States v. Wallach*, 935 F.2d 445, 456 (2nd Cir. 1991).  While concededly

*Wallach* is not perfectly analogous to the facts in this case, the below statement of the

Second Circuit applies here:

> [I]nstead of proceeding with great caution, the government set out on its redirect examination to rehabilitate Guariglia and elicited his rather dubious explanation of what had happened. Defendants placed before the government and the court powerful evidence that Guariglia was lying... We fear that given the importance of Guariglia's testimony to the case, the prosecutors may have consciously avoided recognizing the obvious -- that is, that Guariglia was not telling the truth.
>
> Guariglia was the centerpiece of the government's case. Had it been brought to the attention of the jury that Guariglia was lying after he had purportedly undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury. It was one thing for the jury to learn that Guariglia had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie. While the jury was instructed that Moreno was an acknowledged perjurer whose testimony should be weighed carefully, no such instruction was given relative to Guariglia's testimony. Accordingly, because we are convinced that the government should have known that Guariglia was committing perjury, all the convictions must be reversed.

*Wallach*, 935 F.2d at 457.  While Matta as the case agent did not play the same central

role that Guariglia did in the *Wallach* case, his role was nevertheless crucial here.  He sat

in the courtroom with the prosecutors throughout the case, and he spent hundreds of hours

with the three main cooperators, as well as with several other witnesses.  He was the

central link between all of these witnesses, and the system necessarily relies on him, as

a case agent, to be objective, appropriately detached from the cooperators, seeking the truth, and telling the truth.  His failures in these areas infected this trial.

While much of what Matta said or did in this investigation will never be known, the snippets we do have (summarized below) reinforce the conclusion that his willingness to lead witnesses to get them to support the government's theory knew virtually no bounds.

**(1) The "Courtship" of Berrios**

The record makes it clear that the government waited until Berrios was unrepresented by counsel before he was again returned to Connecticut in 2000.  Berrios was told that no lawyer would be with him in the grand jury room, and that he could not assert a Fifth Amendment privilege.  Vol X, 2321-23.  Matta had testified earlier before this Court that when Berrios told him he wanted a lawyer at the initial meeting, he stopped questioning him, and a lawyer was appointed to represent him at the next meeting.  At trial, however, Matta conceded that no lawyer was provided at any of the meetings on May 16, 2000, May 22, 2000, May 30, 2000, June 13, 2000, and September 22, 2000; it was only after all those meetings that counsel was finally appointed.  Vol. X, 2365-68.

The substance of much of Matta's contact with Berrios will never be fully known. Matta never recorded any of the meetings he had with Berrios (an intentional decision by Matta and the DEA), Vol. X, 2361-63; never made substantive notes of any of the calls he received from Berrios or any of the other cooperators (so there are no records at all with respect to the numerous calls not recorded and preserved), Vol. X, 2358-60, Vol. XI, 2396; failed to write separate reports of many of the meetings he had with Berrios, opting instead for "composite reports," an approach he uses with cooperators, in part because they aren't always truthful from the start, Vol. XI, 2399-2402; and with respect to some of the meetings

-38-

for which no report was written, had notes that were so "sketchy" that they were incomprehensible to him, Vol. X, 2338-40, Vol. XI, 2402-3.[12]

A number of the few recorded calls show that Matta quite clearly advised Berrios that he was in the driver's seat in this investigation.  For example, on May 19, 2000 Matta told Berrios that he was their "last hope," and that he could "save us a lot of work."[13] Vol. VII, 1573.  The day after Berrios for the first time told the government a story that involved Wilfredo Perez in the Casiano murder, Matta told him that Attorney Ring had decided that there was no need for a lie detector test now.  Vol. VII, 1583-85.  On May 25, 2000, Matta told Berrios that nothing could be done without him and they had no evidence without him. Vol. VII, 1598-99.  When efforts to corroborate Berrios' story were unsuccessful, Berrios advised Matta that it is not important.  Apparently, Matta and the prosecutors agreed.

**(2) Manipulation of Stories of Cooperators**

At least three examples of the willingness of Matta to push cooperating witnesses in a certain direction are clear in this record.  When Berrios told him in a recorded conversation that "Blondie" (Francis Chaparro) was there on the day of the murder and began to explain, Matta told Berrios "That's not the story you told us."  Vol. X, 2315-16. When Matta, accompanied by A.U.S.A. Ring and A.U.S.A. Chen, showed photo arrays to Mario Lopez, he first showed him an array including Wilfredo Perez, even though Lopez'

---

[12]  These same deficiencies are also applicable to Matta's contact with the other witnesses.  Vol XI, 2403-4.

[13]  This was also the conversation where Matta told Berrios that if he gave the government "good information," the best he could do was credit for time served.  Berrios clearly understood what "good information," as opposed to "tell us the truth," meant.  Vol. VII, 1568-69.

description of the owner (8 years older than him (40ish), a little taller than Lopez, owned Grand National) did not match Wilfredo.  When Lopez did not identify Wilfredo as the "owner" he saw and met, as Matta had hoped, he had him circle Wilfredo's photo anyway, on the purported basis that Lopez thought that photo looked like, but was not, Fat Jay. When Lopez instead positively identified Tony Perez in the next photo lineup as the owner, Matta then put the lineup with Wilfredo Perez back in front of Lopez.  Vol. X, 2348-52. Finally, despite the denials, it is clear that Matta confronted Berrios about the involvement of a third person (Raymond Pina) after Lopez had put him in the mix.  During all his countless meetings and phone conversations with Matta prior to November 2001, Berrios never mentioned any third party who traveled to Connecticut with them the day before the murder.  Vol. VII, 1634-39; Vol X, 2311.  Suddenly, after 1 1/2 years of cooperation and after Lopez had by then repeatedly discussed the involvement of Pina, Berrios told the grand jury on November 7, 2001 of the participation of the previously non-existent third party.  This appearance occurred one week after the first time Matta met with Berrios since he had conducted numerous sessions with Lopez.  Vol. VII, 1638-40.  The only reasonable conclusion about this is that Matta confronted Berrios with Lopez' version, and thereafter, the third person was inserted into Berrios' story.  The notion that Berrios suddenly "remembered" the presence of a third party at that particular time is fanciful.

The dangers of government reliance on cooperators is hardly a new concern in the criminal justice system.  As noted by the Hon. Stephen S. Trott, a former federal prosecutor now a Judge on the Ninth Circuit, "[c]riminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law."  Trott, "Words of Warning for Prosecutors Using Criminals as Witnesses," 47

Hastings Law Journal 1381, 1383 (1996). Virtually every "rule of thumb" Judge Trott suggests for the government's use of cooperating participants was violated in this case. They include the following:

(1) Use Little Fish (Id. at 1292) - While it can be argued that Berrios was a "smaller fish" in the earlier drug case, there was no bigger fish in the Casiano murder. He found and recruited the killers, planned the murder, transported the killers back and forth both before and after the murder, decided to get rid of the gun, and was involved in every part of the murder scheme. Vol. VIII, 1768-72.

(2) Drive a Hard Deal (Id.) - It is hard to imagine a better deal than the one given to Berrios. For cooperating and telling the government about this murder (and his central role), not only was he not prosecuted at all, but he was offered (and ultimately received) a reduction of his pre-existing narcotics sentence to a sentence of credit for time served.

(3) Stay in Control (Id. at 1393) - As Trott notes, "You must always be in control, not the witness! The moment that you sense that the witness is dictating terms and seizing control of the situation, you are in very deep trouble and you must reverse what has happened." The tapes here provide a unique view into the underbelly of this case, and provide a clear picture of a cooperator who is controlling the case, knows he is in control, and is repeatedly told he is in control.

(4) Keep Your Distance from the Witness (Id. at 1396) - One need only review the tape recordings in this case to develop a clear sense of the extent to which this rule was violated, time and time again.

## CONCLUSION

It is the lack of reliability of cooperators that has led some to conclude that no death penalty prosecutions should be permitted in cases where the government's evidence rests upon the uncorroborated testimony of a cooperator.[14]   Those concerns are multiplied exponentially here, where there is not only no physical or forensic evidence to corroborate the cooperator's stories regarding the involvement of Wilfredo Perez, but there is no corroboration of any kind, such as phone records.   Moreover, as detailed above, the handler for the three principle cooperators, as well as the prosecutor, were so blinded by their desire to prove a case against Wilfredo Perez that they ignored conflicting evidence, tailored the testimony of the witnesses to fit their theory, disregarded the demonstrable falsity of numerous statements of the cooperators, and in regard to the case agent, testified falsely before a judge involved in this case.   All of this was done in a case where adding Wilfredo Perez to the story was incredibly easy.   All that was added was that whatever was done, Wilfredo ordered it, or paid for it.

The government's case here was built upon the earlier drug conviction, for which

---

[14]  In Illinois, the Governor's Commission on Capital Punishment recommended that capital punishment be prohibited in cases where the conviction "is based  solely upon the testimony of a single eyewitness, or of an in-custody informant, or of an uncorroborated accomplice." (http://www.idoc.state.il.us/ccp/ccp/reports ).  Numerous other studies and reports suggest that reliance upon cooperating witnesses, in the absence of corroborating physical or forensic evidence, is insufficient to support a death penalty verdict.  *See*, *e.g.*, Report by Governor's Council on Capital Punishment (Massachusetts) (http://www.mass.gov/Agov2/docs/5-3-04%20MassDPReportFinal) (recommending the requirement that in all capital cases, there exist "conclusive physical evidence" before the death penalty can be imposed).   These and other studies reflect the same conclusion; reliance upon evidence from cooperating witnesses is extremely risky, and has in the past and will continue in the future to lead to unreliable and erroneous convictions.

Mr. Perez was already serving a 22 year sentence.  The "easy" story was that Wilfredo was the leader of the drug organization, the organization collectively (and Wilfredo personally) possessed numerous weapons, Casiano robbed the organization, and so Wilfredo ordered the hit.  The reality, however, was different.  Sadly, the jury here appears to have focused more on the guns (unconnected to the Casiano murder) introduced at trial and paraded before the jury in closing, and the simple logic that the leader of the drug organization "must" have ordered the hit, than all of the evidence that supports the reality that Wilfredo Perez was not involved in this murder conspiracy.

This case has already taken an enormous amount of the Court's time and resources.  It would be easy to conclude that three juries can't be wrong, and it is time to put this entire case to rest.  The fact is, however, that there was only one trial of Wilfredo Perez, and the evidence was presented to a death-qualified jury in a case that never should have been prosecuted as a death penalty case.  There are so many gaps in that evidence, so many demonstrable untruths told, and such a lack of reliability that this is one of those extraordinary cases where a miscarriage of justice has occurred.  Mr. Perez now

faces a mandatory life sentence as a result of that miscarriage. The Court has the power

to set aside the verdict, and order a new trial. It might be the more difficult path, but it is

the correct path.

Respectfully submitted,

THE DEFENDANT,
WILFREDO PEREZ


/s/
April 29, 2005                        Richard A. Reeve
                                      George G. Kouros
                                      Michael O. Sheehan
                                      Sheehan & Reeve
                                      139 Orange Street, Suite 301
                                      New Haven, CT 06510
                                      Federal Bar No. ct05084
                                      (203)787-9026
                                      (203) 787-9031 (fax)
                                      rareeve51@snet.net


## CERTIFICATE OF SERVICE

I hereby certify that copies of the DEFENDANT'S MEMORANDUM IN SUPPORT
OF MOTION FOR NEW TRIAL have been sent by first class mail, postage prepaid, to the
following counsel of record as listed below, this 29th day of April, 2005:

David Ring, Esq.                      William T. Koch, Jr.
David Vatti, Esq.                     151 Brush Hill Rd.
Assistant U.S. Attorneys              Lyme, CT 06371
PO Box 1824
New Haven, CT 06508


/s/
Richard A. Reeve