UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA           Criminal No. 3:02CR007(JBA)

v.

WILFREDO PEREZ,
      aka "Wil" and "Wilfred"           May 18, 2005

### UNITED STATES' RESPONSE TO DEFENDANT WILFREDO PEREZ'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR NEW TRIAL

#### Introduction

The defendant moves this Court to grant him a new trial because, he claims, his "trial [was] fundamentally unfair." Def. Mem. at 3. In pressing his pleas of unfairness, the defendant does not allege *any* legal error at trial. Nor does he allege *any* tactical miscues. Nor does he point to *any* new evidence or information that suggests that his trial was unfair. Rather, the defendant simply restates the same closing argument that he made to the jury, and implores the Court to find that the cooperating witnesses' testimony was so incredible that no rational jury could have, or should have, believed it. In making this argument, however, the defendant ignores the fact that the jury in his case deliberated long and hard before finding him guilty of four of the five charges, and that a total of *three* separate juries necessarily found the cooperators to be credible.[1]

Because the defendant provides no compelling reason for the Court to usurp the jury's role or to contradict the credibility findings that were made by all three juries that

---

[1] This Court, too, found Ollie Berrios' testimony to be credible when the Court reduced Berrios' drug-sentence to a period of time-served, and in doing so concluded that Berrios' testimony had been "forthcoming and truthful."

have considered this case, the defendant's request that a *fourth* jury be impaneled to re-assess the cooperators' testimony should be denied.

## Legal Standard

It is well-settled that motions for new trial are "not favored" and should be granted "only in the most extraordinary circumstances." United States v. Diaz, 176 F.3d 52, 106 (2d Cir. 1999); United States v. Spencer, 4 F.3d 115, 118 (2d Cir. 1993); see United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) ("discretion [to grant new trial] should be exercised sparingly"); United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958) ("motions for new trials are not favored and should be granted only with great caution").

While this Court is permitted under Rule 33 to weigh the evidence for itself and to evaluate the credibility of the witnesses, the jury's conclusions are entitled to considerable deference. Sanchez, 969 F.2d at 1413-14 ("It has long been our rule that trial courts 'must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.'") (quoting United States v. LeRoy, 687 F.2d 610, 616 (2d Cir. 1982)); United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001) ("the courts generally must defer to the jury's resolution of conflicting evidence"). It is only where "exceptional circumstances can be demonstrated" – such as where "testimony is patently incredible or defies physical realities" – "that the trial judge may intrude upon the jury function of credibility assessment." Sanchez, 969 F.2d at 1414.

At bottom, "the test is whether it would be a manifest injustice to let the guilty verdict stand." Sanchez, 969 F.2d at 1414 (internal quotations omitted); accord Ferguson,

246 F.3d at 133-34. "There must be a real concern that an innocent person may have been convicted." Sanchez, 969 F.2d at 1414.

## Discussion

The main thrust of the defendant's argument is that Ollie Berrios' testimony was incredible, and that Berrios' testimony was not corroborated in any significant manner by the other trial witnesses. This argument, however, is not supported by the facts of the case.

There is no dispute that Berrios hated Casiano and wanted to retaliate against him immediately after Casiano, Fernando Colon, and other Savage Nomads kidnapped Berrios in late 1995. Yet, the evidence is clear that Berrios did *nothing* to retaliate against Casiano for months and months after the kidnapping, precisely because Wilfredo Perez – the head of the drug operation to which Berrios belonged – refused to allow Berrios to do so. And, the evidence showed that Berrios and others moved forward against Casiano only *after* Fernando Colon (whose loyalty Wilfredo Perez began to purchase soon after the kidnapping) told Wilfredo Perez that Casiano planned on robbing the Perezes once again.

Similarly, there is no dispute that three main cooperating witnesses (Berrios, Lopez and Feliciano) have different recollections of the events surrounding Casiano's murder. Yet, it is only to be expected that different persons would perceive events differently at the moment when the events were occurring, and that, over the ensuing years, such persons' memories would fade in slightly different ways. While the defendant goes to great lengths to explore each and every one of these differences, he ignores the fact that the main cooperators' testimony differed little in regard to the core events relating to Wilfredo

Perez's involvement in Casiano's murder. These witnesses testified that: the murder-for-hire conspiracy reached a critical point only after Wilfredo Perez told Berrios that the Nomads intended to rob them again (Berrios, Vol. VI, 1367-68, 1397; Feliciano, Vol. II, 430-31); Berrios sought approval from Wilfredo Perez before making any move regarding the killing (Berrios, Vol. VI, 1367-68; Feliciano, Vol. II, 426-27); the killing was finally ordered because Casiano was extorting Wilfredo Perez (the "owner") and Casiano wanted a bigger "cut" than he deserved (Vol. IV, 962-63); the killers went to the "pool room" at Perez Auto to plan and prepare for the murder (the same room used when Fernando Colon told the Perezes of Casiano's impending robbery) (Berrios, Vol. VI, 1377; Feliciano, Vol. II, 443; Lopez, Vol. IV, 946); the conspirators met with Wilfredo Perez (the "owner") each time they arrived at the garage (Berrios, Vol. VI, 1375-77, 1383; Feliciano, Vol. II, 445; Lopez, Vol. IV, 948-49, 964-65); the killers operated in the open at Perez Auto and made no effort to conceal themselves (Berrios, Vol. VI, 1380-81; Feliciano, Vol. II, 445-46; Lopez, Vol. IV, 957-58);[2] Wilfredo and Tony Perez sought to lure Casiano to the scene (Berrios, Vol. VI, 1378, 1383; Feliciano, Vol. II, 449; Lopez, Vol. IV, 958, 960-61, 965, Vol V, 1209-10); Wilfredo Perez (the "owner") informed the killers that Casiano was on the way (Berrios, Vol. VI, 1387; Lopez, Vol. IV, 966); Wilfredo Perez (the "owner") discussed where the murder would occur and said he did not want it done directly in front of the garage (Berrios, Vol. VI, 1379; Lopez, Vol. IV, 958-59, and Vol. V, 1209); Wilfredo Perez (the "owner") paid for the murder in cash

---

[2] Gonzalo Morillo also testified that, on the day of the murder, Berrios and two others were standing beside a bright green racing motorcycle, right in front of the garage. Vol. X, 2262.

(Berrios, Vol. VI, 1391; Feliciano, Vol. II, 453-54; Lopez, Vol. IV, 966); and Perez instructed Berrios to pay the killers only after the job was done (Berrios, Vol. VI, 1391; Lopez, Vol. IV, 966).

The defendant attempts to make much hay out of the fact that Mario Lopez identified *Tony Perez* as the "owner," based on his photospread identification. This argument, however, overlooks several basic facts: (1) Wilfredo Perez was, in fact, the actual owner of the garage, and the person Lopez met was introduced as "the owner" (Lopez, Vol. IV, 948-49); (2) the persons who knew the difference between Wilfredo Perez and Tony Perez (Berrios and Feliciano) both attributed almost all of the significant actions of Lopez's "owner" (as detailed above) to the person they knew to be Wilfredo Perez; (3) other government witnesses (Fernando Colon and Raul Filigrana) confirmed that *both* Perezes were present at critical junctures leading up to the murder, and that Wilfredo Perez was the one who did the talking during these encounters (Colon, Vol., IX, 1961-63; Filigrana, Vol. IX, 2119-24) (4) the defendant's own sister-in-law (Vivian Perez) testified that Wilfredo Perez and several others met with Casiano after he was lured to the garage for the murder (Vol. XI, 2433-34),³ that Wilfredo Perez was the one who gave Casiano money (Vol. XI, 2434, 2452), and that Wilfredo Perez was the one who went to get money after Casiano arrived (Vol. XI, 2452); and (5) Mario Lopez picked *the defendant's* photo from a photospread containing eight different photos and explained that the defendant's face –

---

³ Lopez said he saw the "owner" meeting with the victim (Vol. IV, 967-68), and Berrios testified that *both* Wilfredo and Tony Perez were there (Vol. VI, 1388).

unlike all the others – "looked familiar" to him (Lopez, Vol. IV, 953-54; Vol. V, 1204). These facts, when combined with Berrios and Feliciano's testimony, show that Lopez combined the two Perez brothers in his memory, and that nearly all of the significant acts committed by Lopez's "owner" are attributable to Wilfredo Perez.

The defendant's effort to discredit Berrios' testimony would have been made much easier if Mario Lopez had not remembered the "owner's" critical involvement in the murder-for-hire scheme. This is so for two reasons. First, Lopez's testimony completely undermined one of the central tenets of the defendant's motion for a new trial (as well as his argument to the jury): that Ollie Berrios perpetrated an enormous scam on the government by saying "Wilfredo told me to do it" in regard to each action that he (Berrios) took. *See* Def. Mem. at 2; *see also id.* at 28-29 (arguing that Berrios acted on his own because of his hatred of Casiano as well as Casiano's threat to Berrios' own drug trade).[4] As can be seen from the defendant's own legal memorandum, his argument completely breaks down in the face of Lopez's testimony, and causes the defense to concede that Tony Perez must have been involved in the murder. *See id.* at 6-10; *see also id.* at 9 ("Here, every material characteristic that Lopez identified as the "owner" is demonstrably a reference to Tony Perez."); *id.* ("There is simply no good explanation for the contradiction between Lopez' and Berrios' testimony about Wilfredo Perez' alleged involvement in the murder plot other than that one of them is not telling the truth."). Thus, while on the one hand the defendant

---

[4] The defendant's argument on this point was also severely damaged by Maritza Alvarez's testimony about Tony Perez's call to her home, in which Perez sought to lure Casiano to the garage.

claims that Berrios, alone, was the evil genius behind Casiano's murder, on the other hand the defendant must concede that Tony Perez, too, was involved in the murder. And this creates an irreconcilable conflict for the defendant: how is it possible that Ollie Berrios could have secretly enlisted Tony Perez – the defendant's drug dependent, underling brother – in "Berrios'" murder scheme; and how would Berrios and Tony Perez have dared to carry out this scheme at Perez Auto, right under the defendant's nose, if the defendant was not involved as well?

The second insurmountable problem for the defendant caused by Lopez's testimony relates to another central tenet of the defendant's case (which he seems to have abandoned since the trial): that the cooperators somehow colluded in order to get their "stories" together. If nothing else, Mario Lopez proved at trial that he is highly motivated by his own self-interest. Similarly, more than anyone else, Lopez had significant information about numerous murders that he could use to seek a sentence reduction. Simply put, Lopez had the most to gain by cooperating about various crimes of which he actually knew, and he had the most to lose by testifying falsely to help the person who had implicated him in Casiano's murder, Ollie Berrios. Under these circumstances, it is nearly impossible to imagine that Lopez would have subscribed to a false version of events for the purpose of helping Berrios, who Lopez barely knew. Of utmost significance, the defense makes no claim – nor can they – that Lopez's description of the "owner's" actions developed in any significant manner over time. At the time when Lopez first spoke to the government, only Berrios had provided specific information about Wilfredo Perez's role

in the murder. Had Lopez told a version of events that did not include the "owner" of the garage, things may have developed much differently that they did. But, from the very start, Lopez inculpated the "owner" in the murder, and thus his testimony refutes any claim that Ollie Berrios led the government down a primrose path.

The defendant's inability to press the claim that Berrios simply added Wilfredo Perez to the "story" as an expedient afterthought, as well as his inability to convincingly argue that Berrios was manipulating other witnesses, has left the defendant with only one choice other than to accept the truth of the jury's guilty verdicts: the government must be to blame for his convictions. The defendant's "evil government" theory, however, is as defective as his theory that Ollie Berrios was an "evil genius," orchestrating the government's every move. This is true for the following five reasons.

*First*, the defendant in this case received the benefit of unprecedented discovery: he received access to the government's handwritten notes (including those of the prosecutor); he received tapes of recorded prison calls with Berrios (which were disclosed and transcribed by the government at the very beginning of the discovery process); he received transcripts of all grand jury witnesses (based on the government's motion for such disclosure, even though much of the testimony did not fall within the ambit of Jencks or *Brady*); and he received near-limitless discovery by means of Rule 17(c) subpoenas. Yet, after scouring all of this information, the defendant does not even claim that Berrios' statements about Wilfredo Perez changed or improved over time, or that Lopez and Feliciano's trial testimony about Wilfredo Perez (or, the "owner") differed in any

significant way from the statements they gave to the government right out of the gates – even before they entered cooperation agreements with the government.

*Second*, as noted above (*see infra* at 3-5), there was significant overlap in the testimony of the three main cooperators in regard to Wilfredo Perez's (or the "owner's") involvement in Casiano's murder. This overlap cannot be explained by "subtle hints" being dropped by the government in its initial proffer sessions. Thus, for his claim of misconduct to succeed, the defendant must show that the government was explicitly telling its witnesses (or its potential witnesses) what to say. Yet none of the recorded tapes nor any of the other materials supports such a claim. Indeed, there has been no suggestion from any of the defense attorneys who represented Lopez and Feliciano during these proffers – and who attended these proffers – that such improprieties occurred. *See* Connecticut Rule of Professional Conduct 8.3 (obligation to report misconduct). Simply put, there is absolutely no support for the defendant's implicit claim that the government was putting words into its witnesses' mouths.

*Third*, while the defendant points to several examples of how the cooperating witnesses' statements changed in some ways over the years, such changes must be viewed in the overall context of what did *not* happen: the glaring inconsistencies in the witnesses' testimony (such as Lopez's reference to a single "owner," and Feliciano's recollection of returning to Hartford with the killers on only one day) were never "eliminated" from the witnesses' testimony. In addition, the government dutifully recorded these inconsistencies in their notes and reports. It strains credulity to think that the government would have

gone so far as to have told its witnesses specific details about what to say in regards to Wilfredo Perez from the time of their first interviews (and before they even agreed to cooperate), but by the same token would have allowed the witnesses to provide such contradictory information.

*Fourth*, in making his claim of abuse, the defendant completely ignores the lengths to which the government went in order to maintain the integrity of the cooperators' testimony. For example, the defendant overlooks the fact that Mario Lopez was never even told who the person was who was on trial. Vol. V, 1204-05. Nor was he ever told the names of the persons whose photos he had identified. *Id.* at 1205. Thus, Lopez had no idea whatsoever that the government was (and had been) arguing that two Perez brothers were involved in the murder, or that Wilfredo Perez (not Tony) was the "owner" who handed the money to Berrios. Likewise, Feliciano had no idea what the other witnesses had said (or had not said) regarding his trips to Connecticut or events at Perez Auto after the murder. Vol. III, 600. In short, not only is there an absence of evidence showing that the government manipulated its witnesses' testimony, but there is an abundance of testimony showing that the government did the exact opposite, that is, it took great pains to insulate each of the witnesses from the others' testimony.

*Fifth*, the defendant tries to leverage great weight from the tapes and testimony involving Special Agent Chris Matta. For example, the defendant places huge emphasis on the fact that, on one occasion, Agent Matta told Berrios "That's not the story you told us," when Berrios' suddenly and surprisingly asserted that Francis Chaparro ("Blondie")

-10-

was "there." Likewise, the defendant attempts to contrive an elaborate government conspiracy based on Agent Matta's testimony at a probable cause hearing in Florida. A close examination of each of these events, however, reveals the true weakness of the defendant's argument.

In regard to the "Blondie" tape, the defendant offered the following transcript clip at trial:

| | |
|---|---|
| Berrios | But the Blondie is easy for me |
| Matta | Yeah but, you know, the Blondie wasn't there |
| Berrios | What you mean, that day? |
| Matta | Yeah. |
| Berrios | Yeah! |
| *Matta* | *That's not the story you told us.* |
| Berrios | No, she's there, when, when, come on, she's over there, she know, you know she work in a (talk over each other) |
| Matta | It comes down to like really putting the nail in the coffin |
| Berrios | The what? |
| Matta | Really putting the nail in the coffin, hitting the home run, I mean we need Jay's girlfriend [Jay]. |
| Berrios | I know. We need the Blondie and the other girlfriend |
| Matta | Yeah but we need, you know… yeah but the most important person is |
| Berrios | Yeah, yeah, yeah I know… Jessica [Jay]. |

Defense "Clip Two" (Berrios Call Number 6NOG10X7, 6/23/00) (emphasis added). When hearing the tape, it is obvious that Agent Matta expressed surprise when he was told that "Blondie" was "there" that day. It also should be clear that Matta did *not* tell Berrios "that's not your story" (*i.e.*, that's not what you're *supposed* to say) as the defendant seems to imply, but that he simply stated: "That's not the story you told us" (*i.e.*, that's not what you said before). Nonetheless, despite the plain language of the transcript and the telling inflections of the voices on the on the tape, the defendant would have the Court conclude that this recording is "clear" proof that Agent Matta was "push[ing] cooperating witnesses in a certain direction." Def. Mem. at 39.

In regard to the probable cause hearing in Florida, Agent Matta provided the following testimony:

> Q First of all, what is Berrios getting, or what is he hoping to get in exchange for his cooperation with law enforcement?
>
> Ring Objection to the form of the question
>
> Court Overruled
>
> A What is he hoping to get?
>
> Q Right.
>
> A I haven't talked to him about what he is hoping to get.
>
> Q Have you told him what he might get?
>
> A We never make promises.
>
> Q I'm not asking about promises. What have you told him he might get in exchange for his cooperation?

-12-

  A  I have never told him what he might get.

Def. Ex. U. This testimony is by no means a model of clarity. While the questioner appears to be asking about what Berrios had been told regarding his possible sentence, Agent Matta appears to be speaking about whether Berrios was told what sentence he would receive. While the defense argues that Agent Matta's answers to these questions demonstrate premeditated perjury as well as proof of an overarching Government conspiracy, it would more readily appear that this squib of transcript proves nothing more than Agent Matta's ability to become confused while on the witness stand.

It is simply remarkable to observe the enormous mountain that defense counsel has sought to make out of the mole hill of Agent Matta's Florida testimony. At the time when Agent Matta was testifying in Florida, defense counsel in this case already had been provided with a copy of Berrios' cooperation agreement. That agreement plainly stated: "It is expressly understood that the sentence to be imposed on the defendant remains within the sole discretion of the sentencing Court, *and that the Court may impose any sentence as a result of the defendant's cooperation including a sentence of time served.*" Gov. Ex. 88, at 2 (emphasis added). Undeterred by the practical insignificance of Agent Matta's slip-up, the defendant attempts to use this *insignificance* as proof of the testimony's *significance*. According to the defendant: "[Agent Matta's] lies were so unnecessary that they underscore the absolute willingness of the case agent to 'protect' his cooperators at any cost." Def. Mem. at 3. Said simply, the defendant is arguing that Agent Matta's supposed perjury was *so insignificant* that it *must be significant*. Despite the cleverness of this

-13-

argument, it would more readily appear that Agent Matta's insignificant miscue is just what it appears to be – an insignificant miscue.

The defendant's absolutist and unforgiving view of Agent Matta's testimony is inconsistent with the reality that trials and testimony are constantly riddled with small foibles and innocent mistakes. Behind every mistaken statement of fact does not lie a pernicious motive or prosecutable offense. The best way to make this point is to turn to the defendant's own legal memorandum, filed in support of his motion for a new trial. The following two examples should suffice for purposes of illustration:[5]

*Example One.* In discussing (and attempting to dismiss) Raul Filigrana's trial testimony, the defense makes the following factual assertion: "Filigrana's testimony about both the Pope Park incident and the alleged threat made by Wilfredo Perez in the basement are highly suspect, *given the fact it was about eight years into Filigrana's cooperation with the government before he ever mentioned either of these alleged events.* Vol. X, 2216-18." Def. Mem. at 21 (emphasis added). Yet, the citation provided by the defendant only backs up one-half of this assertion: that Filigrana did not mention *the Pope Park incident* for eight years. And, as the defendant well knows from the extensive discovery materials, Filigrana (who was

---

[5] These two examples do not represent an exhaustive list of factual errors that appear in the defendant's memorandum. Nor are they the only examples to arise in this case. As the Court may recall, the defendant leveraged a severance of his case from Gonzalez's by making the emphatic representation that he absolutely needed to, and he would, impeach Fausto Gonzalez's out-of-court statements as if Gonzalez had testified at trial(including by introducing evidence of Gonzalez's criminal record), and that he would offer proof that Lopez had once blamed a murder committed by Gonzalez on Raymond Piña for the purpose of diverting police attention. Of course, none of these factual representations turned out to be true.

arrested in October 1995), provided information about Wilfredo Perez's threats to kill Casiano in October 1996, and *testified* in U.S. District Court about these threats in December 1997, at Wilfredo Perez's sentencing hearing. Indeed, the fact that defense counsel knew of these facts is clearly revealed in a sidebar colloquy that occurred during the defendant's trial, and in which defense counsel objected to the government seeking (on redirect examination) to elicit the date on which Filigrana actually provided the government with information about the defendant's threats:

Reeve: I was very, very careful to take Mr. Filigrana through all of the statements *before he made any statement about this.* What the government is doing and what they know they're doing is trying to elicit a subsequent prior consistent statement which they are not permitted to do, and they know it.

\*    \*    \*

There were no questions about that at all, it's clear, and the parties agree that he didn't say anything *up through the time I asked him.* . . .

\*    \*    \*

Sheehan: Your Honor, I think the issue is this: *What we've shown is that up through August, I believe, it was of 1996 –* . . .
*in these meetings, that among the things focused on the Perez organization, he never said anything about threats.* . . . If their purpose is to say, which I think would be wrong, I think, or incorrect, that in September of 1996 did you tell the government about . . . About this, then that would b[e] incorrect.

Vol. X, 2233-34, 2235-36 (emphasis added). Quite plainly, defense counsel knew that, after August 1996, Filigrana provided information about Wilfredo Perez's threats to the government. Indeed, this is the very information that they strenuously sought to keep

-15-

from the jury at trial. But, nevertheless, it happened that defense counsel – presumably working together and with all the necessary information in print before them – simply got it wrong when reporting these facts to the Court.

*Example Two.* In attempting to substantiate the claim that Agent Matta was "willing to push cooperating witnesses in a certain direction" (Def. Mem. at 39), the defense describes the photospread process involving Lopez: "When Lopez did not identify Wilfredo as the "owner" he saw and met, as Matta had hoped, he [Matta] had him [Lopez] circle Wilfredo's photo anyway, *on the purported basis that Lopez thought that photo looked like, but was not, Fat Jay.*" *Id.* at 40 (emphasis added) (after subsequent sentence, citing Vol. X, 2348-52). This factual explanation of why Matta asked Lopez to circle Wilfredo Perez's photo is patently false, and plainly contradicted by the record cited by the defendant. Contrary to the defendant's claim, Agent Matta's testimony during cross-examination proceeded as follows:

> Q   And he didn't, right [identify Wilfredo as the "owner"]?
>
> A   He didn't identify him as the owner.
>
> Q   He identified him as someone who looked like Fat Jay, right?
>
> A   *Yes, he said he looked familiar.* He looked like Fat Jay, but he knew it wasn't Fat Jay.
>
>      \*   \*   \*
>
> Q   So what you did then, sir, you told him to circle it?
>
> A   Well, I think – yes, at some point I did tell him to circle it.

> Q    And the purpose of telling him to circle it was to emphasize it in his mind, right?
>
> A    It was for ID purposes, so that's what I told him to do.
>
> Q    He's ID'd him as someone who looks like Fat Jay, right?
>
> A    *And he looks familiar to him.*

Vol. X, 2351-52 (emphasis added).[6] As this excerpt shows, Agent Matta did not have Lopez circle the defendant's photo because Lopez said the person looked like "Fat Jay," but because Lopez also said the person looked familiar. Surely, in preparing their memorandum – and in citing to the exact pages on which the above-colloquy occurred – defense counsel had every reason to know that the facts represented in their brief were wrong. But, again, a mistake occurred.

There is no claim that defense counsel are attempting to hoodwink the Court or intentionally provide false information. Yet, as the above examples make clear, *mistakes happen.* This is true even where multiple persons are checking each other's work, where the underlying facts are readily available (and actually reviewed), and where no time constraint exists in the preparation of the factual assertions. By the same token, the fact that Agent Matta fumbled when answering a few questions on cross-examination does not prove that he committed perjury, or that he was on some berserker charge attempting to protect Berrios on all fronts, no matter how meaningless they were. Rather, Agent Matta's

---

[6] Mario Lopez likewise testified that he identified Wilfredo Perez's photo as being that of someone who looked familiar to him, and who looked like "Fat Jay" but was not. Vol. IV, 953-54; Vol. 5, 1204.

-17-

testimony reflects the reality that people sometimes get confused, and that they sometimes fumble the facts with no evil intent in mind – particularly under the tight constraints of cross-examination.

In the end, the United States provided substantial evidence of Wilfredo Perez's involvement in the murder conspiracy. In addition to the cooperating witnesses discussed above, the government also introduced the testimony of Fernando Colon, who explained how Wilfredo Perez coopted Colon soon after the first robbery, and how Perez vowed to "do something" when Colon revealed Casiano's intent to rob him again. Vol. IX, 1962-63. Also, Raul Filigrana explained that, soon after the first kidnapping, Wilfredo Perez vowed to kill Casiano when the time became right. Vol. IX, 2121-24. And, Maritza Alvarez testified how, shortly before the murder, Tony Perez called her home and left a message for Casiano, in which Perez said "we" want you to come to the shop because "we" want to talk with you.[7] Vol. IV, 817.

Further, the circumstantial evidence confirmed the cooperating witnesses' testimony. For example, the killers gathered, and the murder occurred, at Perez Auto – right under Wilfredo Perez's nose. If, as the defense suggests, Perez had nothing to do with the murder, there is no explanation why Berrios would commit the murder in such an open and notorious manner at Perez Auto (rather than at any of Casiano's other regular haunts), and thereby invite the risk that the Perezes might tell the police or, worse, the

---

[7] Alvarez's testimony was fully consistent with the numbers that were found in Casiano's pager.

vengeance-seeking Nomads of Berrios' supposedly unaffiliated misdeeds. And, of course, there was the fact that the killers fled to New York after the murder in Tony Perez's personal car.

While it is true that there were discrepancies among the witnesses' recollections of events that took place in 1996, it would be "wrong" for the Court "to overrule the jury's findings on credibility" based on such discrepancies. Sanchez, 969 F.2d at 1415. Likewise the lack of physical evidence does not provide a sufficient basis for the Court to disregard the jury's guilty verdicts. See United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003) ("The 'testimony of a single accomplice' is sufficient to sustain a conviction, 'so long as that testimony is not incredible on its face'") (quoting United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993)); United States v. Diaz, 176 F.3d 52, 92 (2d Cir. 1999) (same); United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990) (same). Indeed, given the facts of Casiano's killing, no such physical evidence would exist in regard to *any* of the participants, including the ones who have since confessed to it.

The Supreme Court has recently reaffirmed the jury's necessary and central role in our criminal justice system: a jury, alone, has the power to punish a man as required by law. *See Blakely v. Washington*, 124 S. Ct. 2531 (2004). Here, the jury spoke in a unanimous voice, after extensive deliberations. And, like all of the other juries that heard evidence in this case, the jury credited the testimony of the cooperating witnesses. Moreover, all of the arguments now presented to the Court as reasons why the jury's verdicts should be ignored were arguments that the defendant previously made to the jury, and that the jury

-19-

ultimately rejected. Thus, the defendant cannot support his claim that the trial in his case was "fundamentally unfair," and there is compelling reason for the Court to usurp the role of the jury and to require a fourth trial in this case.

### Conclusion

For the foregoing reasons, the defendant's motion for a new trial should be denied.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

DAVID A. RING
ASSISTANT U. S. ATTORNEY
157 Church Street
P.O. Box 1824
New Haven, Connecticut 06510
(203) 821-3700
Federal Bar No. CT14362

### CERTIFICATION OF SERVICE

This is to certify that the within and foregoing has been sent via first-class mail this 18th day of May, 2005, to:

Richard Reeve, Esq.
Michael Sheehan, Esq.
Sheehan & Reeve
139 Orange Street, Suite 301
New Haven, Connecticut 06510

William Koch
Law Offices
151 Brush Hill Rd.
Lyme, CT 06371

DAVID A. RING
ASSISTANT UNITED STATES ATTORNEY