## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

**UNITED STATES OF AMERICA**　　　　:　　　　**CRIMINAL NO. 3:02CR7 (JBA)**

　　　　**V.**　　　　　　　　　　　　　　:

**WILFREDO PEREZ**　　　　　　　　:　　　　**JUNE 1, 2005**

### DEFENDANT'S REPLY TO UNITED STATES' RESPONSE TO DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL

　　　　The government's claim that three separate juries found the cooperators credible camouflages an obvious fact:  neither Tony Perez' jury nor Fausto Gonzalez' jury had to find that Wilfredo Perez was involved in the Teddy Casiano murder plot in order to reach their respective guilty verdicts.  Moreover, in order to reach their respective verdicts, those juries could have relied entirely upon the very same witness that cannot identify Wilfredo Perez as being involved in Casiano's murder:  Mario Lopez.[1]  Lopez' testimony at this defendant's trial was unequivocal:  Wilfredo Perez was **not** the person that he met and dealt with at Perez Auto in connection with the murder of Casiano.  Vol. VI, 1231.

　　　　The government continues to make the startling claim that "the main cooperators' testimony differed little in regard to the core events relating to Wilfredo Perez' involvement

---

[1]  Given that Lopez was Gonzalez' partner in crime, it appears likely that the jury heavily relied upon his testimony in convicting Gonzalez.  In addition, in the Tony Perez trial, the testimony of Lopez was far more consistent with the other cooperators, in that all three placed Tony Perez at Perez Auto as a participant during the events leading up to the Casiano murder.  It is not a "necessary" conclusion (or even a logical conclusion) that the juries in the other trials found that Wilfredo Perez was involved in the Casiano murder, as the government erroneously argues.  See Gov't. Br. at 1.

in Casiano's murder," Gov't. Br. at 3-4,[2] despite the fact that Lopez testified that Wilfredo

Perez was not involved in Casiano's murder.  Vol. V, 1044.  When confronted with this

insurmountable contradiction in its own case, the government once again resorts to the

unconvincing explanation that Lopez melded the Perez brothers in his memory.  Gov't. Br.

at 6.  The government does not point to any evidence in the record which supports this

claim, nor does it respond to the other aspects of Lopez' testimony, as explained in the

defendant's Memorandum, which make the "meld" theory implausible.  Def. Mem. at 7-9.

The government alternatively responds that by establishing that Lopez' testimony

rules out Wilfredo Perez as a participant in the relevant events at Perez Auto, defense

counsel has proved his guilt by conceding Tony Perez' involvement in those events.  Gov't.

Br. at 7.  This argument goes nowhere.  The government's case at trial was that Wilfredo

Perez *directly* dealt with the killers at Perez Auto, instructing them how to carry out the

murder, negotiating the terms of the payment and actually paying the killers.  Lopez'

testimony flatly contradicts the government's case.  Furthermore, whether or not Lopez

ever dealt with Tony Perez is not dispositive of the case against Wilfredo Perez.[3]

The government's claim that Lopez' testimony creates an "irreconcilable conflict" for

the defense misses the point:  if Lopez' testimony is to be believed, the significance of that

---

[2] Significantly, many of the government's transcript citations are solely to the testimony of Berrios and Feliciano.  Gov't. Br. at 4.  Given that Lopez unequivocally testified that the "owner" to whom he referred was not Wilfredo Perez, the government's reliance on the Lopez transcript citations is unpersuasive, as Lopez clearly did not corroborate any version of events that involved Wilfredo Perez in the Casiano murder.

[3] Furthermore, the government never made an associational claim that even if it was *Tony Perez* who orchestrated the murder of Casiano, it had to have been at the direction of Wilfredo Perez, and the government cannot now try to save the verdict on a theory that was never advanced at trial.

is that Berrios and Feliciano fabricated the parts of their stories that included Wilfredo Perez, not that Wilfredo is somehow indirectly involved in the murder plot on account of his relation to Tony Perez. The defense does not concede now, nor did it concede at trial, that Tony Perez was, in fact, involved in the murder plot. Another theory, which is entirely consistent with the government's evidence, is that Lopez did see Tony Perez at Perez Auto on the day of the murder, but that Lopez' testimony regarding Tony Perez' alleged involvement was fabricated. The evidence at trial demonstrates that the main cooperators in this case had a mutual point of contact during the government's investigation: Ricky Ruiz. Vol. III, 573, 582-3 (Feliciano); Vol. V, 1147 (Lopez); Vol. VIII, 1758-60 (Berrios). It is not inconceivable that the cooperators were in communication with each other (directly of indirectly, through common acquaintances) about implicating the "owner" in the murder. The events subsequent to the Casiano murder, in which Berrios and Feliciano accompanied Lopez and Ruiz on a shopping trip in Hartford for a motorcycle, indicate that the connection between these four was much more significant than Berrios is willing to admit. Def. Mem. at 29-30. Given that Berrios was the first to cooperate, knew for several years before he finally cooperated that the government believed Wilfredo Perez was involved in the Casiano murder and wanted testimony along those lines, and had given a story implicating Wilfredo Perez (the "owner"), it was in both Berrios' and Lopez' interests to give a consistent story in order to receive the benefits of cooperation.[4] Lopez, however, had never met Wilfredo Perez, and was forced to finger the only person he did see at

---

[4] Berrios was clearly astute enough to realize that if Lopez did not implicate the "owner," his chances of a 5K were between slim and none. Thus, he had a powerful motive to get the word to Lopez and Feliciano that this was the way they had to testify, and an equally powerful motive to make sure this was not revealed to the government.

Perez Auto that appeared to be the "owner" and not merely a mechanic: Tony Perez.

The government also argues that the fact that Lopez included the "owner" in his version of the events to the government during its investigation refutes the possibility that Berrios "led the government down a primrose path." Gov't. Br. at 8. However, the government stubbornly refuses to admit that the "owner" to whom Lopez refers is **not** Wilfredo Perez. As such, Lopez' version of events does not corroborate Berrios' story. Instead, it flatly contradicts the government's theory that Wilfredo Perez was involved in any of the dealings with Berrios and the killers at Perez Auto.

With respect to the photospread process involving Lopez, the government makes two claims: (1) this shows Lopez was referring to Wilfredo Perez when he testified regarding the owner, Gov't. Br. at 5-6; and (2) defense counsels' brief misrepresented Agent Matta's testimony on this matter. Id. at 16-17. Both of these claims are weak. Lopez made it absolutely clear at trial that the "owner" was not Wilfredo Perez. Vol. VI, 1231. Furthermore, there is no indication in the record that Lopez ever told the government that the person whose picture he had circled was someone he had ever met or dealt with in connection with the Casiano murder. Even a casual reading of Lopez' testimony makes it clear that when Lopez stated that Wilfredo Perez' picture was "familiar" he did not mean: "This person's photo is familiar because I've met this person before," but rather: "This person's photo is familiar because it reminds me of someone I know, Fat Jay – but I know that the person in this photo is not Fat Jay." If indeed Agent Matta believed that Lopez meant the former, and not the latter, it only further proves the point about Matta's tunnel vision: he was so focused on "proving" his case that he consistently interpreted evidence in a manner that fit the theory rather than acknowledge the facts for

-4-

what they were.  Instead of simply admitting that Lopez was unable to identify Wilfredo

Perez as "the owner," Matta directed Lopez to circle the photo on the flimsy basis that

Lopez thought Wilfredo Perez resembled Fat Jay.

Defense counsel has never accused the government of being "evil," but has

consistently argued that the government's zeal in prosecuting Wilfredo Perez produced a

"tunnel vision" effect which blinded it to the weaknesses in its own case and led it to put

more energy into "proving" its case than conducting an impartial investigation of the facts.

The government's response to this charge essentially boils down to:  "We were very fair

in other respects when it came to this case, so if you can't prove that there were *always*

problems in the way we handled this case, then you can't prove there were *any* problems

with the way we handled this case."  Not only is this argument predicated on faulty logic,

but it fails to account for the evidence of government overreaching in its efforts to

prosecute Wilfredo Perez.

First, the government continues to offer an overly simplistic definition of "witness

manipulation."  The government does not need to "explicitly tell its witnesses what to say"

in order to influence a witness' testimony.  As Berrios stated at trial, and as experienced

interviewers should well be aware, there can be implicit messages communicated between

the government and potential witnesses about what sort of information the government is

looking for and how it can benefit the witness to cooperate.[5]  Vol. VII, 1531-2, 1505-7,

---

[5]  This is aptly demonstrated by the "Blondie" tape.  Vol. X, 2315-6.  While the government contends that the "plain language of the transcript and the telling inflections of the voices on the tape" are indicative of surprise by Matta and not an intent to influence Berrios' story, Gov't. Br. at 12, the government somehow misses the rest of that conversation.  Matta made it clear to Berrios that "Blondie wasn't there," and that in order to "put the nail in the coffin" and "hit a home run," Berrios needed to give the government

1569.  This is common sense:  a self-interested witness looking for a way out of a

desperate situation is highly motivated to tailor his or her "information" to what he or she

believes the government wants.  Vol. VII, 1565-6, 1569.  Berrios was clearly well aware

that Wilfredo Perez was a key target of the investigation.  Vol. VII, 1505-6, 1517.  Indeed,

he was reminded that without him, the government had no case.  Vol. VII, 1598-9, 1573,

1585.  Any indication by the government that it was interested in information against

Wilfredo Perez was sufficient to alert Berrios and Feliciano to include him in their

respective stories.   It would not be difficult for Berrios and Feliciano to insert Wilfredo

Perez into their version of events – they simply had to say that the plot was Wilfredo Perez'

idea, that he was present for some of the dealings with the killers, and that he paid for it.[6]

The government focuses on the general manner in which Berrios' and Feliciano's stories

overlapped as evidence of their truthfulness, but ignores the numerous inconsistencies that

show a breakdown in their stories once they are asked to provide details.  Def. Mem. at 12-

19, 30-31.  Rather than address the fact that these inconsistencies, both in their quantity

and quality, indicate that the cooperators fabricated aspects of their stories in order to curry

---

"the most important person" – Jay.  While Matta never explicitly said to Berrios:  "Forget
about Blondie – we don't believe he's involved in Casiano's murder, so remove him from
your version of events," Matta's comments to Berrios made it perfectly clear to Berrios that
Blondie [Francis Chapparra] did not figure into the government's case, and, therefore,
should not be included in Berrios' story.

   [6] The only cooperator who would have trouble in this regard is Lopez, because
Lopez had never met Wilfredo Perez, so he could not provide any identifying
characteristics that matched Wilfredo Perez or pick him out of a photo spread as someone
involved in the killing.  In order to compensate for this problem, the government was careful
to have Lopez testify about the "owner," but not take the next logical step of asking Lopez
to make an in-court identification of the "owner."  The government's linguistic legerdemain
was intended to have the jury believe that Lopez' testimony about the "owner" corroborated
Berrios' and Feliciano's testimony, when the opposite was true.

favor with the government, the government instead seeks to be congratulated for "allow[ing] the witnesses to provide such contradictory information."  Gov't. Br. at 10.[7] What is alarming is that the government placed no significance at all in these many contradictions and inconsistencies.  See United States v. D'Angelo, 2004 U.S. Dist. LEXIS 2239, *61 (E.D.N.Y. 2004) (granting motion for judgment of acquittal, and, in the alternative, motion for new trial) ("[the cooperating witnesses], the government argues, had no opportunity to collude, so I should take comfort that their versions of the homicide are true.  In fact, a long list of crucial, irreconcilable conflicts in their testimony supports exactly the opposite conclusion:  The testimony leaves the impression that two perjurers made up facts about a murder without having had a chance to get their stories straight").  The government has always maintained that anything other than what relates to the "core events" of the Casiano murder is irrelevant.  It is precisely this sort of tunnel vision which compromised the government's investigation.  The government's definition of "core events" is self-serving, and ultimately blinded it to clear indicators that the cooperators were fabricating details to make their stories more favorable to the government's case (e.g., Feliciano's testimony regarding the burning of Casiano's photo at Perez Auto).

The starkest example of the government's commitment to "proving" its case is Agent Matta's false testimony at the probable cause hearing in Florida, and the government's

_____

[7] As a point of fact, Agent Matta testified that the reason he creates composite reports of proffer sessions is because of a concern that cooperators lie and tell different stories at each session. Vol. XI, 2399-2402. Given the fact that Matta's practice of making composite reports is not sanctioned by DEA Guidelines, Vol. XI, 2397-8, we cannot know for sure if there were other inconsistencies in the cooperators' stories that were simply left out of the final composite report.  Matta's rough notes of his proffer sessions were not complete and sometimes were even illegible to him.  Vol. X, 2338-40; Vol. XI 2402-3.

failure to correct that testimony. The government contends that Agent Matta's testimony at that hearing was "not a model of clarity" and "proves nothing more than Agent Matta's ability to become confused while on the witness stand."  Gov't Res. at 13.  This explanation is unconvincing.  Agent Matta was not a lay witness unfamiliar with court proceedings and giving testimony;  he is a highly educated and trained federal agent who is familiar with the legal process and testifying.  The notion that he was "confused" by the simple and direct questions posed by defense counsel strains credulity, to say the least.

As even a cursory reading of the transcript from that hearing demonstrates, the questions posed to Matta were clear, unambiguous and direct.  Matta was asked about whether he had discussed with Berrios what Berrios hoped to get in exchange for his cooperation.  Matta attempted to evade the question on the first pass by giving a non-responsive answer that  the government never makes promises to witnesses.  Defense counsel explicitly clarified that she was not talking about promises, but rather, what Matta told Berrios he *might* get in exchange for his cooperation.  The question could not have been more direct.  Agent Matta's testimony in response was neither a "slip-up" nor a "miscue."[8]  He was trying to shield and protect the star witness that he had cultivated by concealing his conversation with Berrios on this matter.  Matta understood the significance

---

[8]  The government points to a misstatement in the defendant's brief to make the point that everyone makes mistakes sometimes.  Gov't. Br. at 14-16.  While it is clear that counsel unintentionally "simply got it wrong" as to one aspect of Filigrana's testimony, Gov't Br. at 16, this proves nothing with respect to either Agent Matta's testimony at the probable cause hearing, or the government's decision to leave that testimony uncorrected if Agent Matta "simply got it wrong."  As noted, *supra*, Agent Matta first attempted to avoid answering the relevant question by giving a non-responsive answer, then followed up with a direct denial that he told Berrios what he might get.  A mistake in counsels' brief does not excuse or explain the specific facts of Matta's false testimony and the government's subsequent silence.

of what was asked, and well knew that revealing the existence of these conversations between the government and Berrios would have given defense counsel in Florida significant ammunition to argue that the information being provided by Berrios was unreliable.

Regardless of whether Matta was or was not actually confused by the questions, his answers were demonstrably false.  Matta testified that: "I [Matta] haven't talked to him [Berrios] about what he is hoping to get," and "I [Matta] have never told him [Berrios] what he might get." As the tape recorded conversations between Agent Matta and Berrios establish, Agent Matta and Berrios did indeed discuss what Berrios was hoping to get in exchange for his cooperation, and Agent Matta told Berrios "what he might get":  credit for time served on the existing drug sentence and a new identity, job and residence through the witness protection program.  It is impossible to conclude that Matta was "confused" about the substance of his conversations with Berrios.

What is abundantly clear is that Agent Matta did not want to disclose the deal the government had cut with Berrios, and the government did not, at any time during or after the hearing, correct Agent Matta's false testimony in this regard.   The government, however, is silent in its brief as to why it took no steps at the probable cause hearing to alert the judge or opposing counsel that, in fact, Berrios and Matta had had several discussions about what Berrios might get in exchange for his cooperation; that Agent Matta had told Berrios that Berrios might receive credit for time served and the benefits of the witness protection program if he cooperated; and that Berrios had already received a written cooperation agreement in which a sentence of time served was explicitly stated as an option.  There is simply no explanation as to why the government stood by in silence

while Agent Matta intentionally misled both defense counsel and a federal magistrate judge as to the substance of Matta's dealings with Berrios.

### Conclusion

While juries undoubtedly play a central role in our criminal justice system, "principles of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice.  If convinced that there has been a miscarriage of justice then it is the trial judge's duty to set aside the verdict."  United States v. Landau, 155 F.3d 93, 104-5 (2d Cir. 1998).   Here, a death-qualified jury convicted Wilfredo Perez on the questionable and often contradictory testimony of cooperating witnesses looking to receive significant benefits in exchange for their testimony.  "While critics may consider a new trial for [a defendant] to be a waste of resources and based on legal technicalities, we must take a broader view.  No harm and only good can come to our system of justice where we require the government to supply competent, satisfactory and sufficient evidence to prove an element of criminal liability.  To let a verdict stand on anything less is indeed a manifest injustice...."  United States v. Ferguson, 246 F.3d 129, 131 (2d Cir. 2001).   Given the numerous inconsistencies and contradictions of the government witnesses, the lack of physical or documentary evidence to corroborate the witnesses' claims, and the enormous incentives the witnesses had to conform their stories to the government's theory of the case in order to avoid capital prosecutions and receive potential reductions in their mandatory life sentences, the testimony of these witnesses cannot be considered competent, satisfactory and sufficient evidence to prove Wilfredo Perez guilty.  To let this verdict stand in the face of obvious and clear deficits in the credibility of these witness would truly be a manifest injustice.

Respectfully submitted,


THE DEFENDANT,
WILFREDO PEREZ



_____/S/_____

June 1, 2005                    Richard A. Reeve
                                George G. Kouros
                                Michael O. Sheehan
                                Sheehan & Reeve
                                139 Orange Street, Suite 301
                                New Haven, CT 06510
                                Federal Bar No. ct05084
                                (203)787-9026
                                (203) 787-9031 (fax)
                                rareeve51@snet.net


## CERTIFICATE OF SERVICE

        I hereby certify that copies of the DEFENDANT'S REPLY TO UNITED STATES'
RESPONSE TO MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL have
been sent by first class mail, postage prepaid, to the following counsel of record as listed
below, this 1st day of June, 2005:

David Ring, Esq.                       William T. Koch, Jr.
David Vatti, Esq.                      151 Brush Hill Rd.
Assistant U.S. Attorneys               Lyme, CT 06371
PO Box 1824
New Haven, CT 06508



                                _____/S/_____
                                Richard A. Reeve