UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States | : |
| | : |
| v. | :     No. 3:02cr7(JBA) |
| | : |
| Wilfredo  Perez | : |

### Ruling on Defendant Wilfredo Perez's
### Motion for New Trial [Doc. # 1144]

Following the jury's guilty verdict on four of the five counts of the indictment against him, all arising out of the murder of Theodore Casiano,[1] Wilfredo Perez moves for a new trial pursuant to Fed. R. Crim. P. 33, on grounds that the testimony of three cooperating witnesses was unreliable because of the means by which their cooperation was secured, the inconsistencies in their testimony, and the lack of adequate supervision of these witnesses by the Government.  For the reasons discussed below, defendant's motion is denied.

Fed. R. Crim. P. 33, which permits the Court, upon defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires," allows "'broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" United States v.

---

[1] In this capital case, Wilfredo Perez was convicted of conspiracy to commit interstate murder-for-hire, murder-for-hire by use of interstate travel, VICAR murder, and causing death by use of a firearm during a crime of violence, and unanimously sentenced by the jury to a term of life imprisonment.  He was found not guilty of murder-for-hire by use of an interstate facility.

1

Ferguson, 246 F.3d 129, 133 (2d Cir. 2001)(quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). Describing the standard applied to claims that the verdict was against the weight of evidence, the Second Circuit has stated:

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record support the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

Id. at 134 (citations and quotations omitted).

In the exercise of its discretion, the court may "weigh the evidence and in so doing evaluate for itself the credibility of witnesses." Sanchez, 969 F.2d at 1413 (citation and internal quotation marks omitted); see also United States v. Autori, 212 F.3d 105, 121 (2d Cir. 2000). "At the same time, the court may not wholly usurp the jury's role," and must give due deference to the jury's resolution of the weight of the evidence and the credibility of witnesses. Autori, 212 F.3d at 121. "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." Sanchez, 969 F.2d at 1413.

Perez challenges first the credibility of the three central

witnesses in this case: Oligabeth Berrios, Mario Lopez, and Santiago Feliciano.  Berrios was the first witness to cooperate with the Government in providing information about the participants in the Casiano murder, and he assisted in the resulting prosecution by testifying, which both innoculated him from prosecution for the Casiano murder and produced a promise from the Government that after completion of truthful testimony in all the Casiano murder trials it would move for a reduction in the 11 year sentence for drug trafficking that Berrios was then serving.  Lopez and Feliciano each pled guilty to the charges against them in this case and agreed to testify against Wilfredo Perez in exchange for an agreement by the Government not to seek the death penalty, and to move for a downward departure at sentencing to avoid a mandatory life sentence.

     Defendant argues that Berrios' testimony about Wilfredo Perez's participation in the murder plot was contradicted by the testimony of Mario Lopez.  Lopez, who drove the motorcycle from which Fausto Gonzalez shot Casiano, testified that he traveled from the Bronx to Hartford on two occasions and spoke to the "owner" of Perez Auto about the killing, whom he identified in a photospread as Jose Antonio ("Tony") Perez, Wilfredo Perez's brother.  Lopez could not identify Wilfredo Perez in a photo array, saying only that his photograph "looked familiar," and testified at trial that he did not see Wilfredo Perez at Perez

Auto.  See Trial Tr. Vol. VI [Doc. # 1351] at 1231 ("Q.  That person you circled on No. 4, that is not a person that you saw at Perez Auto, correct?  A.  Correct.  Q.  And Wilfredo Perez is not a person that you saw at Perez Auto, correct?  A.  That is correct.").  Lopez consistently testified about his interactions with only one person from Perez Auto — the "owner" — in contrast to Berrios and other witnesses, who testified that both Wilfredo and Tony Perez were present when Casiano was lured to Perez Auto in prelude to his murder.

The deficiencies of Lopez's testimony, and its inconsistencies with the testimony of other cooperating witnesses, were thoroughly and ably explored by the defense in cross examination, and need not compel the conclusion that Wilfredo Perez was not involved in the Casiano murder.  Given that Wilfredo Perez was indeed the "owner" of Perez Auto, that Lopez testified that the person he met was introduced as the "owner",[2] and that other witnesses testified that both Tony and Wilfredo Perez met with Lopez and Fausto Gonzalez (who had been

---

[2] Lopez's testimony linking the "owner" of Perez Auto to the murder of Casiano was significant, because it interfered with the defense theory of the case — that Berrios was primarily responsible for Casiano's murder, as he, having been kidnapped, robbed, and humiliated by Casiano, had the most significant personal motive to kill Casiano.  Lopez's testimony demonstrated that the "owner" of Perez Auto, not Berrios, was in charge.

4

hired to carry out Casiano's murder), and with Casiano,[3] the jury could reasonably have found, as the Government argued, that Lopez combined Tony and Wilfredo into one person in his mind. Defendant's theory of the case would have required the jury not only to discredit testimony by Berrios, Feliciano, and Vivian Perez about Wilfredo Perez's actions on the day of the murder, but also to disregard testimony by defendant's former drug supplier Raul Filigrana that Wilfredo Perez expressed to him Perez's intention to kill Casiano after Casiano kidnaped Berrios and robbed him of cocaine and money belonging to the Perez Organization,[4] and by Fernando Colon that he informed Wilfredo

---

[3] Berrios testified, for example, that he introduced Wilfredo to Lopez and Gonzalez when they arrived at Perez Auto from the Bronx, Trial Tr. Vol. VI [Doc. # 1351] at 1377, that both Wilfredo and Tony Perez participated in a conversation with the conspirators about where the murder should take place, id. at 1379, and that after Tony Perez called Casiano on his cell phone, Wilfredo Perez informed the other conspirators that Casiano was on his way over to Perez Auto, id. at 1383-84.

Feliciano testified, for example, that both Wilfredo and Tony Perez, along with Lopez, Gonzalez, and Berrios, were waiting for Casiano to arrive at Perez Auto on the day of the murder, Trial Tr. Vol. II [Doc. # 1347] at 449, and that while waiting for Casiano to arrive Wilfredo gave money to Berrios, id. at 453, who paid Lopez and Gonzalez once the murder was complete.

Defendant's sister-in-law, Vivian Perez, testified that Wilfredo Perez and others met with Casiano on the day of the murder. Trial Tr. Vol. XI [Doc. # 1356] at 2433-34.

[4] Defendant argues that Filigrana's testimony should not be credited because he testified that an incident in which he observed Wilfredo Perez and others preparing for a "war" with Casiano occurred in the "beginning of 1995," which could not have been the correct date because Casiano remained in prison until April 1995 and the incident that provoked the "war" preparation did not occur until the fall of 1995. This discrepancy is not

two days prior to Casiano's murder that Casiano intended to rob him again.[5]

The defendant's argument that Felicano's and Berrios' testimony as to Wilfredo Perez should not be credited because of their inconsistencies also does not provide an adequate basis for a new trial, because the inconsistencies were on matters peripheral to the central questions in this case: whether Wilfredo Perez participated in a conspiracy to commit murder-for-hire, caused someone to travel in interstate commerce to commit murder-for hire, aided and abetted a VICAR murder, and conspired to cause death by use of a firearm. There were discrepancies in Feliciano's and Berrios' testimony, for example, about whether a post-murder meeting at Perez Auto occurred at which Wilfredo

---

outcome determinative, as Filigrana also testified about a specific conversation he had with Wilfredo Perez in which Perez threatened to kill Casiano. The testimony about the threat Wilfredo Perez made was consistent with his earlier testimony at Wilfredo Perez' December 1997 sentencing on drug trafficking charges.

[5]Defendant argues that Colon is a problematic witness because his testimony (that the catalyst for Casiano's murder was his disclosure to Wilfredo Perez that Casiano intended to rob Perez again, and that Casiano and Perez had otherwise restored their friendly relationship after the first robbery), is inconsistent with testimony that Berrios and Feliciano made efforts to find the contract killers in New York prior to Colon's catalyzing event. The testimony need not be viewed as inconsistent, however, as both Berrios and Feliciano testified that after finding the hitmen in New York, they were "waiting on Wil" before hiring them, and the hiring did not occur until after Perez was informed of Casiano's plan for a second robbery.

burned a photograph of Casiano, whether Feliciano traveled with the other conspirators to Connecticut the day before the murder, what vehicle Feliciano and Berrios used to travel to and from New York, the time and manner in which Lopez and Gonzalez were paid for the murder, and whether others such as Raymond Pina or Francisco Chaparro were involved in the conspiracy.  Importantly, however, Berrios' and Feliciano's testimony was consistent on the core issues: that Wilfredo Perez was the person who authorized the murder of Casiano before Feliciano and Berrios made the arrangements for Lopez and Gonzalez to come from New York to commit the murder, see Trial Tr. Vol II at 426 (Feliciano testified that Berrios said "he'd have to talk to Wil, he was waiting on Wil" after Feliciano located a contract killer in New York); Trial Tr. Vol. VI at 1367-71 (Berrios testified that he received permission from Wilfredo Perez to make arrangements for the murder-for-hire); and that Wilfredo Perez was the person who paid $6000 for the murders, giving the money to Berrios to pay the others, see Trial Tr. Vol. II at 453; Vol. VI at 1391. Moreover, important details about the manner in which the murder was carried out were consistent: for example, all of the cooperating witnesses testified about meeting in the "pool room" of Perez Auto, see Trial Tr. Vol. II at 443, Vol. VI at 1384; locating Lopez and Gonzalez at the El Cubano pizza restaurant in the Bronx, see id. Vol. II at 415-16, 425; Vol. VI at 1372-73;

the manner in which Lopez and Gonzalez followed Casiano out of Perez Auto on a green motorcycle, see id. Vol. II at 456-57; Vol. VI at 1391-93; and the motorcycle stunts performed in front of Perez Auto, see id. Vol. II at 434-35; Vol. VI at 1380-81.

In light of the long time lapse between the May 1996 murder of Casiano, the witness statements to law enforcement beginning in 2000, and the 2004 trial of Wilfredo Perez, some inconsistencies may reflect no more than the fading of memory. Others, such as Berrios' prior concealment of his own relationship with the criminal syndicate run by Ricky Ruiz from the El Cubano pizza restaurant in the Bronx, undoubtedly reflect self-serving obfuscation by someone engaged in a variety of criminal activity.  The defense fully explored each of these inconsistencies at trial.[6]  While the testimony of the cooperating witnesses must be viewed with an appropriate degree of skepticism, here the testimony of the cooperating co-conspirators was consistent on the significant facts and key details.  The testimony of Feliciano and Berrios also holds up when viewed in the context of the other evidence presented at trial, such as the testimony by Filigrana and Colon about the events leading up to the murder and the testimony of Casiano's

---

[6]The defense also cross examined Berrios about his false statements at his 1997 sentencing hearing on drug trafficking charges, about the amount of drugs he was responsible for and his employment history.

8

lover Maritza Alvarez about Tony Perez's phone calls luring Casiano to Perez Auto. There is thus no basis for the wholesale disregard of Feliciano's and Berrios' testimony as defendant urges.

The defendant also calls into question the testimony of the cooperating witnesses based on their supervision by DEA agent Christopher Matta. Most notably, Matta testified at a removal hearing before a U.S. Magistrate Judge in Florida involving Raymond Pina,[7] at which he provided misleading testimony about the incentives the Government gave Berrios in exchange for his cooperation.[8] Because defense counsel was fully and timely provided with information about the cooperation agreement between Berrios and the Government, and was provided with Matta's phone calls with Berrios and testimony in Florida, the defense was fully prepared at trial to use all relevant information to impeach both Berrios' and Matta's credibility, which defense

---

[7]Raymond Pina had been indicted as a co-conspirator in this case, and was acquitted of the conspiracy charges at trial.

[8]Matta testified at the removal hearing that he "never told him what he might get," when in fact Matta had told Berrios that the "best case" scenario for his cooperation included a reduction in the sentence Berrios was currently serving. The government states that Matta's Florida testimony may have reflected his confusion that the question was aimed at what Berrios was told about his ultimate sentence (which would be up to the Court), and not at what Berrios was told about possibility that his sentence could be reduced by an indeterminate amount of time. At minimum, however, Matta's Florida testimony parsed the questioner's words very finely, leaving a misleading impression.

counsel did most effectively.  Although Matta's credibility may have been damaged to some extent by his prior misleading testimony, there is no basis for concluding that Matta improperly manipulated the statements of the conspirators in this case. Defense counsel was provided with audio tapes of conversations between Berrios and Matta, along with other discovery materials, and highlighted several of these conversations at trial.  None demonstrates that Matta in any way told the cooperating co-conspirators what to say, or otherwise led the witnesses to a particular result.  Matta's statement to Berrios, "That's not the story you told us," made after Berrios told Matta that Francis Chaparro, or "Blondie," was present on the day of the murder, reasonably reflects a statement of fact — that Berrios had not implicated Blondie before — and need not be viewed as implicit encouragement that Berrios stick to one contrived story. Berrios's late identification of Raymond Pina as a participant in the events leading up to Casiano's murder also need not be attributed to Matta's influence.  More importantly, there is no evidence that Matta influenced the co-conspirators' testimony on any of the central facts relevant to Wilfredo Perez's prosecution, and the fact that the inconsistencies in the testimony of the cooperating co-conspirators were not eliminated by the time of Wilfredo Perez's trial supports the conclusion that the witnesses testified to no more than their independent

and sometimes flawed recollections of events.

Reliance on the testimony of cooperating witnesses is far less than ideal, and while such testimony must be viewed with particular caution, it remains settled law that the testimony of a cooperating witness may be enough in itself to sustain a conviction. See United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003) (The "testimony of a single accomplice" is sufficient to sustain a conviction "so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.") (quoting United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993)). For the reasons discussed above, this Court cannot conclude that the cooperating witness testimony was incredible, such that there exists a concern that an innocent person was convicted on the basis of it.[9] Each of the arguments on which the defendant now relies were explored on

---

[9] This case is far removed from United States v. D'Angelo, No. 02cr399 (JG), 2004 U.S. Dist. Lexis 2239, at * 46 (E.D.N.Y., Feb. 18, 2004), in which the district court concluded that the accomplice testimony was "patently incredible." In D'Angelo, a subsequent government investigation revealed that the accomplice testimony was "rife with perjury" — for example, the person who ordered that the murder be committed denied having any role in the murder — and the district court found that the Government's theory of the case was implausible. In contrast, here the Government's theory of the case was persuasive, and the cooperating witnesses — who each testified to having significant roles in the Casiano murder — were in agreement on the core details of how the murder was carried out. While the defense was effective in highlighting the inconsistencies in the testimony, the Court is satisfied that there is sufficient evidence in the record to support the jury's verdict, and that the jury's implicit credibility findings should not be disturbed.

cross examination at trial and thoroughly covered during the defense's impressive closing argument, and the jury reached its verdict after more than five days of deliberation.  That verdict is entitled to due deference, and defendant has demonstrated no extraordinary circumstances that would render the guilty verdict a manifest injustice.  Accordingly, defendant's motion for a new trial [Doc. # 1144] is DENIED.

                              IT IS SO ORDERED.

                                      /s/

                              Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 18th day of August, 2004.**