IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:02-CR-0007 (JBA) |
| v. | Dated: January 28, 2021 |
| WILFREDO PEREZ | |

GOVERNMENT'S RESPONSE TO THE DEFENDANT'S EMERGENCY MOTION FOR
REDUCTION IN SENTENCE UNDER THE FIRST STEP ACT

"Lay Casiano down." Wilfredo Perez is serving three concurrent statutorily-mandated life sentences for the 1996 murder of Teddy Casiano. Casiano was shot multiple times in broad daylight on a busy Hartford street by hired killers. Perez "green-lit" and paid the hitmen to protect the drug trafficking organization that he led and eliminate Casiano.

After a full jury trial on the merits, Perez was convicted of violations of Title 18 U.S.C. § 1958 (conspiracy to commit murder-for-hire), §§ 1958 and 2 (interstate travel to commit murder-for-hire and aiding and abetting), §§ 1959(a)(1) & 2 (VCAR murder of Teddy Casiano), and §§ 924(c), (j)(1) & 2 (causing death by use of a firearm and aiding and abetting). *See* Judgment, Dkt. No. 1397. During the death penalty phase of the trial, Perez's jury found beyond a reasonable doubt that he: (1) intentionally participated in an act, contemplating that Casiano's life would be taken, or intending that lethal force would be used, (2) procured commission of the offense[s] by payment, or promise of payment, of anything of pecuniary value, and (3) committed conspiracy to commit murder for hire in connection with his role as leader of the Perez organization. *See* Special Verdict Form, Dkt. No. 1080. But, by unanimous vote, the jury sentenced Perez to life imprisonment without the possibility of release. *Id.*

On January 6, 2021, Perez filed a motion for compassionate release (or reduced sentence) because of the COVID-19 pandemic under Section 603 of the First Step Act of 2018, Pub. L. 115-319, 132 Stat. 5194, which amended 18 U.S.C. § 3582(c)(1)(A). *See* Dkt.Nos. 1460-1461 (hereinafter, "Deft's Mot."). Perez argues that his medical conditions – a body mass index of 31.8, hypertension, sleep apnea, and arthritis – render him especially vulnerable to the virus requiring immediate release, and further asserts that his sentence should be reduced because he is rehabilitated, his mandatory sentence was excessive, his family hopes for his return to society, and based upon other factors under 18 U.S.C. § 3553(a).

Perez seeks that this Court reduce Congressionally-mandated life sentences imposed for his convictions imposed after a full jury trial. While Perez presents evidence that he has a medical condition deemed by the Centers for Disease Control and Prevention ("CDC") to increase risk for severe illness from COVID-19 – obesity – he remains ill-suited for relief. The defendant's relevant circumstances today are not materially different than they were when he was originally sentenced. Certainly, his circumstances are not so changed to render his continued confinement inequitable. Given the gravity of Perez's crimes – the depraved for-hire murder of a rival to protect his drug trafficking organization – his motion should be denied. Simply put, Perez cannot overcome the § 3553(a) factors, which weigh against his release.

## BACKGROUND

### A.    Offense Conduct

Wilfredo Perez hired killers from New York to murder Teddy Casiano. *See* Presentence Report (hereinafter, "PSR"). Casiano was killed violently in broad daylight on a public street in Hartford. Hired gunmen shot him 14 times at point blank range. PSR ¶ 29. In all, Wilfredo Perez paid the hitmen merely $6,000 to end Casiano's life. PSR ¶ 30.

From 1992 to 1996, Wilfredo Perez was the leader of a large-scale drug distribution ring in Hartford, Connecticut. PSR ¶¶ 6-7. Wilfredo Perez's brother Jose Antonio ("Tony") Perez was a supervisor in the organization. PSR ¶ 8. Wilfredo Perez funded the inception of his drug distribution ring as well as an automotive business with money that Casiano had stolen from an armored car. PSR ¶ 9.

When Casiano was released from prison for the armored car robbery, he sought out the Perez brothers for financial assistance, which they provided. PSR ¶ 12. Casiano hoped to rebuild the Savage Nomads gang with which he and the Perez brothers were previously affiliated. PSR ¶ 13. While Tony Perez initially attended a few Savage Nomads meetings, he eventually stopped, and Casiano became increasingly upset with the Perez brothers' relatively small financial contributions and apathy towards the Savage Nomads. PSR ¶¶ 13-14. The Perez brothers' drug operation was lucrative, and Casiano's Savage Nomads were struggling financially. PSR ¶ 14.

In the fall of 1995, Casiano and the Savage Nomads kidnapped Ollie Berrios, an important player in the Perez operation, and stole kilograms of cocaine and cash from Perez. PSR ¶ 15. The Perez brothers confronted Casiano, and Casiano admitted to kidnapping Berrios and stealing from them. PSR ¶ 16. Casiano told Wilfredo Perez that Perez had failed to show sufficient respect to Casiano and the Savage Nomads. *Id*. Shortly after the kidnapping and robbery, Wilfredo Perez told his cocaine supplier that Casiano had stolen from him and asked for more time to make payment on the stolen drugs. PSR ¶ 17. Wilfredo Perez relayed to his drug supplier his intention to "lay Casiano down" for the trouble he was causing. *Id*.

Casiano decided to rob the Perez brothers again, but this plan was interrupted when a Savage Nomad member betrayed Casiano and informed the Perez brothers. PSR ¶ 19. Instead, it was decided that Casino would be eliminated before a second robbery could take place. PSR ¶¶ 19-20. Santiago

Feliciano, Berrios's friend, provided Berrios with the names of men in New York who could be hired to kill Casiano. PSR ¶ 20. Wilfredo Perez spoke to Berrios in private and directed Berrios and Feliciano to travel to New York and bring hired killers to Connecticut to murder Casiano. PSR ¶ 20. In deciding to kill Casiano to protect his business and drug proceeds, Perez said, "We need to do something about this guy." PSR ¶ 19.

Berrios and Feliciano traveled to New York to pick up the hired killers, Mario Lopez and Fausto Gonzalez, and bring them to Hartford. PSR ¶ 23. Wilfredo Perez provided Berrios with $6,000 to pay the killers. PSR ¶¶ 26, 30.

On May 24, 1996, Tony Perez called Casiano and set up a meeting to lure him to the Perez brother's automotive shop, the front for the drug enterprise. PSR ¶¶ 27-28. As Casiano left the meeting in his car, Lopez and Gonzalez followed Casiano on a motorcycle, pulled up to Casiano's stopped car at a traffic light, and shot him 14 times at point blank range. PSR ¶ 29. Casiano's life was ended in a hail of bullets. Berrios and Feliciano aided the killers to escape to New York, and rendered Wilfredo Perez's payment to them. PSR ¶ 30. Wildfredo also paid Feliciano $1,000 after the fact for his assistance in killing Casiano. PSR ¶ 31.

After the murder, the Perez brothers, Berrios, and others were arrested in relation to the drug distribution enterprise. PSR ¶ 9. In 1998, Wilfredo Perez was convicted and sentenced to 262 months of imprisonment for drug conspiracy offenses. PSR ¶ 57. Years later, the DEA identified Gonzalez as Casiano's killer. PSR ¶ 36. Berrios, Lopez, and Feliciano ultimately cooperated with law enforcement and testified at the trials of each Perez brother. *Id*.

### B.   Procedural History

On January 10, 2002, a grand jury returned an indictment charging Wilfredo Perez (hereinafter, "Perez") with the following five offenses:

- Count 1 – conspiracy to commit interstate murder-for-hire, in violation of 18 U.S.C. § 1958;

- Count 2 – interstate travel to commit murder-for-hire, in violation of 18 U.S.C. §§ 1958 & 2;

- Count 3 – using a facility to commit murder-for-hire, in violation of 18 U.S.C. §§ 1958 & 2;

- Count 4 – committing the murder of Teddy Casiano in furtherance of a racketeering enterprise, in violation of 18 U.S.C. §§ 1959(a)(1) & 2;

- Count 5 – causing death by use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c), (j)(1) & 2;

*See* Dkt. No. 1. On July 11, 2002, the grand jury returned a superseding indictment, but the charges against Perez remained unchanged. *See* Dkt. No. 114. On February 4, 2003, the grand jury returned a second superseding indictment, which differed principally in that it alleged special findings, which subjected Perez to the possibility of the death penalty. *See* Dkt. No. 349.

On June 29, 2004, a trial jury convicted Perez of Counts One, Two, Four, and Five, but acquitted him of Count Three.[1] *See* Dkt. No. 1049. In the penalty phase, the jury returned a special verdict sparing Perez from death, but unanimously found that he should be sentenced to life imprisonment without possibility of release. *See* Dkt. No. 1080. On August 18, 2004, the Court denied Perez's motion for a new trial. *See United States v. Perez*, 2004 WL 3556190 (D. Conn. Aug. 18, 2004).

The United States Probation Office ("USPO") prepared Perez's PSR for sentencing on his convictions. The guideline sentences on Counts One, Two, and Four were mandatory terms of life imprisonment. *See* PSR at ¶ 77-78. The term of imprisonment on Count Five was a mandatory-

---

[1] Perez's brother Tony was tried separately and a jury found him guilty of conspiracy to commit interstate murder-for-hire, interstate travel murder-for-hire, VCAR murder, and using and carrying a firearm in relation to a crime of violence. *See* Dkt. No. 477. Like his brother Wilfredo, Tony Perez was sentenced to concurrent life terms, with 60-months imprisonment to run consecutively for the firearm conviction. *See* Dkt. No. 520.

minimum term of imprisonment of ten years, consecutive to any other term of imprisonment imposed. *Id*.

On September 12, 2005, the Court sentenced Perez to three consecutive terms of life imprisonment on Counts One, Two, and Four, with ten years of imprisonment on Count Five to run consecutive to the life sentences. *See* Dkt. Nos. 1396 & 1397.

### C.  Direct Appeal

On direct appeal, the Second Circuit affirmed the judgment entered against Perez. *United States v. Perez*, 256 F. App'x. 383, 385-386 (2d Cir. 2007). The Second Circuit (1) denied Perez's motion for a new trial "on the ground that the testimony of cooperating witnesses was unreliable," *id*. at 385; (2) found that the district court acted within its discretion in admitting "firearms and ammunition – which concededly were not used in the killing of Casiano – as evidence that Perez's purpose in murdering Casiano was to maintain or increase his position in a racketeering enterprise, an element of the offense of committing murder in furtherance of a racketeering enterprise," *id.*; and (3) the district court correctly determined that Perez's convictions on Counts One, Two, and Four were punishable by terms of life imprisonment, rather than "fine-only sentence[s]," *id.* at 386.

On March 24, 2008, the Supreme Court denied Perez's writ of certiorari. *See Perez v. United States*, 552 U.S. 1290 (2008).

### D.  Section 2255 motions

On January 9, 2009, Perez filed a *pro se* motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. First, he argued the Government and this Court improperly amended the indictment at trial. Second, Perez claimed his trial counsel was ineffective for denying him the right to testify on his own behalf, denying him the right to call witnesses to testify, failing to object to the purported amendment of the indictment, and failing to request limiting instructions. On

March 30, 2012, the Court denied the § 2255 motion in all respects. *See Perez v. United States*, No. 3:09cv30 (JBA), 2012 WL 1067549 (D. Conn. Mar. 30, 2012).

Perez appealed the Court's ruling. *See Perez v. United States*, 589 F. App'x. 13, 14 (2d Cir. Dec. 23, 2014) (summary order). The Second Circuit rejected Perez's ineffectiveness claim and affirmed the judgment entered against him by the district court. *See id.* at 14-15. The Second Circuit subsequently denied Perez's petition for rehearing.

On May 11, 2020, Perez filed a successive § 2255 to vacate, set aside, or correct his sentence in light of *United States v. Davis*, 139 S. Ct. 2774 (2019), which invalidated the residual clause of 18 U.S.C. § 924(c). *See* 3:20cv0655 (JBA), Dkt. No. 1. Perez claimed that his murder-for-hire convictions could not serve as predicate crimes of violence for his § 924(c) conviction because they do not categorically qualify under the force clause, § 924(c)(3)(B). *Id*. On October 1, 2020, the Government responded to Perez's motion, arguing that his claim is procedurally barred as he never raised a challenge at trial or on appeal to the constitutionality of § 924(c), that even if his ten-year sentence for causing death by use of a firearm and aiding and abetting were vacated he would receive no relief, and because his conviction was predicated upon valid force clause crimes of violence. *See* 3:20cv0655 (JBA), Dkt. No. 8. The defendant replied to the Government's response on November 4, 2020. *See* 3:20cv0655 (JBA), Dkt. No. 9. Perez's § 2255 motion is still pending before this court.

## LEGAL STANDARD

The defendant now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Section 3582(c)(1)(A)(i) states:

> The court may not modify a term of imprisonment once it has been imposed except that — (1) in any case— (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of

Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A)(i). Section 1B1.13 of the Sentencing Guidelines further explains that a sentence reduction under § 3582(c)(1)(A) may be ordered where a court determines, "after considering the factors set forth in 18 U.S.C. § 3553(a)," that:

> (1)(A) extraordinary and compelling reasons warrant the reduction; . . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement."

U.S.S.G. § 1B1.13. The defendant bears the burden of establishing that he is entitled to a sentence reduction. *See United States v. Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).

The Sentencing Commission determined that a defendant's circumstances constitute "extraordinary and compelling reasons for sentence reduction" when the defendant is "suffering from a serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I).

The Second Circuit recently held that a court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). In particular, the court held that U.S.S.G. § 1B1.13 is outdated and inapplicable to motions filed by prisoners (as opposed to the Bureau of Prisons). *See id*.

8

In ruling on a motion for compassionate release, a court's "task is not to second guess or to reconsider whether the original sentence was just, but to assess whether the defendant's circumstances are so changed that it would be inequitable to continue the confinement of the prisoner." *United States v. Anton*, 3:17CR263 (MPS), 2020 WL 3430187, at *3 (D. Conn. June 23, 2020) (quoting *Ebbers*, 432 F. Supp. 3d at 429-30) (alterations and quotation marks omitted). Given the enduring importance of the § 3553(a) factors, courts have denied compassionate release motions based on the factors, even where extraordinary and compelling reasons exist. *See United States v. Webster*, 2020 WL 618828, at *6-8 (E.D. Va. Feb. 10, 2020) (denying compassionate release to defendant with terminal cancer even though court found extraordinary and compelling reasons because § 3553(a) factors weighed strongly against relief).

## ANALYSIS

The defendant's motion should be denied because it fails on the merits. He bears the burden of establishing that he is a suitable candidate for release and overcome the § 3553(a) factors. *See Ebbers*, 2020 WL 91399, at *4. Perez must also show that a reduced sentence would be consistent with the sentencing goals set forth in § 3553(a). 18 U.S.C. § 3582(c)(1)(A); see also *United States v. Gagne*, 2020 WL 1640152 (D. Conn. 2020 Apr. 2, 2020), at *5; *Colvin*, 2020 WL 1613943, at *2. The defendant has not met this burden, and, in the Government's view, he cannot meet it.

### A. In Light of Perez's Convictions for the For-Hire Murder of Casiano, a Reduction in Sentence Would Undermine the Sentencing Goals in 18 U.S.C. § 3553(a)

Based solely on a consideration of the sentencing factors under 18 U.S.C. § 3553(a), this Court would be well within its discretion to deny Perez's motion because reducing his mandatory (effective) life sentence would undermine the purposes of sentencing. *See* 18 U.S.C. § 3582(c)(1)(A) ("[T]he court … may reduce the term of imprisonment …, *after considering the*

*factors set forth in section 3553(a) to the extent that they are applicable …*" (emphasis added)). *See also United States v. Gotti*, 2020WL7706828 (S.D.N.Y. Dec. 29, 2020) ("The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.") Another judge in this district has observed, "in determining whether the defendant has demonstrated that there are compelling reasons that warrant a sentence reduction, nothing with respect to the number of COVID-19 cases at [a Federal Correctional Institute] and/or the way that the situation is being managed by that institution deserves greater weight than the objective of not undermining the purposes of a criminal sentence the court concluded are most important in this case." *United States v. O'Garro*, CM/ECF 3:14CR227 (AWT), 2020 WL 3086028, at *4 (D. Conn. Jun. 10, 2020).

The Court must consider whether granting the defendant's motion for compassionate release would be consistent with the sentencing goals set forth in § 3553(a). The sentence imposed reflected the seriousness of the offense, promoted respect for the law, provided just punishment, afforded adequate deterrence, protected the public, and provided the defendant with needed medical care. *See* 18 U.S.C. 3553(a)(2)(A-D). Perez's purported rehabilitation, by itself, is not a basis for a reduced sentence. *See* U.S.S.G. § 1B1.13 cmt. n.3 ("Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary or compelling reason for purposes of this policy statement."). In this case, a sentence reduction would be contrary to the sentencing goals, and the extraordinary and compelling reasons for release as presented are not so compelling that they overcome the purposes of Perez's sentence.

The phrases "compassionate release" and "extraordinary and compelling reasons" have a long legislative history. These concepts date to 1980 and the original compassionate release statute, 18 U.S.C. § 4205(g). *See United States v. Rivera*, 2020 WL 2094094, at *3 (S.D.N.Y. May 1, 2020) (Section 4205(g), which was repealed in 1987, was the original compassionate release statute). The regulations interpreting this statute made clear that compassionate release was available only in "particularly meritorious or unusual circumstances" such as severe illness or significantly changed family circumstances. 28 C.F.R. § 572.40 (1980). Section 4205(g) was replaced by Section 3582 in the Sentencing Reform Act of 1984, *see* Pub. L. No.98-4773, 98 Stat. 1998-99 (1984), and through the Sentencing Commission's amendments to § 1B1.13 of the Sentencing Guidelines, *see* U.S.S.G. Amends. 683, 698, 799.

Thus, for nearly forty years, the phrase "extraordinary and compelling reasons," as stated in Section 3582(c)(1)(A)(i), has applied to a discrete set of personal circumstances relating primarily to severe and debilitating illness and family circumstances. As a matter of statutory interpretation and common sense, it is clear that, in the First Step Act, Congress intended the phrase "extraordinary and compelling reasons" to have its long-understood meaning. *See United States v. Palozie*, 166 F.3d 502, 504 (2d Cir. 1999) (explaining that Congress's use of the same language in essentially the same context carried with it the language's previously ascribed meaning); *see also Lorillard v. Pons*, 434 U.S. 575, 581 (1978) (when Congress adopts a new law incorporating sections of a prior law, Congress is presumed to have had knowledge of the interpretation of the prior law).

Thus, even courts that have found that § 1B1.13 is not binding on them have looked to the Sentencing Commission's policy statement, explaining what constitutes "extraordinary and compelling reasons," as a guide for the exercise of their discretion. *See, e.g. United States v. Pinto-*

11

*Thomaz*, 454 F. Supp. 3d 327, 329 (S.D.N.Y. Apr. 13, 2020) (reasons should be on a similar magnitude and importance as those enumerated in Application Note 1 to § 1B1.13); *Ebbers*, 432 F. Supp. 3d at 427; *United States v. Morel,* 2020 WL 3412907, at *2 n.2 (S.D.N.Y. Jun. 22, 2020); *United States v. Vandegrift,* 2020 WL 5747808, at *2 (W.D. Wash. Sept, 25, 2020); *United States v. Butler*, 2020 WL5369753, at *2 (E.D. Pa. Sept. 8, 2020); *United States v. Ludwig,* 2020 WL 4547347, at *3 (E.D. Cal. Aug. 6, 2020); *United States v. Garcia-Zuniga*, 2020 WL 3403070, at *2 (E.D. Cal. June 15, 2020); *United States v. Smith*, 2020 WL 1903160, at *2 n.3 (D. Conn. April 17, 2020) (citing cases).

As the Court is aware, the Government believes that *Brooker* was wrongly decided and filed a petition for rehearing. That petition was denied by the Second Circuit. *See* No. 19-3218, Dkt. No. 104. *Brooker* remains law. But, in any event, to accept this defendant's claim under the First Step Act would allow him to prevail upon what is effectively a petition for excessive sentence when he would clearly lose under § 2255, and would suggest that, through the compassionate release provision as amended by the First Step Act, Congress wanted to grant district courts unfettered authority that subsumes and renders obsolete all other forms of post-conviction relief. If Congress wanted to grant district courts such authority, it is highly likely that it would have done so expressly rather than by passing the First Step Act and then relying on the happenstance that the Sentencing Commission would lack a quorum to update §1B1.13 by adding the language "or upon the motion of an inmate after exhaustion of administrative remedies" after "Upon motion of the Director of the Bureau of Prisons" at the beginning of that provision. Even after *Brooker*, what remains is a statute, § 3582(c), that this Court must construe. For the reasons stated above, the Government respectfully submits that, in the First Step Act, Congress intended the phrase "extraordinary and compelling reasons" to have its settled meaning, which, even in light of the current pandemic, would not encompass this defendant's claim.

Beyond the current COVID-19 pandemic, Perez's circumstances are not materially different than when he was originally sentenced to mandatory life sentences in 2005. His situation during the COVID-19 pandemic, no different than that of thousands of other inmates across the country (and millions of our fellow citizens), does not change his circumstances. As the court stated in *Ebbers*, 432 F. Supp. 3d at 429-430, the court's task on a First Step Act motion is not to second-guess or to reconsider whether the original sentence was just, but to assess whether the defendant's circumstances are so changed that his continued confinement would be inequitable. Perez has not shown changed circumstances so changed to justify a reduction. Nor can he overcome the § 3553(a) factors which strongly weigh against release of a defendant convicted of murder-for-hire.

1. <u>Statutorily-mandated life sentences for murder-for-hire and VCAR murder are sufficiently reflective of Perez's conduct, and not greater than necessary</u>

Perez's life sentences are just punishment for the murder-for-hire killing of Casiano and afford adequate deterrence against murder-for-hire conspiracies in our district and in our society. The jury found unanimously that Perez shall be sentenced to life imprisonment without the possibility of release. *See* Special Verdict Form, Dkt. No. 1080. At sentencing, this Court noted that it was "mandated to impose a life sentence." Deft's Ex. B, p. 13. *See also* § 3553(a)(3). But the defendant makes the extraordinary claim that his mandatory life sentence for murder-for-hire was "excessive" and should be reduced. *See* Deft's Mot. at 46-47. The Congressionally-authorized penalty for conspiracy to commit murder-for-hire, interstate travel to commit murder-for-hire, and VCAR murder of Teddy Casiano, on each count of conviction, was death or mandatory life imprisonment. PSR at ¶¶ 77, 87. The penalty remains the same today under our law. *See* 18 U.S.C. §§ 1958, 1959. Seeking to now reduce his sentence, Perez points almost exclusively to the passage of time.[2]

---

[2] Perez provides a letter written by former members of the prosecution team to support his assertion that his statutorily-mandated life sentence is excessive. *See* Deft's Ex. G. Putting the propriety of the letter aside, the views of former

Where other avenues of post-conviction relief have already failed, or would fail in the future in the Government's view, Perez attempts to use compassionate release under 18 U.S.C. § 3582(c)(1)(A) as a sword, to reduce his mandatory life sentence for murder-for-hire where he would otherwise not be afforded relief. The defendant attempts to draw a distinction between what the law requires – imposition of a mandatory life sentence of imprisonment for Perez's crimes, including murder-for-hire – and his want for release, opining upon the "necessity" of his life sentence. Deft's Mot. at 46-47. But the circumvention of statutorily mandated life sentences for murder was not the intention behind compassionate release. The provision was intended for meritorious and unusual cases, but Perez's circumstances are hardly unusual. The law is clear, life imprisonment was then, and is now, the minimum available sentence by statute for Perez's murder-for-hire killing of Casiano.

Indeed, pursuant to the defendant's argument, a court could now impose on a defendant the statutorily-mandated sentence of life imprisonment for conspiracy to commit murder-for-hire and VCAR murder and then proceed a short time later to grant a motion for a reduction of that sentence under the First Step Act – and thereby circumvent the sentence required by statute – to a term of years that the court may deem sufficient. And this would be so, despite the fact that the defendant would not prevail on a direct appeal of his conviction or in habeas petition. *See United States v. Arojojoye*, 806 F.App'x 475, 477-78 (7th Cir. 2020) (defendant's Section 3582(c)(1)(A) claim, attacking the length of his sentence, was really a successive § 2255 petition and thus properly denied); *United States v. Rivernider*, 2020 WL 597393, at *4 (D. Conn. Feb. 7, 2020) ("To my knowledge, nobody has suggested that the 'extraordinary and compelling' standard can be satisfied by . . . alleged wrongs that

---

advocates for the Government are not factors for consideration under § 3553(a). Nor has the state of the evidence changed in the 15 years since Perez's trial and conviction.

Perez similarly provides to a letter written to this Court by a juror, well before Perez's sentencing. *See* Deft's Ex. F. The Court has been aware of this juror's viewpoint since 2004.

are cognizable on a direct appeal of conviction or by means of a habeas corpus petition."). Here, Perez has had his bite at the apple, his direct appeal and § 2255 motions have been denied, though he continues to challenge his sentence with a § 2255 motion is pending before this Court. *See* 3:20cv0655 (JBA), Dkt. No. 1.

But in the context of a compassionate release motion, the § 3553(a) factors strongly weight against reduction of a mandatory life sentence for murder-for-hire. "There are relatively few reported cases of courts reducing the sentences of inmates convicted of murder [under 18 U.S.C. § 3582(c)(1)(A)]." *United States v. Hicks*, 2020WL7714606 at *6 (E.D. Mich. Dec. 29, 2020) (denying compassionate release for defendant convicted of murder whose health conditions were extraordinary and compelling in light of COVID-19). "Even fewer have *released* inmates convicted of murder." *Id*. (emphasis added). *See also United States v. Gotti,* 2020WL7706828 (S.D.N.Y. Dec. 29, 2020) (denying compassionate release to a 81-year old petitioner currently incarcerated for various crimes including conspiracy to commit murder in aid of racketeering based on § 3553(a) factors); *United States v. Shakur*, 2020 WL 6482875 (S.D.N.Y. Nov. 2, 2020) (denying compassionate release to a petitioner currently incarcerated for 1st degree murder with extraordinary and compelling medical conditions because "3553(a) factors make it impossible for the Court to find that Shakur demonstrates extraordinary and compelling reasons"); *United States v. Myrick*, 2020WL6128943 (E.D.N.Y. Oct. 19, 2020) (denying compassionate release to petitioner incarcerated for VCAR murder who made strides toward rehabilitation, but the serious and violent nature of the offenses mitigated against release); *United States v. Colon*, 2020 WL 6049215 (D. Conn. Oct. 12, 2020) (denying compassionate release to petitioner incarcerated for VCAR murder with obesity where "Colon has made some progress, but it is not enough to outweigh the seriousness of this offense"); *United States v. Morales*, 2020WL4926609 (D. Conn. Aug. 20, 2020) (denying compassionate release to petitioner incarcerated

for VCAR murder with obesity and hypertension where 3553(a) factors preclude relief); *United States v. Gioeli*, 2020WL257191 (E.D.N.Y. May 21, 2020) (denying compassionate release to petitioner incarcerated for multiple conspiracies to commit murder). Perez string cites numerous cases to support his claim that courts have reduced *life sentences* based on COVID-19 considerations and rehabilitation, but those were mostly for drug offenses. Deft's Mot. at 53-54. None of the cases cited by Perez support release where the defendant was convicted of murder, let alone conspiracy to commit murder-for-hire and VCAR murder.[3]

Instead, Perez relies almost exclusively upon three recent cases to support a sentence reduction for his convictions arising from Casiano's murder. First, Perez cites *United States v. Rios*, 2020WL7246440 (D. Conn. Dec. 8, 2020). This Court is well aware of its decision in *Rios*, where it granted the defendant a sentence reduction from three consecutive terms of mandatory life imprisonment to a term of imprisonment of 30 years. But absent here, the family of the man that Rios murdered made the "remarkable decision" to "take no position" on Rio's efforts to be released. *Id*. at 3. Perez cannot point to such a remarkable decision by the Casiano family.

Next, Perez relies upon *United States v. Fisher*, 2020WL5992340 (S.D.N.Y. Oct. 9, 2020). But Fisher's life sentence was reduced because of his advanced age and "dire and particularized risk" should he contract COVID-19 in prison. (Fisher's life sentences on drug offenses do not appear to

---

[3] *United States v. Torres*, 2020 WL 2815003 (S.D.N.Y. June 1, 2020) (heroin conspiracy); *United States v. Ledezma-Rodriguez*, 472 F.Supp.3d 498 (S.D. Iowa July 14, 2020) (drug conspiracy and use of firearm); *United States v. Barron*, 2:94-559-GW, Doc. # 424 (C.D. Cal. Jul. 10, 2020) (methamphetamine conspiracy); *United States v. Rice*, No. 1:03-cr-00441-RBW, Doc. # 1066 (D.D.C. July 8, 2020) (heroin conspiracy); *United States v. Regas*, 2020WL2926457 (D. Nev. June 3, 2020) (drug enterprise); *United States v. Parker*, 2020 WL 2572525 (C.D. Cal. May 21, 2020) (cocaine conspiracy); *United States v. Kubinski*, 2020 WL 2475859 (E.D.N.C. May 13, 2020) (drug conspiracy); *United States v. Barrenechea*, 2020 WL 2315638 (N.D. Cal. May 7, 2020) (drug conspiracy); *United States v. Curtis*, 2020 WL 1935543 (D.D.C. Apr. 22, 2020) (sex trafficking, petitioner diagnosed with multiple sclerosis and incomplete quadriplegia); *United States v. Plunk*, 2020 WL 3582902, at *3 (D. Alaska Apr. 9, 2020) (drug conspiracy); *United States v. Williams*, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) (armed bank robbery, petitioner deteriorating with implanted cardioverter-defibrillator); *United States v. Perez*, No. 88-cr-10094-JTM, 2020 WL 1180719 (D. Kan. Mar. 11, 2020) (drug conspiracy); *United States v. Millan*, 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2020) (drug conspiracy).

have been mandatory, unlike those faced by Perez.) Fisher was an associate of notorious Harlem drug kingpin Nicky Barnes, and Fisher is believed to have committed several murders (though acquitted of murder at trial). *Id*. However, the court did not have the benefit of a special verdict form and could not know whether the jury found beyond a reasonable doubt that Fisher had committed any violent acts. *Id*. at 5. Here, we have the benefit of knowing that Perez's jury found that he acted in contemplation of murdering Casiano, procured the murder by payment, and was the leader of his organization. *See* Special Verdict Form, Dkt. No. 1080. In any event, after 38 years of imprisonment with his confederates now dead, 73-year old Fisher was at dire risk of serious illness should he contract COVID-19 and was released to "the great likelihood . . . that his reentry into the world he left so long ago, in which he caused so much harm, will be a lonely one." *Id*. at *7.

Finally, Perez relies upon *United States v. Rodriguez*, 2020WL5810161 (S.D.N.Y. Sept. 30, 2020). Rodriguez's life sentence for drug offenses – and his participation in the murder an informant – was reduced because of his underlying health risks his extraordinary rehabilitation. *Id*. But unlike Perez, Rodriguez presented letters of support from no fewer than 27 prison officials, many expressly supporting his release. *Id*. at 1. The court also found Rodriguez "wholly rehabilitated." *Id*. Perez has no such support from prison officials who expressly support his release. Instead, Perez now provides letters from two former inmates. *See* Deft's Ex. O, P. Beyond his positive BOP Progress Report, *see* Deft's Ex. C, Perez can only point to the 2004 penalty phase testimony of Paul Gibson, a subpoenaed case manager at FCI Otisville, and Ronald Dimmie, a correction counselor at FCI Otisville, neither of whom testified at the time to Perez's whole rehabilitation or expressly supported his release. Perez also provides letters from his family members, including his son, who undoubtably wish to see him released. *See* Deft's Ex. E, H, Q, R. But Perez wanting to be with his family and his son, and his family wanting to be with him, is not an extraordinary and compelling reason for reduction of sentence. "It

simply stands to logic that, if wanting to be with your children constituted an extraordinary and compelling reason for a reduction of sentence, almost every defendant would qualify. The exception would swallow the rule." *United States v. Corin*, 2020WL5898703 at *4 (S.D.N.Y. Oct. 5, 2020).

Perez's situation is more akin to that in *United States v. Arana*, 2020WL2214232 (E.D. Mich. May 7, 2020), where compassionate release was denied for a petitioner convicted of murder-for-hire. Arana, the leader of a drug trafficking organization, arranged the killing of his former partner after disagreements about money. *Id*. at 1. Like Perez, Arana did not pull the trigger of the gun that killed his former partner. Instead, Arana paid $20,000 to a hired killer who was assisted by Arana's street-level enforcer. *Id*. Convicted of murder-for-hire, aiding and abetting an intentional killing and a firearms murder in relation to a drug trafficking crime, and conspiracy to possess cocaine with intent to distribute, Arana was sentenced to four consecutive life sentences. *Id*. at 2.

The court assumed that Arana's pancreatitis and age, 68-years old, presented extraordinary and compelling reasons in light of the pandemic. *Id*. at 3. Like Perez, Arana had no prior criminal history, was engaged in the drug trade for several years before he was caught, and was involved in the orchestration of a drug-related murder. *Id*. at 4. While incarcerated, Arana completed more than 50 educational programs while incarcerated, had a limited disciplinary history in prison, maintained strong family relationships and the support of his children, and posed no risk of danger to others with no risk of recidivism if released. *Id*. at 2, 4. But where Arana committed the "ultimate violence – the taking of a human life," his medical condition and purported rehabilitation could not outweigh the § 3553(a) factors. *Id*. at 6. *See also United States v. Hicks*, 2020WL7714606 (E.D. Mich. Dec. 29, 2020) (§ 3553(a) factors fatal to compassionate release motion where petitioner was president of a motorcycle chapter, engaged in the distribution of controlled substances, firearms possession and violent acts, and played integral role in the decision to murder members who were providing

information to rivals). *But see United States v. Gluzman*, 2020WL4233049 (S.D.N.Y. Jul. 23, 2020) (compassionate release granted to 71-year-old cognitively impaired petitioner suffering from Parkison's disease who murdered her husband); *United States v. Wong Chi Fai*, 2019WL3428504 (E.D.N.Y. Jul. 30, 2019) (compassionate release granted to 65-year-old terminal petitioner suffering from thyroid cancer, with 12-month life expectancy, involved in gang-related murders). Perez similarly fails to overcome the § 3553(a) where the execution of Casiano was the ultimate act of violence.

Statutorily-mandated life sentences reflect the gravity that our society places on Perez's conduct – murder-for-hire – and should not be reduced. In Perez's case, a compassionate release motion is not the proper vehicle for post-conviction relief where the argument advanced is mostly that his sentence is "excessive" or "unnecessary." Perez, and other members of society, will remain deterred from murder-for-hire and VCAR murder where a life sentence is mandatory where death results, and the statutory penalties for murder-for-hire and VCAR murder continue to protect society from such vile plots.

2.   Perez received just punishment due to the seriousness of his offenses

Perez sought to "lay Casiano down." PSR ¶ 17. He did – Casino was shot point-blank 14 times by hired killers. This was no simple murder, but a killing planned and paid for to protect an illicit drug trafficking organization. The murder-for-hire eliminated a rival who was a clear threat to business. As the leader of the drug trafficking organization, Perez authorized Casino's murder. He paid hitmen for Casiano's murder, and then paid Feliciano after the fact for coordinating the killing.

Plainly, Casino was no saint. He led a Hartford gang, the Savage Nomads. PSR ¶ 10. He robbed an armored car and went to prison for that offense. PSR ¶ 11. He kidnapped Berrios and stole two kilograms of cocaine and cash from Perez. PSR ¶ 15. He disrespected Perez, selling stolen cocaine in

Perez's own drug gate, a bar controlled by the Perez organization. PSR ¶ 16. He put Perez in a bind with his drug suppliers, vital to any drug trafficking organization, because the stolen cocaine was provided to Perez on credit.  PSR ¶ 17. Casino's disrespect of the Perez Organization continued until it reached a breaking point for Perez. PSR ¶ 19. Upon hearing that Casino was to rob the Perez Organization again, Perez said, "We need to do something about this guy." *Id*. Days later Casino was dead.

Casiano's murder stemmed from jealousy and money. It is true that Casiano and Perez were formerly friends or acquaintances. *See* Deft's Ex. B, p. 19-22. But after his release from prison for the armored car robbery, Casiano was jealous of Perez and members of his drug organization "living the lives of the 'rich and famous'" – with proceeds of cocaine trafficking amounting to expensive race cars, custom motorcycles and lots of cash. PSR ¶ 14. Casiano wanted a cut of the profits that he never received. Instead, he stole from Perez and disrespected the Perez Organization. But without doubt, Casiano was a living human being. A life Perez, nor members of his organization, had the right to extinguish. Casiano had a family, including a sister.[4] PSR ¶ 14.

Unlike Perez, Casiano never had the chance, with age and wisdom, to be in a position where he could claim that he had shed his life of crime and was rehabilitated. Maybe that day would have come. Maybe it would not have. In any event, Casino's death was vicious and brutal – bullets were pumped into him while he sat in his car shortly after being lured to Perez's automotive shop. Casino's death was a business decision.  The jury found beyond a reasonable doubt, as to each count of conviction, that Perez "intentionally participated in an act, contemplating that the life of Teddy Casiano would be taken, or intending that lethal force would be used in connection with Teddy

---

[4] At the time of filing of this response, attempts have been made to contact members of the Casiano family without success. The Government has not yet been able to receive an impact statement from any of Casiano's family members or to obtain their position on the defendant's motion, if any.

Casiano, a person other than one of the participants in the offense, and that Teddy Casiano died as a direct result of the act." Special Verdict Form, Dkt. No. 1080.

Perez attempts to equate his offense to that of an "average" murder. Deft's Mot. at 49-50. According to the *Overview of Federal Criminal Cases* published by the United States Sentencing Commission for the fiscal year of 2019, the average sentence imposed for murder is 255 months. *Rios*, 2020WL7246440 at *4. But, a murder-for-hire, where the leader of a drug trafficking organization authorizes and pays for the broad day public execution of a rival is not average. This Court knows all too well the danger to innocent citizens brought by daytime drug-motivated drive by shootings in Connecticut's cities. Casiano's death, the way it was brought about and its authorization to protect an illegal drug trafficking organization, was especially vile and offensive to society. Even so, Perez's mandatory life sentence was the minimum effective legal sentence available for his actions.

The seriousness of Perez's offenses, a planned murder-for-hire plot to protect his cocaine trafficking business, is a significant aggravating factor weighing against any sentence reduction.

      3.   <u>Perez, the leader of his drug trafficking organization, authorized Casiano's death</u>

Perez was the leader of the Perez Drug Trafficking Organization. PSR ¶ 57. He led a drug distribution network in Hartford from 1992 to 1996 that operated out of the Hour Glass Café. *Id*. The successful operation sold cocaine seven days a week, 52 weeks a year, and distributed over 20-kilograms of cocaine per year. *Id*. The organization sought to maintain its turf and possessed firearms. One Perez Automotive employee was arrested in 1994 with a 9-millimeter gun. PSR ¶ 6. Perez's drug supplier, Raul Filigrana, testified at Tony Perez's trial that, because Casiano kidnapped Berrios and was attempting to take over the Hour Glass Cafe, Wilfredo was expecting "war." *United States v. Perez*, 2004WL2472275 at *2. In preparation for "war" with Casiano, Filigrana was with Perez and

members of the Perez organization and "saw a shotgun at the front door. [He] saw . . . an AK-47 at the table. Wilfredo had a pistol on his belt." *Id*.

In his leadership role, Perez authorized Casino's death. In discussing Casiano with Filigrana, Perez stated his intention to "lay Casiano down." PSR ¶ 17. When Filigrana said that there could be negative consequences to killing Casiano, Perez assured him that he knew how to do it, and that he would wait until things settled down and the time was right. *Id*. Filigrana testified at Tony Perez's trial that Wilfredo did not want the killing to occur "too close to the garage." *Perez*, 2004WL2472275 at *2. Perez paid $6,000 for the killing, providing the funds to Berrios to distribute to the hired killers. PSR ¶ 30. So too did Perez pay Feliciano for his assistance. PSR ¶ 31.

Perez's actions occurred when he was a fully formed adult, 29-years-old. Casino's killing was calmly calculated, a decision to protect the Perez Organization and eliminate a threat to an illicit drug trafficking business. As the leader of the organization, Perez's authorization was required. Payment came from Perez, not some other member of the plot. In the penalty phase, the jury found beyond a reasonable doubt that Perez committed conspiracy to commit murder-for-hire in connection with his role as the leader of the Perez Organization.[5] *See* Special Verdict Form, Dkt. No. 1080. So too did the jury find beyond a reasonable doubt that "Perez procured the commission of [each offense of conviction] by payment, or promise of payment, of anything of pecuniary value." *Id*. While Perez did not pull the trigger of the gun that ended Casiano's life, he authorized and paid hitmen to do so.

Perez's role as leader of the Perez Organization, and his authorization to kill Casiano and his payment to hired-killers is a significant aggravating factor weighing against any sentence reduction.

---

[5] The jury did not find beyond a reasonable doubt that Perez acted in his role as leader of the Perez Organization with respect to interstate travel to commit murder for hire, VCAR murder of Teddy Casiano, and causing death by use of firearm. *See* Special Verdict Form, Dkt. No. 1080.

4.    <u>Perez's purported rehabilitation is not an extraordinary and compelling reason for his release</u>

Perez argues that he has been rehabilitated in prison, warranting a sentence reduction. The Court should reject this argument.

Perez's "compliance with institutional regulations has no bearing on the sentencing factors" – after all, "behaving himself in prison" is "plainly required of him."  *United States v. Mumuni*, 946 F.3d 97, 112 (2d Cir. 2019).  But the fact that he has lived a productive life in the controlled environment of prison says little about whether he will conform his conduct if released.  The more convincing data point is Perez's conduct in the real world, where for years he was unwilling or unable to resist criminal conduct as an adult, sold dozens of kilograms of cocaine per year that that endangered the Hartford community, and hired killers to publicly eliminate a rival who endangered his drug business.

To be sure, Perez has taken advantage of educational opportunities while incarcerated. He received his G.E.D. He has taken some 41 courses since 1998, though records do not show that he took any courses between 2005 and 2016. *See* Def't's Ex. C. He has been industrious and found work. Perez is employed in the commissary and earned his electrical certification. *Id*. He is entrusted to repair electrical items, often creating cost-savings for the Bureau of Prisons. *Id*.  The Bureau of Prisons reports that he has a rapport with staff and inmates, and two former inmates have written letters supporting Perez. *See* Def't's Ex. C, P, Q. Perez should be commended for contributing to the prison community at FCI Otisville.

But Perez's purported rehabilitation is hardly extraordinary. Much of the behavior he now advances remains unchanged from information that was before this Court when he was sentenced 15 years ago. *Cf. United States v. Rodriguez*, 3:08-cr-317 (AWT) (D. Conn. Mar. 6, 2020) ("remarkable" rehabilitation where leader of a trafficking organization involved acts of violence (but not murder), completed "a 6,000-hour painting apprenticeship course" – an "impressive and atypical

accomplishment"). During the penalty phase of his trial, the jury heard testimony to support several factors mitigating against a sentence of death, including nearly a decade of his behavior in prison. *See* Deft's Ex. A. This included testimony that led at least one juror to find (by a preponderance of the evidence), among other things, that Perez was a model prisoner, conformed his conduct to BOP rules, participated in educational and counseling programs, was employed in prison, and showed concern for other inmates and acted as a role model. *See* Special Verdict Form, Dkt. No. 1080. The jury also found that "if Wilfredo Perez is granted life, the prison system will gain a man of demonstrated positive leadership within the prisoner community." *Id*.

Perez may have upheld the hope that his jury had for him when it rejected the death penalty and determined that he should serve a life sentence without possibility of release. This Court, sentencing Perez to a mandatory sentence of life and reflecting upon mitigating factors presented during the penalty phase, encouraged Perez to continue to redeem himself:

> The Court does not have authority to change the outcome of the jury's verdict. The Court is, however, mindful that in the course of the trial, in the sentencing phase, everyone hearing the testimony began to understand how life imprisonment can still be a life. Mr. Reeve expressed the hope that he would -- that Mr. Perez would have a shot at some kind of life, and yet the testimony at trial of the young man whose life you turned around by your example and by your counsel is some kind of life. It is perhaps a form of redemption. It is certainly a reason that the Court will recommend most strongly that you remain at Otisville where your undertakings have been not only exemplary by the testimony at trial, but have made, for the prison administration, an easier time. So, for that reason I will make a particular recommendation.

Deft's Ex. B at 22-23. Where Perez was sentenced to life, it is beneficial to society that, as this Court put it years ago, that Perez has "understood how life imprisonment can still be a life." *Id*. Similarly, where Perez took the life of Teddy Casiano, he can continue to find a form of redemption by providing fellow inmates counsel and friendship.

Perez's rehabilitation, as weighed against his conduct – the for-hire murder of Casiano – is not so extraordinary as to weigh for any sentence reduction.

**B.  Perez's Arguments for Discretionary Relief Under § 3582(c)(1)(A) Do Not Outweigh the § 3553(a) Factors**

1.  <u>Exhaustion and danger to the community</u>

Section 3582(c)(1)(A)(i) requires that a request for compassionate release first be presented to the Bureau of Prisons for its consideration. Only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the Bureau of Prisons' failure to move on the defendant's behalf, may a defendant move the court for compassionate release. Perez has provided an email dated October 14, 2020, purporting to be his request to the Warden at FCI Otisville for compassionate release. *See* Deft's Ex. J. But in his motion, the defendant states that he moved for compassionate release on November 24, 2020. *See* Deft's Mot. at 57.  Perez does not provide any documentation that the emailed request was received, nor does he provide documentation that his request for compassionate release was denied by the Bureau of Prisons. Assuming that Perez has exhausted his administrative remedies, he cannot overcome the § 3553(a) factors.

The Court must also determine whether Perez remains a danger to the safety of any other person or to the community. U.S.S.G. § 1B1.13(2).  Based on Perez's age, criminal history, and history while incarcerated, there is no reason to believe that he is now a danger to others or is at high risk of recidivism. He did receive a disciplinary infraction in 2018 for fighting, though another inmate claims that he started the fight. *See* Deft. Ex. C, P.[6] This determination, however, does not change that Perez's offense, the broad-day drive-by execution of Casino on a public street, put innocent members of the Hartford community in extreme danger and was exceptionally abhorrent.

---

[6] Perez also owes $16,330 in fines and assessments. *See* Deft's Ex. C.

2.    COVID-19 at FCI Otisville

As of January 28, 2021, FCI Otisville has three inmates who are actively positive for the COVID-19 disease. *COVID-19 Coronavirus* https://www.bop.gov/coronavirus/ (last visited January 28, 2021). Seven staff members are actively positive. *Id*. Twenty-four inmates and fifteen staff members have recovered from the disease. *Id*. Fortunately, the facility has not had any inmate or staff member deaths. *Id*. FCI Otisville, a medium security facility located in Otisville, New York, has a population of approximately 616 inmates (58 of those inmates are at an adjacent minimum security camp). *FCI Otisville* https://www.bop.gov/locations/institutions/otv/ (last visited January 28, 2021). To prevent the spread of COVID-19, FCI Otisville has suspended visits to the facility. *Id*. The Federal Bureau of Prisons has modified operations to mitigate the spread of COVID-19 in prison facilities. *BOP Modified Operations* https://www.bop.gov/coronavirus/covid19_status.jsp (last visited January 19, 2021). The CDC has also provided interim guidance on the management of coronavirus disease in correctional and detention facilities. Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited August 31, 2020).

It is well known that our nation awaits distribution of now-approved vaccines, a two-dose process, to protect our society against COVID-19. *See, e.g., Information about the Moderna COVID-19 Vaccine* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html (last visited January 19, 2021). Vaccination for federal prisoners remains around the corner. Because prisoners live in a congregate setting, they are among the first groups approved in phased distribution of the vaccine. *See, e.g., New York State Phased Distribution of the Vaccine* https://covid19vaccine.health.ny.gov/phased-distribution-vaccine (last visited January 19, 2021). The

COVID-19 vaccine has been delivered to staff and inmates at more than half of the BOP's correctional facilities across the nation. *COVID-19 Vaccination Efforts Commended* https://www.bop.gov/resources/news/20210116_covid_vaccine_efforts_commended.jsp (last visited January 19, 2021). FCI Otisville has not yet received doses of the vaccine for distribution, as of January 20, 2021. BOP plans to first vaccinate employees, followed by inmates. COVID-19 Vaccine Guidance https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf (last visited January 19, 2021). But as of January 28, 2021, BOP has vaccinated 20,415 individuals with one dose, and 6,846 individuals with two doses. COVID-19 Vaccinations in the United States https://covid.cdc.gov/covid-data-tracker/#vaccinations (last visited January 28, 2021). As of January 15, 2021, 5,427 inmates have received one dose of vaccine, while 1,051 inmates have received two doses of vaccine.[7]

### 3.   Perez's medical conditions weight against release

The 54-year old defendant presents evidence of two medical ailments that put him at increased risk of severe illness from COVID-19, obesity and hypertension. *See People with Certain Medical Conditions* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited January 19, 2021). The defendant presents a condition that might increase risk of severe illness from COVID-19. None of the conditions advanced by the defendant weaken his immune system or cause him to be immunocompromised. *See If You Are Immunocompromised, Protect Yourself From COVID-19* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html (last visited January 19, 2021).

### i.   Conditions that increase risk of illness

The CDC cautions that obesity, a body mass index ("BMI") of 30 or above, increases the risk of severe illness from COVID-19. The defendant has provided medical records showing a BMI slightly

---

[7] As of January 14, 2021, there are a total of 151,830 federal inmates. *See Population Statistics* https://www.bop.gov/mobile/about/population_statistics.jsp (last accessed January 19, 2021).

above 30, with a BMI of 32.7 in March 2020. *See, e.g.,* Deft's Ex. S1. The defendant has been instructed to make a lifestyle modification to lose weight. *Id*. at 122. In 2018, the defendant had a BMI under 30, at 29.7. *Id*. at 189. With respect to COVID-19, the CDC recommends that individuals suffering from obesity "take your medicines for any underlying health conditions exactly as prescribed" and "follow your healthcare provider's recommendations for nutrition and physical activity." *People with Certain Medical Conditions* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited January 19, 2021). Obesity first appeared on the defendant's medical records as an ailment in November 2020. Deft's Ex. S1 at 122.

ii.   Conditions that might increase risk of illness

The defendant presents evidence of one medical ailment that might put him at increased risk of severe illness from COVID-19, hypertension. *See People with Certain Medical Conditions* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited January 19, 2021).

Hypertension – high blood pressure – might increase the risk of severe illness from COVID-19. *People with Certain Medical Conditions* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited January 19, 2021). The defendant, as of March 2020, is taking a medication to manage his blood pressure. Deft's Ex. S1 at 365. BOP medical staff have monitored and adjusted the defendant's treatment and medication for hypertension since 2010. *Id*. at 32-34. In 2017, for example, Perez stopped taking blood pressure medication because he "drastically changed his diet and exercised religiously" and medical staff then noted that his hypertension was "well controlled." *Id*. at 89-91.

### iii.   Perez's common ailments do not entitle relief

But for the COVID-19 pandemic, the defendant would present no basis for compassionate release. The defendant suffers from obesity and hypertension, fairly common ailments. Current treatment consists mostly of a common blood pressure medication and medical advice to modify his lifestyle (*i.e.*, exercise). His ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution.

The only question, then, is whether the risk of COVID-19 changes the assessment. The government acknowledges that the defendant presents risk factors identified by the CDC as heightening the risk of severe illness were the inmate to contract COVID-19, specifically obesity, and hypertension. Accordingly, this Court may find that the defendant has met his burden in showing that there exists an extraordinary and compelling reason for compassionate release.

But Perez is not entitled to relief. Numerous courts that have declined to grant an inmate's motion for compassionate release when the inmate suffered from obesity, especially when there was no indication that that obesity was not being handled adequately at the inmate's institution. *See, e.g.*, *United States v. Sanchez*, 2020 WL 3790546, at *3 (S.D.N.Y. July 7, 2020) (noting that although inmate's high BMI (38.2) was a risk factor, the BOP was managing inmate's condition well, which "weighs against a finding of extraordinary and compelling circumstances") (quoting *United States v. Foozailov*, 2020 WL 3268688, at *2 (S.D.N.Y. June 17, 2020)) (cleaned up); *United States v. Steele*, 2020 WL 4717912, at *3 (W.D. Va. Aug. 13, 2020) (denying compassionate release to inmate with BMI of 43.5 because inmate had not shown "a particularized risk of contracting the disease at his facility" and the section 3553(a) factors weighed against his release); *United States v. Lindo*, 2020 WL 5038766, at *1 (S.D.N.Y. Aug. 26, 2020) (noting both that Lindo did not suggest "that he is receiving inadequate treatment for" his medical conditions and that "if preexisting medical conditions such as

obesity were the end of the compassionate-release inquiry, every inmate who suffers from a COVID-19 risk factor would be entitled to release, no matter the severity of his crime or the potential danger of his release to the community"); *United States v. Vadakin*, 2020 WL 4818440, at *3–4 (D. Conn. Aug. 17, 2020) (denying compassionate release to an inmate suffering from obesity because "[t]he inquiry does not end there" and the "Court harbors significant concerns about the potential danger Defendant poses to the community, given his lack of treatment ... and short period of incarceration).

Perez's obesity and hypertension, common medical conditions, are appropriately managed at the facility, which is engaged in strenuous efforts to protect inmates against the spread of COVID-19 and would act to treat any inmate who does contract COVID-19. In fact, 24 inmates at FCI Otisville have been treated for COVID-19 and have recovered. None have died. No claim has been made by the defendant that he is receiving inadequate treatment. *See* Deft's Mot. Nor has Perez established in his reentry plan how living in Vernon, Connecticut, or interacting with the public in a proposed delivery job, would be safer and allow for better treatment of his current ailments, or better treatment if he contracted COVID-19. *See* Deft's Ex. I. As of January 19, 2021, Vernon has had 1,531 cumulative cases of COVID-19 resulting in 43 deaths. *Connecticut Daily COVID-19 Update for 1/27/2021* https://data.ct.gov/stories/s/q5as-kyim (last visited January 28, 2021). Vernon's current COVID-19 rate per 100,000 persons is 5,225. *Id.*

Finally, the Bureau of Prisons has begun vaccinating federal inmates against COVID-19. The extraordinary and compelling reason that is foundational to Perez's motion for compassionate release is increased risk of illness should he contract COVID-19. Of course, his purported rehabilitation alone cannot support the motion. *Brooker*, 976 F.3d at 237-238 ("[T]he only statutory limit on what a court may consider to be extraordinary and compelling is that rehabilitation alone shall not be considered an extraordinary and compelling reason."). But there is light at the end of the tunnel – vaccine doses

are being administered to prisoners. Once Perez is inoculated against COVID his risk of severe illness should fall away. *See COVID-19 Vaccines* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/index.html (last accessed January 19, 2021). So too would his claim that extraordinary and compelling reasons exist for his release.

Where the defendant moves for release because of medical risk, release to the community could possibly increase the chance he would contract COVID-19. And where Perez seeks protection from the virus, his release from the custody of the Bureau of Prisons may very well delay his access to the vaccine. In Connecticut, the vaccine is only now available to Phase 1a individuals: healthcare personnel, first responders, and long-term care facility residents; and some Phase 1b individuals: individuals 75 and older, and residents and staff in select congregate care facilities. *CT COVID-19 Vaccine: Phases and Eligibility* https://portal.ct.gov/Coronavirus/COVID-19-Vaccination---Phases (last accessed January 28, 2021). Scheduling information is also coming soon, "likely March," for vaccine access for "individuals with an underlying medical condition with increased risk for severe illness." *Id*. It is unclear when those with an underlying medical condition will be able to receive the vaccine, and whether the State of Connecticut will categorize a BMI of 32 as a severe underlying condition. *Id*. The State only notes that "more information will be available soon for these with severe underlying medical conditions" and links to the CDC website. *Id*. In any event, where the Bureau of Prisons has begun inoculating inmates (though, not yet FCI Otisville), the State of Connecticut has not begun inoculating individuals in Perez's cohort. Perez's release could delay his access to the COVID-19 vaccine and be antithetical to his goal of protection from the virus.

## **CONCLUSION**

Perez fails to raise reasons for his release that are so compelling that they overcome his concurrent life sentences for conspiracy to commit murder-for-hire and VCAR murder. The § 3553(a) factors are fatal to his claim for relief. His obesity is not extraordinary considering the ongoing pandemic. His rehabilitation is not remarkable. A jury unanimously found that Perez should serve a life sentence without possibility of release. Perez's circumstances are hardly changed from when his Congressionally-mandated life sentence was imposed in 2005. For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's motion for release.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

__/s/_____
PATRICK J. DOHERTY
ASSISTANT U.S. ATTORNEY
Federal Bar No. PHV10400
157 Church Street, 25th Floor
New Haven, Connecticut 06510

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on January 28, 2021, a copy of the foregoing Government's Memorandum was filed electronically and served by first-class United States mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_/s/_____
PATRICK J. DOHERTY
ASSISTANT U.S. ATTORNEY