```
 1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2

 3   _____ )
     UNITED STATES OF AMERICA,      ) No. 3:02-cr-00007-JBA-1
 4                                  )
                        Plaintiff,  ) February 12, 2021
 5   v.                             )
                                    ) 11:22 a.m.
 6   WILFREDO PEREZ,                )
                                    ) 141 Church Street
 7                     Defendant.   ) New Haven, Connecticut
     _____ )
 8

 9            VIDEOCONFERENCE MOTION HEARING

10   B E F O R E:

11        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12

     A P P E A R A N C E S:
13

     FOR THE GOVERNMENT:
14
          OFFICE OF THE UNITED STATES ATTORNEY
15             1000 Lafayette Blvd, 10th Floor
               Bridgeport, CT 06604
16             (203) 696-3049
               Email: Patrick.doherty@usdoj.gov
17        BY:  PATRICK DOHERTY, ESQ.

18
     FOR THE DEFENDANT:
19
          FEDERAL PUBLIC DEFENDER'S OFFICE
20             265 Church Street, Suite 702
               New Haven, CT 06510-7005
21             (203) 498-4200
               Email: Kelly_barrett@fd.org
22        BY:  KELLY M. BARRETT, ESQ.

23

24             Official Court Reporter:
               Melissa J. Cianciullo, RDR, CRR, CRC
25             (203) 606-1794
```

```
 1          THE COURT:  All right.  We're here this
 2   morning at last, I have moved all my computers
 3   around, in United States of America v. Wilfredo
 4   Perez, 02-CR-7.
 5          We are here on Mr. Perez's emergency motion
 6   for reduction in sentence under the First Step Act.
 7          May I have appearances of counsel, please,
 8   starting with the government.
 9          MR. DOHERTY:  Good morning, Your Honor.
10   Patrick Doherty for the government.
11          THE COURT:  Good morning.
12          And for the defendant.
13          MS. BARRETT:  Kelly Barrett from the Federal
14   Defender office on behalf of Mr. Perez who is also
15   joining us by Zoom.
16          THE COURT:  All right.  Good morning,
17   Mr. Perez.  You join us from Otisville; is that
18   correct?  This is a sound check.
19          THE DEFENDANT:  Yes.  Yes.
20          THE COURT:  All right.  Do you understand
21   that you have the right to be present for this
22   proceeding and that would be done in a courtroom?
23   Have you discussed that with Ms. Barrett?
24          THE DEFENDANT:  Yes, I have.
25          THE COURT:  And are you willing to give up
```

1  your right to be present in order for us to be able

2  to proceed today remotely?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  All right.  Mr. Doherty, is there

5  anything further that we need to do with respect to

6  proceeding remotely in this matter?

7          MR. DOHERTY:  No, Your Honor.  I think beyond

8  the defendant consenting through his advice with

9  counsel as well as Your Honor finding specific

10  instances in this case that in light of the ongoing

11  pandemic as well as public health and the health of

12  the parties, that it's appropriate for us to continue

13  on via Zoom or VTC today.

14          THE COURT:  I agree.  And that is because, in

15  part, Mr. Perez is incarcerated, and the undertaking

16  of getting him to court, recognizing the safety to

17  him and others, is a concern that can be readily met

18  by proceeding, as he has agreed to, remotely.

19          All right.  There is a pending motion to seal

20  that seems to have no objection; it is to file the

21  memorandum in support in redacted form.

22          Any objection to that?

23          MR. DOHERTY:  No, Your Honor.

24          THE COURT:  Absent any objection and inasmuch

25  as the portions that Ms. Barrett seeks to seal

1   contain, among other thing, medical information that

2   is HIPAA protected or is -- otherwise has a

3   confidentiality that outweighs the public's right to

4   a fully public record, so unless there's anything

5   else, I will grant that emergency motion for --

6   excuse me.  I'll grant that motion for permission to

7   file under seal and to file the redacted memorandum

8   on the public record with the unredacted one on the

9   docket under seal.

10          Anything further on that, Ms. Barrett?

11          MS. BARRETT:  No, Your Honor.

12          THE COURT:  And that's Docket 1462.  All

13   right.

14          I'd like to see if we can have agreement on

15   certain matters so that we can focus our proceeding

16   today efficiently.

17          First of all, given the medical record that's

18   been submitted, is the government agreeing that

19   Mr. Perez's health conditions of obesity and

20   hypertension being CDC comorbidity factors satisfy

21   the -- satisfy the criterion for compelling and

22   extraordinary circumstances health-wise?

23          MR. DOHERTY:  Yes, Your Honor.  He's

24   presented a BMI over 30 which the CDC lists as an

25   ailment that may increase risk of illness with

1  respect to COVID-19 as well as hypertension.

2          THE COURT:  There are other medical concerns

3  that have been addressed, but they are not recognized

4  comorbidities.

5          Then are we agreed that Mr. Perez has

6  successfully exhausted his administrative rights?

7          MR. DOHERTY:  Yes, Your Honor.

8          THE COURT:  And is there any issue with the

9  release plan that he submitted in his papers which is

10 1461-9?

11         MR. DOHERTY:  No, Your Honor.

12         THE COURT:  Okay.  So the focus today then

13 needs to be on the government's opposition that the

14 defendant, serving mandatory life sentences, is

15 ill-suited for relief in light of the gravity of his

16 offenses; namely, murder for hire.  So let's focus on

17 that.

18         And, Ms. Barrett, you may proceed.

19         Ms. Barrett, will I be hearing from anyone

20 other than Mr. Perez today?

21         MS. BARRETT:  Yes, Your Honor.  If the Court

22 would allow it, it would be our intention to have

23 three others briefly address the Court, being

24 Mr. Ring, Mr. Christian Perez and Ms. Nelid a Perez.

25         THE COURT:  Very well.  All right.  You may

1   begin.

2        MS. BARRETT:  Thank you, Your Honor.

3        THE COURT:  You know what, let me get a full

4   inventory.

5        Mr. Doherty, will the government be

6   presenting -- will the government be presenting any

7   witnesses today?

8        MR. DOHERTY:  No, Your Honor.

9        THE COURT:  Very well.  Okay.

10        Ms. Barrett, you may proceed.

11        MS. BARRETT:  Thank you, Your Honor.

12        Mr. Perez has served the equivalent of a

13   sentence with good time credit of 26.4 years.  We'd

14   ask the Court to reduce this sentence to time served

15   under 18 U.S.C. 3582 because there are extraordinary

16   and compelling reasons that justify it and it is

17   warranted by the 3553 factors.

18        Moreover, he does not pose a danger to the

19   community, and his claim is exhausted, as we've

20   already discussed.

21        The Court has already addressed the

22   extraordinary and compelling circumstances to the

23   extent of his medical vulnerabilities.  We asserted

24   five different bases.  I don't plan to address any of

25   the other ones since we've satisfied the standard on

1    the medical conditions alone.

2         However, I do think that it's relevant to

3    address the question of the length of his sentence,

4    and that is a factor that can be an extraordinary and

5    compelling circumstance.  It's also a factor that

6    weighs into the 3553 factors.

7         In *Brooker*, the Second Circuit stated that it

8    bears remembering that compassionate release is a

9    misnomer.  3582 in fact speaks of sentence

10   reductions.  The Second Circuit goes on to say that a

11   District Court's discretion in this area, as in all

12   sentencing matters, is broad.

13        In *Brooker*, the Second Circuit lists several

14   nonexhaustive factors that could constitute

15   extraordinary and compelling factors justifying

16   reductions.  And I think it's relevant that one of

17   the explicit factors that the *Brooker* Court lists is

18   a, quote, unusually long sentence.  A life sentence

19   is unusual.  I obtained a list from the clerk's

20   office of all life sentences imposed in this district

21   since 1993.  There are 52.  Of the 52, at least eight

22   have been reduced, leaving only 44 remaining.  Out of

23   all of the people sentenced since 1993, that's easily

24   less than a percent of those, by what I could tell,

25   it looked like Your Honor had imposed only four other

1    life sentences.  So it is certainly unusual.

2           And I think it is relevant to consider what

3    does the *Brooker* Court mean by "an unusually long

4    sentence."  It can mean whatever the Court wants it

5    to mean, because *Brooker* gave the Court total

6    discretion to consider it.  But what I think it means

7    is how well did the sentence age, how well did it

8    stand up over time.  Not to say it was unjust at the

9    time or not to make commentary unnecessarily, maybe

10   it was, maybe it wasn't.

11          But at the time of the sentencing, the

12   government and the Court's hands were tied.  The

13   Court could not do a 3553 analysis.  Mr. Perez did

14   not sit for a PSR interview.  The sentence was a

15   foregone conclusion.

16          The question then regarding the length of the

17   sentence is not necessarily whether it was unjust at

18   the time, but in taking a retrospective look, the

19   question is whether the sentence is necessary today.

20          Judge Underhill addressed this in the *Vincent*

21   *Clark* decision on January 20th of this year where he

22   did reduce a sentence in part based on the length of

23   the sentence, not because it was necessarily unjust

24   at the time it was imposed, but with the benefit of

25   changed social mores and empirical data and more

1    information about how Mr. Clark fared in prison, it

2    was not necessary today.

3        And so I think it's relevant in part that

4    Mr. Perez's case arose between 1996 and 2005 at the

5    very height of draconian criminal justice practices

6    in this country.  We know from public press records

7    that the fact that the death penalty was sought was

8    an anomaly specific to John Ashcroft's Justice

9    Department.  And we know about the powerful anchoring

10   effect the death penalty can have and when death is

11   on the table, anything less, even life, seems

12   miraculous.

13       But the mitigation in this case was

14   extraordinary.  The jury found all 24 mitigating

15   factors including adding two of its own.  The maximum

16   effect of that finding though was only to reduce the

17   sentence from death to life in prison.

18       Moreover, the era that this case arose in was

19   an era at the height of the get-tough era on crime,

20   which was a philosophy not backed by empirical data

21   which has since been debunked by evidence-based

22   practices.  Many studies have since concluded that

23   the effect of increasing incarceration on crime rate

24   has been essentially zero.  That was according to a

25   Brennan Center study.  It's no longer even reasonable

1  to hypothesize that crime patterns can be explained

2  in terms of punishment policies or imprisonment

3  rates.  And, importantly, a Pew Research study found

4  that states that reduced their imprisonment rates

5  actually saw a decline in crime rates.

6       Public opinion supports the view that mass

7  incarceration is unnecessary and ineffective, and

8  there has been a growing consensus that

9  rehabilitation should principally replace

10 incarceration as a tool for addressing crime.

11      And it was in this context that the First

12 Step Act was passed.  And to be clear, the only

13 reason why we are able to be here today is because of

14 the First Step Act.  And it was in the First Step Act

15 that the other two branches of government, in an

16 unprecedented bipartisan way, both Congress and the

17 President, came together and said to the third branch

18 of government, the judiciary, we're giving you

19 discretion.  You have discretion to do this.  You may

20 reduce the sentence when there are extraordinary and

21 compelling factors and the 3553 factors support it.

22      And the Second Circuit has said in *Brooker*

23 that the First Step Act was passed because this

24 bipartisan coalition sought sweeping remedial reform

25 of the criminal justice system, including to expand

1   and expedite the use of the doctrine formerly known

2   as compassionate release.

3          In *Brooker*, the Circuit said that the First

4   Step Act was both monumental and incremental.  And

5   the important part is it explicitly says that it was

6   incremental in that rather than mandating more

7   lenient outcomes, it often favored giving discretion

8   to the appropriate decision-maker to consider

9   leniency.  And it's within that context that the

10  *Brooker* Court announced that District Courts can

11  consider the unusual length of the sentence as an

12  extraordinary and compelling factor.

13         Here the unusual length of the sentence does

14  not hold out as proportionate knowing all that we now

15  know.  We have a juror letter from the time even

16  expressing concern with the length of the sentence.

17  We have a letter written by the two prosecutors who

18  prosecuted Mr. Perez at Exhibit G, the architects of

19  the case, completely unsolicited by me, stating that

20  they understand that Mr. Perez is petitioning the

21  Court for compassionate release in part based on the

22  argument that life behind bars is too harsh a

23  sentence, and they agree.  They believe that a life

24  sentence for Wilfredo is excessive and not

25  commensurate with the role he played in the crime.

1        And so the government says, yes, but if you

2    look at the length of the sentence and revisit what

3    was the statutory mandatory minimum, that would allow

4    Courts to circumvent mandatory minimums.  And to that

5    I say, yes, that could happen.  But the answer to

6    that is judicial discretion, and that is exactly what

7    the other two branches of government chose to do in

8    the First Step Act, and that's exactly what the

9    Second Circuit says in *Brooker* and what hundreds of

10   Courts have done, including those who have granted

11   reduction in sentence motions even when there's a

12   mandatory minimum.  There is nothing improper about

13   doing so.  There is nothing in the statute, in

14   *Brooker*, in the case law that says, oh, the Court has

15   full discretion to reduce a sentence but not when

16   there's a mandatory minimum.  It doesn't say that.

17       The government says, but then anyone could

18   revisit their sentence.  But that's not true because

19   there's no right to a reduction.  And that's what

20   *Brooker* really emphasizes.  This is not a right.

21   It's something that's within the Court's discretion,

22   and that is a powerful safety valve.

23       I think the other factor that's highly

24   relevant here, and although it's not necessary

25   because the Court -- the government has conceded

1   extraordinary and compelling factors on the health

2   conditions.  But the other factor that's highly

3   relevant is Mr. Perez's rehabilitation and what that

4   says about the length of the sentence.  The Second

5   Circuit and many Courts, including this Court, have

6   considered rehabilitation as an extraordinary and

7   compelling factor, and it raises an interesting

8   question about what exactly is rehabilitation and how

9   do we consider it.  And we've looked at things like

10  the length of a sentence, remorse, programming,

11  tickets.  I have seen a lot of rehabilitation in

12  these cases under the First Step Act, but I've never

13  seen better rehabilitation than Wilfredo Perez.  He

14  has the tangible markers of rehabilitation that we

15  often look to, it's true, but there's also something

16  much more with him.  There's a breadth and a depth to

17  rehabilitation, and he has both.  You look first to

18  the length of his sentence.  He's served over 23

19  years of actual time which is the equivalent of 26.4

20  years with good time.  That's half his adult life.

21       We have heard from onlookers that when --

22  there was a visible change from the time that he went

23  to court in his first case to the time that he came

24  back to court for a trial in the second case, in this

25  case.  When he went to prison, he felt a deep sense

1    of remorse and came to the realization that the way

2    forward was through programming and trying to make a

3    difference around him.  And he set forth to try to

4    rehabilitate then and then continued to do so after

5    the sentencing in this case.

6          He's -- we know from the penalty phase of

7    this case, the case manager at Otisville testified

8    that there's only two programs that are mandatory at

9    Otisville:  The GED, which Wilfredo got, and a drug

10   program if ordered by the Court.  Wilfredo has taken

11   over 40 programs.  That's a breadth of

12   rehabilitation.

13         But he also has depth of rehabilitation

14   because he also taught himself an electrical trade

15   and put that toward the service of Otisville.  We

16   have his certification at Exhibit M.  We know from

17   BOP staff that he keeps it current.  That's at

18   Exhibit C.  And many staff have commented in Exhibit

19   C, in an exhibit -- a BOP document that I have never

20   seen this level of detail and praise exhibited toward

21   any other inmate, that the feedback is extraordinary.

22   One of the BOP staff says that Mr. Perez has saved

23   the food service department hundreds of dollars by

24   fixing and maintaining multiple pieces of equipment

25   that would have had to be replaced if he didn't fix

1  them.

2       The recreation staff says that he took it

3  upon himself to receive his certification for an

4  electronics technician in 2005.  And with his

5  certification, he has repaired numerous equipment in

6  the food service, like microwaves, also televisions,

7  food service equipment.  The total cost savings for

8  the institution cannot be accurately estimated, but

9  staff estimates it's in the thousands of dollars

10  range.

11       Every department and institution has utilized

12  his skills at some point to repair their equipment.

13  They actually established an electrical shop just for

14  Mr. Perez in the recreation department.  So after he

15  finishes his normally scheduled job in the

16  commissary, he goes to the electrical job to work a

17  second job voluntarily from about 4 to 8 fixing food

18  service ovens, fixing televisions.  He fixed a hot

19  water dispenser because inmates were making the water

20  an unsafe temperature.  So he fixed it so that there

21  was a switch that will keep the water at 190 degrees

22  and saved the administration thousands of dollars.

23       Several years ago the regional director for

24  BOP came to Otisville and met with Mr. Perez.  He

25  asked him if he thought he could repair a floor

buffer, and he said he would try.  They had a problem
with the floor buffers at Danbury prison.  He ended
up fixing between 15 and 20 floor buffers for
Danbury.

In 2008, he also saved the institution $7,000
by sanding and replacing the gymnasium floor.  And
BOP staff refers to it saying he took pride in his
work, and they go on at great length about the pride
that he showed and says that these inmates should be
recognized for their hard work and dedication in
improving the living conditions for inmates at
Otisville.

Above and beyond his work in electrical
certification, he has an actual job in the commissary
department at Otisville which is a position of trust
that very few people are selected to do.  They have
to be cleared by the SIS to do it.  He works Monday
through Thursday seven hours a day and has received
excellent work ratings.  According to the Exhibit C,
staff says, "He earns excellent work ratings.  Inmate
Perez has been working in the Trust Fund off and on
throughout his sentence.  He is a model inmate with
respect from his peers and holds a leadership role in
the commissary over his peers.  He is respectful to
staff and inmates alike.  He is helpful with

1    different tasks in the commissary and inside the

2    warehouse.  He is always willing to take on new tasks

3    and learns quickly.  He is a hard worker and always

4    gives extra to be sure his work is complete."

5         Above and beyond that, his work mentoring

6    other inmates has been documented in the record by

7    BOP staff, by the letters submitted by six other

8    fellow inmates.  There was also testimony in the

9    penalty phase by Greg Villegas and his mother about

10   this mentoring, and Mr. Perez addresses it in his

11   letter to the court.

12        According to the BOP staff, Mr. Perez has

13   been observed mentoring inmates that have a difficult

14   time adjusting to prison.  He encourages them to find

15   and maintain a job and use their time to program and

16   maintain a healthy lifestyle.

17        I'm not going to repeat what the -- there are

18   six letters in the record from other inmates that the

19   Court has that speak to the extensive nature of

20   Mr. Perez's efforts to mentor them.  Just one example

21   from Mr. Sneed's letter at Exhibit O, says, "Will was

22   always there to help the younger inmates and get

23   adjusted as well as to deescalate matters when there

24   was tension between inmates and staff.  Will found a

25   way to show younger inmates that it was okay to

1    respect authority and still be respected by others in

2    the compound.  Will worked tirelessly each day and

3    every day took pride in everything he did, not

4    wanting one thing to be off."

5          And each letter is like this, Your Honor.  It

6    goes on and on and on.

7          And, finally, he's taken on a role in trying

8    to create peace and keep the peace at Otisville.

9    There's not an officer there that doesn't know him

10   and like him.  According to staff, he maintains an

11   excellent rapport with staff and inmates, and he's

12   assisted numerous inmates trying to deescalate

13   tension when it arises.

14         Perhaps most extraordinary of all though is

15   the Bureau of Prisons' own decision to keep Mr. Perez

16   at Otisville for over 23 years which is something

17   I've never seen with any other client.  It's truly

18   extraordinary.  Most inmates sentenced to life in

19   prison are sent to U.S. penitentiaries.  They made an

20   exception for him to be sent to Otisville which is a

21   medium-security institution.  In addition to that,

22   even inmates serving that sentence are transferred

23   multiple times, but he's been kept there due to

24   institutional needs which speaks volumes for his

25   rehabilitation and the worth that he has in the

1    institution's eyes.

2          He has also demonstrated rehabilitation

3    through his relationship with his family.  He has

4    strong ties with his son, his sister, his parents.

5    At the penalty phase there was testimony that

6    Mr. Perez spoke to his son every single day before

7    school and after school and up to four times a day.

8    Every 15 days he visited with his son in person at

9    the institution.

10          Tickets, in over 23 years, he has only two

11    tickets which is an extraordinary record.

12          So the level of rehabilitation for Mr. Perez

13    is truly extraordinary.

14          I do want to just touch on briefly the -- one

15    other factor that we cited, which is not necessary to

16    find but just in considering the entire picture about

17    Mr. Perez.  We also cited his father's health as one

18    other extraordinary and compelling factor.  Juan

19    Perez is 82 and has end-stage renal disease and a

20    variety of other medical ailments that we submitted

21    at Exhibit Z.  Courts have held family medical issues

22    to constitute extraordinary and compelling

23    circumstances especially in combination with other

24    factors.

25          The Court also has to consider the 3553

1    factors which I'll turn to now.

2          THE COURT:  May I stop you there,

3    Ms. Barrett.

4          MS. BARRETT:  Yes.

5          THE COURT:  Mr. Perez's father's health, that

6    issue.  His father is in Puerto Rico.  The release

7    plan has him staying up here in Connecticut.  Why is

8    his father's health relevant?

9          MS. BARRETT:  Yes, Your Honor.  The release

10   plan has Mr. Perez coming here because that's what we

11   think will provide the most stability for him, and I

12   stand by that plan.

13         The -- in talking with the family, their hope

14   and plan is that if they can stabilize Juan Perez

15   enough to be able to make the trip, that they would

16   move him from Puerto Rico to here.  It's been

17   difficult because of COVID.  But if Mr. Perez were

18   released, that would provide the impetus to make that

19   happen, and then he would become the primary

20   caretaker.  But because -- without Mr. Wilfredo Perez

21   being released, there wouldn't be another suitable

22   primary caretaker here, so they haven't done that

23   yet.

24         In regards to the 3553 factors, these were

25   not able to be considered at the original sentencing

1    due to the fact that the sentence was a foregone

2    conclusion.  The Court is very familiar with

3    Mr. Perez's history and characteristics, which is the

4    first thing the Court has to consider in this -- in

5    the 3553 analysis.

6            Just briefly, Mr. Perez lived with his family

7    when he was young in Hartford.  And when he was 13,

8    he moved to Puerto Rico, which was a very traumatic

9    move for him.  At 17, he entered into a relationship

10   with a woman who became Christian's mother.  She then

11   took Christian to Florida without permission and

12   began abusing him and neglecting him which then

13   prompted Wilfredo to get custody of Christian, which

14   has been a central and extremely important

15   relationship in his life.

16           At the time of the offense, Mr. Perez was 29

17   years old, and he is now 54 years old.  Prior to his

18   arrest in 1996, he had no criminal record and had

19   never been incarcerated.

20           As I said, he has maintained a strong

21   connection to his family.

22           And I've already discussed his postconviction

23   conduct.  I'm not going to repeat it here.  But what

24   I've already discussed about his characteristics in

25   prison apply in the 3553 analysis.

1          I would also mention that he was on bond for

2    two years in the 1996 drug case with no new criminal

3    conduct, and it was actually stipulated at the

4    penalty phase in this case that he attended every

5    court appearance as required as well as sentencing,

6    even knowing then that the government was seeking a

7    sentence of 30 years or possibly even life.  There

8    was also testimony at the sentencing hearing that he

9    maintained employment during the two years he was on

10   bond between 1996 and 1998.

11         In addition to his history and

12   characteristics, the Court has to consider the nature

13   and circumstances of the offense which in this case

14   are extremely serious.  I think this is described

15   very succinctly and clearly in the letter submitted

16   to the Court by David Ring and Shawn Chen at Exhibit

17   G which refers to the fact that Wilfredo was the head

18   of a small drug organization that obtained sizable

19   quantities of drugs.  Wilfredo and his brother Tony

20   Perez, as well as Ollie Berrios, were the main people

21   involved in the organization.

22         Wilfredo and his family members had a lengthy

23   and tumultuous relationship with Teddy Casiano who

24   was the violent head of a local street game called

25   the Savage Nomads.  They began as, actually,

childhood friends.  And even when Teddy was in prison

for federal bank robbery, Wilfredo and his family

supported him there.  And it was after he was

released from prison the relationship deteriorated.

After a number of run-ins between Mr. Casiano's gang

and Wilfredo's street dealers, the conflict came to a

head when Teddy Casiano kidnapped Berrios and stole

several kilograms of cocaine.

After prior confrontations, Wilfredo had

refused to allow Tony and Ollie Berrios to respond

with violence.  After this time, Wilfredo green lit

Berrios's efforts to a hit man from New York to

arrange for Casiano's killing.  And he did so knowing

that that's what was going to happen, that Casiano

would be killed.  It's obviously an extremely serious

offense, and there's nothing that can undo that.

I think it bears noting though that in

bringing this motion, neither I nor the prosecutors

who prosecuted Mr. Perez in submitting their letter

are trying to trivialize Wilfredo's role in any way.

In Exhibit G, Attorneys Ring and Chen state, "In our

minds, he bears responsibility; however, the evidence

presented at trial showed that Wilfredo was not a

moving force behind the murder.  Without the drive

and determination of others, the murder would not

1    have happened."

2         Mr. Perez has taken responsibility in his

3    letter to the Court at Exhibit D through trying to

4    atone by his behavior in prison and will also take

5    responsibility when he addresses the Court shortly.

6         Under 3553, we also look to the purposes of

7    sentencing, and one of the purposes of sentencing is

8    to reflect the seriousness of the offense, to promote

9    respect for the law and provide just punishment.  And

10   this is obviously at the heart of the Court's

11   consideration.

12        Here Mr. Perez has served the equivalent of

13   26.4 years in prison, which is a serious sentence for

14   a serious crime.  It's a fundamental principle of

15   sentencing law that punishment is not measured in a

16   vacuum.  It's measured against a specific individual.

17   Here Mr. Perez had no prior criminal history and was

18   never in prison before.  Under *Mishoe*, a sentencing

19   is supposed to be incrementally proportionate.  Here

20   a sentence of 26.4 years is proportionate under

21   *Mishoe*.  A life sentence though would be unnecessary.

22        In addition, Mr. Perez has been punished

23   beyond the contours of this sentence.  Both of his

24   brothers have been killed by, in effect, his criminal

25   wrongdoing.  One brother from drug-related causes,

1    the same kind of drugs that he was selling.   And

2    another brother, Tony, was murdered in prison serving

3    his sentence on his case.

4         In addition, due to the pandemic, the

5    conditions of confinement have been extremely severe.

6    This is a factor that also constitutes extraordinary

7    and compelling circumstances as we've briefed it, and

8    it's discussed at length in Judge Rakoff's decision

9    in the *Rodriguez* case that although prison is

10   supposed to punish, the punishment is in the taking

11   away of the person from society.   It's in the

12   incapacitation.   It's not supposed to be to cause

13   suffering.

14        And the effect of the pandemic has caused not

15   only extremely harsh conditions but also suffering.

16   When the pandemic hit, the facility went into a 24/7

17   lockdown with only a brief 30-minute period three

18   times a week for showers.   There have been no family

19   visits, very limited calls, no programming.

20        Courts have considered the harshness of

21   conditions of confinement in doing the analysis of

22   the severity of punishment, and in this case those

23   severe conditions have made the sentence more

24   punitive.

25        The average federal murder sentence is 241

months, according to a study we cited from the
Sentencing Commission which was also cited by Judge
Bolden in the *Powell* case.  There is precedent within
the Second Circuit and outside the Second Circuit for
sentence reductions in cases involving murder with
reductions between 20 -- two sentences between 20 and
30 years.  There were a series of reductions under
Section 404 of the First Step Act where several
people had their sentences reduced to 20 years.  Each
one involved murder.  That was Aaron Harris, Leonard
Jones, Lyle Jones and Quinne Powell.

         There have also been reductions under the,
quote/unquote, compassionate release portion of the
First Step Act.

         In the *Gluzman* case in the Southern District,
the sentence was reduced to 24 years.  The *Wong Chi
Fai* case, the sentence was reduced to 26 years.  The
*Lopez* case from Hawaii, the sentence was reduced to
23 years.

         So there is precedent for reducing a sentence
even for cases involving murder, to a sentence
between 20 and 30 years.

         There have also been reductions to 30 years.
The *Rodriguez* case by Judge Rakoff was one of them.
In that case, though, he describes that as a

1    particularly heinous murder.  It involved the murder

2    of a government informant.  And, of course, this

3    Court's decision in *Hector Rios*, the sentence was

4    reduced to 30 years which in that case was the time

5    that he had already served.

6         Another factor the Court has to consider in

7    the 3553 factors is deterrence.  For much the same

8    reasons a sentence of 26.4 years is adequate to

9    deter, there is no empirical evidence that longer

10   sentences deter more.  In fact, there is some

11   evidence by the Sentencing Commission that longer

12   sentences actually increase recidivism.  Under

13   *Mishoe*, there's also no reason to believe that a

14   longer sentence is needed to deter.  And there are

15   other factors like his age of 54, his accomplishments

16   in prison and his strong family support that make him

17   unlikely to recidivate.

18        Protecting the public from further crimes of

19   the defendant, public safety just isn't served by

20   Mr. Perez remaining in prison for the rest of his

21   life.  He poses very little threat if released now.

22   He has not been a danger in prison.  He -- his

23   reduced security classification is commensurate with

24   the BOP's view on that.  He does not have a history

25   of violence in prison.  He has a very strong release

1    plan which will provide the Court with additional

2    assurances.  He was on bond for two years after the

3    1996 case, and there were no issues while he was on

4    bond.

5            The Court is also supposed to consider

6    providing the defendant with needed educational or

7    vocational training, medical care and correctional

8    treatment in the most effective manner.  He's already

9    taken advantage of almost every opportunity available

10   in prison, so there's no need to incarcerate him

11   further for that purpose.

12           As for medical care, this factor strongly

13   weighs in favor of release since he's 54 years old,

14   vulnerable to COVID and unable to protect himself in

15   prison.

16           We've also cited studies about the reduced

17   life expectancy of aging prisoners, and this goes not

18   only to his inability to protect himself from COVID

19   in prison but also to the fact that his life

20   expectancy is expected to be shorter due to both his

21   medical issues and the toll that prison has taken on

22   his body.

23           Finally, the statute directs the Court to

24   consider the need to avoid unwarranted sentencing

25   disparities.  If the Court looks at relative

1    culpability in this case, reducing Mr. Perez's
2    sentence would not create an unwarranted disparity
3    because all of the other sentences are much shorter.
4    Feliciano was sentenced to 144 months which was
5    reduced to time served.  Antonio Perez did receive
6    life but he was killed in prison.  Raymond Pina
7    received 108 months.  Fausto Gonzalez also -- he was
8    the shooter in this case, Your Honor, and as Court
9    knows he did receive life; however, he was also
10   convicted of many other -- or at least other murders
11   in New York.  Ollie Berrios was not prosecuted in
12   this case, and he received a reduced sentence on the
13   prior drug case.  And Mario Lopez got a sentence of
14   60 months.  So a reduced sentence here for Mr. Perez
15   would not create a disparity within the case.
16          There's also the question of relative
17   disparity across similar cases, and I've already
18   cited numerous examples that highlight that this
19   would not create an unwarranted disparity.
20          Under the reduction in sentence test, the
21   Court also has to consider whether Mr. Perez would be
22   a danger to the community.  The evidence that's
23   already been discussed applies to this factor as
24   well:  through his programming, good works, mentoring
25   others, work ethic in prison, his security

1   classification, his disciplinary record, as well as

2   his stringent release plan and his record on bond

3   when he was released between 1996 and '98.

4          So in conclusion, Your Honor, this is a very

5   serious case and Mr. Perez has served serious time

6   for it, over 26 years with good time.  Because there

7   was a mandatory minimum, neither this Court nor the

8   government could request or impose anything other

9   than life, nor could a 3553 analysis be done before.

10         The First Step Act gives the Court the power

11  to reduce sentences, not just to circumvent mandatory

12  minimums but when there are extraordinary and

13  compelling circumstances and when the 3553 factors

14  support it.  There is no exception under the First

15  Step Act for mandatory minimum sentences.  On the

16  contrary, the Second Circuit actually suggests in

17  *Brooker* that the length of a sentence in particular

18  is a factor the Court can consider in determining

19  extraordinary and compelling circumstances.

20         And it's clear that the intent of passing the

21  First Step Act was to address the draconian impact of

22  past sentencing procedures and laws.  The Court is

23  now empowered by both the legislative and executive

24  branches to do the 3553 analysis that it never had

25  the chance to do before.  Beyond that though, the

1    Court is not bound by the perspective of this case

2    between 1996 and 2005.  The Court now has the benefit

3    of a retrospective look including new empirical data

4    about sentencing practices, changed social norms and,

5    most importantly, Mr. Perez's completely and utterly

6    extraordinary rehabilitation in prison.

7           There are many pathways to a decision here.

8    But on the most basic level, the Court is authorized

9    to grant this motion on the basis of Mr. Perez's

10   medical vulnerabilities to COVID in combination with

11   the severity of conditions rendered by the pandemic

12   and his rehabilitation, as have countless other

13   Courts across the country, even in cases involving

14   life sentences and even in cases involving murder.

15          I'm asking the Court to reduce his sentence

16   to time served rather than to impose a particular

17   number because if the Court imposes a number, it will

18   trigger the BOP to do a time credit analysis, and my

19   concern is that there may be a problem with the way

20   the BOP credits his time from the 1996 case.

21   Moreover, I believe that a sentence of time served,

22   which reflects a 26.4-year sentence, is sufficient

23   and is also commensurate with the immediate threat to

24   his life posed by COVID.

25          However, if the Court believed that a

1   time-served sentence was not sufficient but that

2   another form of reduction was appropriate, the Court

3   would also be authorized to do that under *Brooker*,

4   and there have been numerous examples of Courts

5   reducing sentences to something other than time

6   served.

7          In closing, at the penalty phase of the

8   trial, Mr. Reeve, defense counsel, asked Mr. Perez,

9   "Do you intend to change anything in terms of what

10  you've been doing for the last six years and what you

11  intend to do down the road?"

12         Mr. Perez said, "I think I'll try to do it

13  better."

14         They were referring to specifically to his

15  relationship with his son.  But the comment applies

16  in all respects, and that is exactly what he has

17  done.  He has given the Court every reason to believe

18  that a life sentence is not necessary.

19         With that, unless the Court has any other

20  questions, I would -- if it's acceptable to the

21  Court, I would ask that Attorney David Ring be able

22  to speak briefly on behalf of Mr. Perez.

23         THE COURT:  Can I update Mr. Perez's medical

24  situation?  Has he been vaccinated?  Has he been

25  tested recently?  There was some analysis that he had

1   potential COVID symptom but had not been tested, I

2   think, in the last six months.

3        MS. BARRETT:  He has not been vaccinated.  To

4   my knowledge, he has not been tested since the last

5   test on record in June.

6        THE COURT:  Your data on life sentences in

7   this district, did you sort out for mandatory versus,

8   let's call it, individualized death -- life

9   sentences?

10       MS. BARRETT:  No, I didn't, Your Honor.  But

11  I can say that there have been reductions in sentence

12  granted in cases where there have been mandatory life

13  sentences.  The *Rodriguez* case in New York is one of

14  them, and there have been at least two others that

15  we're aware of.  The *Wong Chi* case out of New York

16  was also a mandatory life sentence that was reduced.

17  And there was a third, at least a third one, the *Rios*

18  case out of Hawaii was also a mandatory life.

19       Within this district, I don't have that -- I

20  don't have precise information on that.  I do know

21  that the -- in the *Hector Rios* case that this Court

22  presided over, that was treated as a mandatory life

23  sentence, although our office determined that that

24  was actually an error.  But at all times that had

25  been treated as a mandatory life sentence.

1    THE COURT:  And then Mr. Perez has three life

2    sentences imposed concurrently, but that was just for

3    one murder.

4    MS. BARRETT:  Yes, Your Honor.  And that was

5    the same situation in the *Hector Rios* case.  There

6    were three concurrent life sentences for one murder,

7    in contrast to some other cases where there were

8    multiple murders.  This was just one murder.

9    THE COURT:  I'm interested in your view of

10   any difference analytically that you see between a

11   defendant who personally commits a murder versus

12   hires it.  What are the culpability differences, if

13   any, that you see?

14   MS. BARRETT:  I think that it could depend on

15   the individuals in the specific case.  To me what

16   resonates in this case is not so much that he didn't

17   actually commit the murder but that the plan was

18   brought -- that the plan did not initiate with him.

19   The plan was brought to him.  And he gave the go

20   ahead.  First of all, he initially did not want to go

21   forward with it, and he was known not to want to be

22   engaged in violence and that he resisted and only --

23   THE COURT:  I understand the circumstances of

24   his case.  I am interested analytically though in the

25   relative culpability of somebody who hires someone to

1    do the murder for them versus does it with his or her

2    own hands.

3              MS. BARRETT:  I think it's a hard question to

4    answer, Your Honor.

5              THE COURT:  That's why I'm asking it, because

6    I am interested in that distinction, if there is one.

7    I don't -- I have not run across any case law that

8    has made that distinction.

9              MS. BARRETT:  I also haven't seen any case

10   law that's made that distinction.  In my mind, just

11   my opinion, I sort of intellectually think that the

12   person that actually commits the murder, who carries

13   it out, is more culpable because that's a direct --

14   it says -- there's a certain psychological distancing

15   that can occur when one is removed from that act.

16   But that one that is actually able to do that act to

17   take another human life, I see that as more

18   aggravating, as something that's more culpable.

19   Because there's so many things that can happen

20   between point A and point B, and the bottom line is

21   that when a person is actually the one carrying it

22   out, to me that reflects a greater level of

23   culpability than someone that is multiple steps

24   removed.

25              THE COURT:  So that means that the hit men

```
1   always should be punished more severely than the
2   person who hired them?
3          MS. BARRETT:  I don't think it's always the
4   case.  I think it depends on the other factors that
5   go into the 3553 analysis, the other factors that --
6   about the person's history and characteristics and
7   what may have led them to that point, the other
8   factors surrounding the actual commission of the
9   crime and other factors about the individual, like
10  whether there are mental health factors, whether
11  there are, like, organic brain injury, what -- the
12  age of the person involved.  I think there are a lot
13  of factors that can go into what sentence such a
14  person should get.
15         But kind of in an intellectual vacuum to me,
16  generally speaking, I think actually committing --
17  actually carrying out the act is more severe.
18         THE COURT:  All right.  You wanted us to next
19  hear from Mr. Ring.
20         MS. BARRETT:  Yes, Your Honor.
21         MR. DOHERTY:  May I be heard on this matter
22  before Mr. Ring speaks?
23         THE COURT:  Yes.
24         MR. DOHERTY:  Your Honor, I have a concern
25  with Mr. Ring speaking specifically and object on the
```

1    grounds that I don't know if it's necessarily

2    appropriate for a former advocate of the government

3    to weigh in on this proceeding and potentially take a

4    position of advocacy in this hearing where he's -- he

5    no longer represents a party and he's no longer

6    involved in the case, and he may be -- where he

7    represented the United States of America in the past,

8    now may be taking a position contrary to that prior

9    position.  So I'm concerned, first, with that aspect.

10          And, secondly, I don't know beyond the letter

11   that's already been provided to the Court and really

12   haven't considered, because I didn't have prior

13   knowledge that Mr. Ring may be speaking today, what,

14   if anything, first, he may say, if there are any

15   discovery obligations if he says something

16   differently than what's been said in the past or

17   what's been relayed by the government in the past.

18          And, third, there are co-defendants, of

19   course, in this case too.  So while this is a hearing

20   with respect to Mr. Perez, what's said here could

21   potentially be imputed onto co-defendants and cause

22   issues there.

23          These aspects just haven't been considered

24   yet.  I don't know if this is something that we could

25   object to or put on hold so that I can discuss this

1   internally within our office.  But with respect to

2   the propriety of a former advocate for the government

3   now speaking in a different role as a nonparty to the

4   case, that certainly concerns me.

5        THE COURT:  So, Mr. Doherty, it seems to me

6   that it would be worthwhile hearing Mr. Ring on this.

7   He had a long career at the U.S. Attorney's Office

8   and was -- I believe, enjoyed the reputation of

9   punctiliously carrying out and respecting his role

10  there.

11       Your quarrel is once he has left the office

12  and to the extent he is not testifying about any

13  internal discussions or decisions of the office at

14  the time that he was involved with Mr. Perez's

15  prosecution, whether he can, based on his knowledge

16  and personal assessment of the evidence in the case,

17  testify; is that right?  Is that your quarrel?

18       MR. DOHERTY:  I think it's twofold, Your

19  Honor.

20       THE COURT:  I think "testimony" is a strong

21  word.

22       MR. DOHERTY:  Sure.  I think any facts that

23  he may present would already be in the record, of

24  course.  So I would presume he is being called to

25  opine on the matter or opine on Mr. Perez to date.

 1          But moreover, he, again, was a former

 2     advocate for the government so he may be taking

 3     positions contrary to his prior advocacy as well.

 4          THE COURT:  Does this not get back to

 5     Ms. Barrett's argument that with a mandatory life

 6     sentence, there are no discussions at sentencing or

 7     otherwise about the individual 3553 factors, that

 8     that is now presented for the first time in ab

 9     initio?

10          MR. DOHERTY:  I think in part, Your Honor,

11     there was, of course, the penalty phase where there

12     was, of course, hearings or it went before the jury,

13     at least, with respect to Mr. Perez's background.  He

14     was able to call witnesses and the jury did find

15     mitigating factors.

16          So while, yes, there was not the 3553(a)

17     analysis because a mandatory -- there was a mandatory

18     minimum of life imprisonment, I don't know here what

19     Mr. Ring would say that is not already within -- not

20     already in the record.  So whether it's evidence and

21     facts of the case, the occurrence and the murder, or

22     would potentially be contrary to his prior advocacy

23     where he was on part of the prosecution team that

24     sought the death penalty.  The jury rejected that and

25     imposed a mandatory life sentence.

1        And, again, I would presume that he would

2    then opine now, based on his letter, that less than

3    life is now appropriate based on, it looks like, a

4    combination of the facts of the case and Mr. Perez's

5    efforts in prison to date.

6        So, again, it's just concerning to me to have

7    a prior advocate for the government who no longer is

8    an advocate for the government and is now in private

9    practice opining or giving his opinion, whether it's

10   to the record which is already established and clear

11   or, I assume, events that have occurred since, to wit

12   Mr. Perez's incarceration or how he has behaved while

13   incarcerated.

14       THE COURT:  Given the unusual circumstance of

15   a former prosecutor volunteering to come forward to

16   be of assistance to the Court in this difficult

17   decision, why isn't this part of what the Court

18   should consider?

19       MR. DOHERTY:  Well, again, I don't know if

20   Mr. Ring, as a prior advocate, if his opinion on, I

21   guess, what the appropriate sentence now, looking

22   retrospectively, would be, if that's an appropriate

23   opinion to be made before the Court.  I think

24   ultimately, that, of course, is Your Honor's

25   decision.  I think we have the letter, which I think

1    we can all surmise that that's what he will say.

2         But, again, it's a bit counterintuitive for

3    him, where he previously brought this case to a death

4    penalty determination before the jury, of course also

5    had the mandatory minimum life sentence for the

6    counts of conviction, I just think it's -- it's of

7    course -- it is unusual, and I think Your Honor put

8    it best.

9         But I don't know if his opinion now is

10   necessarily relevant as part of Your Honor's

11   consideration.  It's certainly not one of the 3553(a)

12   factors, the prosecutor's opinion, I guess, on

13   whether or not a particular statute or sentence is

14   overly punitive or underly punitive.

15        THE COURT:  Well, let's be clear.  It was not

16   Mr. Chen's or Mr. Ring's decision to prosecute this

17   as a death penalty case.  That whole procedure

18   emanates from the decisions made in Main Justice.

19        MR. DOHERTY:  That's fair, Your Honor.

20        THE COURT:  And are directed to be carried

21   out by the U.S. Attorney's office; isn't that

22   correct?

23        MR. DOHERTY:  That's a fair representation,

24   Your Honor.

25        THE COURT:  And that could even happen

1    over -- even where a U.S. Attorney's office gives
2    recommendation to the attorney general not to pursue
3    the death penalty but the attorney general overrules
4    that and proceeds to prosecute it as a death case.
5    Isn't that correct?
6              MR. DOHERTY:  Of course, Your Honor.
7              THE COURT:  All right.  I'm going to -- I
8    understand your concern.  It's been clearly set out.
9    When you say you don't know if it's appropriate, I
10   don't see anything inappropriate.  The weighing,
11   obviously, is what's important.  And we've had enough
12   time with his letter on the record to have any
13   impropriety briefed and brought to the Court's
14   attention.
15             So absent any of that and with your remarks
16   expanding on the unusual nature of the former
17   prosecutor coming forward like this, I'm going to
18   permit Mr. Ring to speak.  It is not, of course,
19   testimony.  And perhaps he will address some of the
20   considerations that he and Mr. Chen went through in
21   deciding to come forward here.  But I'll leave that
22   up to him.
23             Mr. Ring.
24             MR. RING:  Thank you, Your Honor, and good
25   afternoon.

1        I will point out the irony of the person who

2   perhaps in this room knows the least about the case

3   objecting to the person who perhaps knows the most

4   about the case from providing information to the

5   Court.

6        In regard to the concerns that were raised by

7   Mr. Doherty, first of all, I have no intention of

8   saying anything to this Court that is inconsistent to

9   what was said to the Court previously.

10        We sought a mandatory sentence, as we were

11   obligated to do under the law, and now we're in a

12   situation where that mandatory apparently is no

13   longer applicable.

14        To Mr. Doherty's point that he doesn't know

15   what I have to say or whether there's something I'm

16   going to say that's new, I'll just simply point out

17   Mr. Doherty has never reached out to me and asked me

18   to elaborate on my position or even to discuss this

19   matter.

20        I'll point out to the Court too that the

21   Count can probably see on the screen that Mr. -- not

22   mister, Special Agent Matta is also in attendance.

23   It's my understanding that despite Agent Matta's

24   extensive involvement and experience in this case,

25   that the government has not reached out to him either

1  in terms of asking his opinion on the issue that is

2  now before the Court.  And, in fact --

3         THE COURT:  I did not realize Mr. Matta was

4  on this, in this hearing.  He is?

5         MR. RING:  He is.  And not by invitation of

6  the government, Your Honor.

7         In fact, and third, and not to belabor my

8  response to Mr. Doherty's comments too much, I think

9  if, I heard correctly, Mr. Doherty referred to my and

10  Mr. Chen's pursuit of the death penalty against

11  Mr. Perez and maybe perhaps that being part of his

12  concern as to why my position now might be

13  inconsistent with the position that was taken

14  earlier.

15         And as Court knows, being familiar with the

16  facts of this case, the government, the prosecutors,

17  myself and Mr. Chen, obviously with the approval of

18  our office, actively and intentionally did not ask

19  for the death penalty in the case of the jury.  We

20  simply processed the death penalty phase without

21  explicitly asking the jury to impose the sentence of

22  death.  And, frankly, the reason behind that is

23  entirely consistent with the reason behind the

24  position that was expressed by Mr. Chen and myself in

25  the letter to the Court.

1        So all of that being said, my intention was

2   to be extremely brief here, which I've now failed at

3   doing.

4        I wanted to begin my comments by just

5   pointing out something that's probably a truism.  Not

6   everybody who is involved in a particular crime is

7   culpable in the same way.  I think in this case the

8   Court could not have a clearer example of that.  To

9   say that somebody like Fat Jay has the same or had

10  the same culpability as somebody like Fausto

11  Gonzalez, I think would be fairly absurd.

12       The way the mandatory minimums work in our

13  system, obviously the law sets a floor to make sure

14  -- or sometimes sets a floor to make sure that there

15  is some degree of culpability and some degree of

16  responsibility that people are held to as a result of

17  their conduct or involvement in a particular crime.

18       But in cases like this where the mandatory

19  minimum is the maximum, that becomes even more

20  trying, challenging and potentially unjust.  And,

21  again, using the example of Fat Jay and Fausto

22  Gonzalez, I think everybody, perhaps not Mr. Doherty,

23  would agree that it would be an unjust result to have

24  somebody who is strictly involved in a murder case

25  treated in the way that the person who is most

1  involved in the murder is treated and have to suffer

2  from a mandatory life sentence.

3      And that really is the point that I intended

4  to make in regard to Mr. Perez and that I hope I made

5  in the letter that Mr. Chen and I submitted to the

6  Court is Mr. Perez falls in the range of culpability

7  in this case based on the evidence that was presented

8  at trial.  And most strikingly in regard to that, as

9  the Court, I think, knows, he was not the driving

10 force behind this murder.

11     And given the situation that the Court is now

12 in, the fact that the Court can for the first time,

13 hopefully, sentence Mr. Perez based on his actual

14 conduct based on the 3553 factors, we are of the

15 opinion, or at least we are grateful that the Court

16 is in a position to do so, and we ask the Court to

17 take the facts and circumstances in the case as

18 presented by the government at trial and impose what

19 truly will be a just sentence in this case.

20     THE COURT:  All right.  Thank you.

21     Mr. Doherty, do you have anything that you

22 wish to query Mr. Ring about?

23     MR. DOHERTY:  I don't, Your Honor.  Thank

24 you.

25     THE COURT:  Ms. Barrett?

1          MS. BARRETT:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you, Mr. Ring.

3          MR. RING:  Thank you, Your Honor.

4          MS. BARRETT:  Your Honor, I would next ask

5    that Christian Perez address the Court.  This is

6    Wilfredo's son.  He's now 34 and works as a nursing

7    program coordinator.

8          Christian, if you're there, you can unmute

9    yourself now.

10          THE COURT:  Good afternoon, Mr. Perez.

11          MR. CHRISTIAN PEREZ:  Good morning, Your

12    Honor.

13          THE COURT:  The last time I saw you, you were

14    a teenager, right?

15          MR. CHRISTIAN PEREZ:  Yes, I was.

16          First and foremost, I just want to thank you

17    for taking the time to view my father's case.  Once

18    again, my name is Christian Perez and I'm Wilfredo

19    Perez's son.

20          I have been employed at UConn Health for the

21    past 15 years, and I also -- I attend Central

22    Connecticut State University.  I also received my

23    associate's degree, and I've received numerous

24    promotions throughout the years.

25          And if it wasn't for my father, I wouldn't be

1   in the position I'm at today.  He has been my

2   inspiration.  He has motivated me.  And as you are

3   all aware now, that's the only parent I have.  I've

4   never seen my mother.  And he's guided me, he's

5   mentored me the whole way despite the circumstances.

6   You know, and I just hope that we're able to reunite

7   one day and I can just ...

8           THE COURT:  So tell me about the impact his

9   calls to you from prison have had.

10          MR. CHRISTIAN PEREZ:  Over the years we have

11  communicated by e-mails, by calls, my visits.  You

12  know, any -- every time we would leave his visits, we

13  have -- not only I but whoever has came along with me

14  to visit him, we have always left inspired.  He

15  has -- you know, we've always had conversations along

16  the lines of this -- opening up small businesses or

17  just how to stay positive or how to just keep

18  pressing on and, you know, striving towards, you

19  know, success.

20          THE COURT:  Any questions of Mr. Perez?

21          Thank you.

22          MR. CHRISTIAN PEREZ:  We are --

23          THE COURT:  What?

24          MR. CHRISTIAN PEREZ:  Me or my father?

25          THE COURT:  Of you, Christian Perez.

1      MR. CHRISTIAN PEREZ:  No.  I don't have any

2  questions.

3      THE COURT:  Okay.  Thank you very much.

4      MS. BARRETT:  Thank you, Your Honor.

5      Now I would ask Ms. Nelida Perez to address

6  the Court.  This is Mr. Perez's sister.

7      MS. NELIDA PEREZ:  Thank you for giving me

8  this opportunity.  Thank you, Kelly.

9      As everyone knows involved with this case, in

10  1998, Wilfredo, my brother, was incarcerated.

11  February 14, 1998, two days from like now would be

12  his anniversary, my oldest brother passed.  In 2010,

13  we lost Jose Perez who was murdered in prison.

14      I, Your Honor, have my parents here.  They

15  weren't able to log on, so what I did was I had my

16  camera turned on my phone so that they could be

17  present today.

18      With everything that happened with my family,

19  Your Honor, I decided to study drug addiction.  I

20  became a drug addiction counselor.  And in that time

21  for 15 years I've been working with people in

22  recovery.  I also started an LLC as a conservator,

23  which I work a full-time job as a conservator, and I

24  also work as a drug addiction counselor full-time.

25      When I sit with my clients, I use my brother

1    as an example, and I tell my clients that my brothers

2    don't have an opportunity but they do.  My brother

3    Nelson died of addiction.  He's not here.  He can't

4    make a change.  But my clients can.

5            I have a client who was a heroin user for 30

6    years.  And when we met it was very, very difficult.

7    I was -- it was almost impossible to build a

8    relationship with this individual.  But like I say, I

9    never gave up on her.  And for years I worked with

10   her and I got -- I can say that she's been six years

11   clean, and we still until today, we keep our

12   relationship.

13           I believe in change.  I believe in

14   rehabilitation.  This is why I'm here today, because

15   I believe that the Wilfredo has rehabilitated.

16   Wilfredo and I are very, very much alike.  And when

17   he says -- when I hear Kelly express all of the

18   circumstances and how he's bettered himself, I can

19   see that she's barely almost speaking of me, of who I

20   am, because that's exactly what I've done.

21           When my family -- this whole thing happened

22   with my family, I decided that, why, you know, drugs.

23   I have so many questions and so little answers.  I

24   couldn't go back to my brothers because,

25   unfortunately, they were no longer here.  So this is

1    when I decided that I want to get into drug

2    addiction.  I want to make a change.  I will be

3    damned if any other family is ever going to go

4    through what we went through.

5            In the event that Wilfredo Perez is released,

6    I have -- in 2016, I bought a home.  I have two empty

7    rooms.  And I'm going to answer your question as to

8    my dad being in Puerto Rico and why not here, it

9    would be very difficult for me to do it alone because

10   -- considering that I have two full-time jobs.  My

11   mission is to have my parents here.  In the event

12   that Wilfredo was released, I would do that.  I have

13   two empty rooms, one waiting for Wilfredo, the other

14   one waiting for my mom and dad.

15           As we speak, my dad has a huge ulcer in the

16   bottom of his foot.  I was just there in January.

17   And they can't seem to understand why it's not

18   healing, and so they are -- as a matter of fact, he

19   has an appointment today.  They're going to run some

20   tests to find out if it's something that has to do

21   with his circulation.  I know medical treatment in

22   Puerto Rico is not what it is here.  I believe -- I

23   have more belief in the medical system here, and I

24   would love to bring my dad here.  But in order to be

25   able to do so, I am definitely going to need

1    Wilfredo's help.

2         I am very, very sad about everything that has

3    happened with the Casiano family.  I wish I can look

4    them in the eye and apologize because I know what it

5    feels like to lose a family member.  I've lost three,

6    my three brothers.  And it's been very difficult.

7    But I just felt that the only way that I can make a

8    little light of this is to turn to drug addiction,

9    help people in drug addiction so that I can give

10   back.  It's the only way that I -- has made me deal

11   better with the whole thing that has happened.

12        And if I may, Your Honor, just talk to you a

13   little bit about my children, I have three.  My son

14   Alexis, he's 29, he works at the probate court in

15   Hartford.  My oldest daughter, Leslie, she's 34,

16   she's a paralegal.  And then my middle daughter,

17   Jocelyn, she has her own business.  These are the

18   people that Wilfredo Perez will be surrounded by.  It

19   would be myself and my three kids.  Right within

20   walking distance of where I live, there is the

21   medical clinic that I want Wilfredo to attend.  He

22   has his room where he will quarantine.  And, like I

23   said, if he came, I would also have my parents here

24   where him and I could attend to my dad.

25             THE COURT:  All right.  Thank you.

```
 1              Any questions at this point?

 2              All right.  Thank you.

 3              MS. NELIDA PEREZ:  You're welcome.

 4              Thank you, David Ring.

 5              THE COURT:  And are there any other people

 6    that, Ms. Barrett, you want the Court to hear on your

 7    side other than Wilfredo Perez?

 8              MS. BARRETT:  Your Honor, I haven't been

 9    intending but I just received word that Mr. Eric

10    Snead is on the line and would like to just very

11    briefly address the Court, if the Court would allow

12    it.

13              Mr. Snead, are you there?

14              MR. SNEAD:  Yes, I am.

15              THE COURT:  All right.  Can we put Mr. Snead

16    on.  All right.

17              MR. SNEAD:  Yes, I'm here.

18              MS. BARRETT:  Go ahead.

19              MR. SNEAD:  Thank you, Your Honor.

20              I was incarcerated at Otisville.  I did eight

21    and a half years there.  I came in, I was angry,

22    disgruntled.  I was sentenced to eleven years, and I

23    was hell bent on coming out and committing crime

24    again.  I hadn't learned my lesson.

25              But then Will -- I got to Otisville.  I was
```

1    actually in Canaan when Will's brother was killed.  I

2    met him.  And he took me in.  I was scared when I got

3    to Canaan.  He took me in and got me comfortable.

4    Then he was murdered, and I get transferred to

5    Otisville and I meet Will.

6           And I talked to Will and let him know that I

7    knew his brother.  Will took me under his wing,

8    taught me about hard work and ethics, instilled in me

9    skills of fixing a TV, fixing the microwaves, keeping

10   in touch with my daughter.  I had just had a newborn

11   when I was arrested in the feds, making sure that I

12   always thought about her, always helping me make

13   things for her.

14           If it wasn't for Will, right now I wouldn't

15   be doing what I'm doing.  I'm sitting in a UPS truck.

16   I'm a UPS driver.  I'm a Teamsters steward.  I've

17   changed my whole life in three years.  That's how

18   long I've been out.  And I'd say I owe 75 percent of

19   that to Will taking me under his wing and showing me

20   that, you know, you can do it.  You don't have to do

21   what you was doing in the street.  You don't have to

22   have the respect of the street.  All you need to do

23   is have the respect of your family and your friends

24   and live the right way.

25           And so I am who I am right now to be able to

1   sit in this UPS truck and have the trust of a Fortune

2   500 company, to -- after serving eleven years, to put

3   me in this situation because he gave me that.  He put

4   that in he me, that I could do it.  And I just want

5   to say, if it wasn't for him, and a lot of other guys

6   that left Otisville, there's a lot of guys who we're

7   all out here and we're all doing the right thing, and

8   it's due to Will.

9           THE COURT:  Congratulations to you.

10          MR. SNEAD:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          All right.  Ms. Barrett, anything more?

13          MS. BARRETT:  No, Your Honor.  Just if the

14   Court would hear from Wilfredo Perez himself.

15          THE COURT:  I think what I'm going to do is

16   invite the government to speak first, because that

17   will allow Mr. Perez to at least know what has

18   been -- everything that has been said in case he

19   wants to respond to it.

20          Is that all right with you, Mr. Perez?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  We'll let you speak after

23   Mr. Doherty.

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  All right.  Mr. Doherty.

1          MR. DOHERTY:  Your Honor, may I just have a

2  brief five-minute recess?

3          THE COURT:  Sure.  We will take a five-minute

4  recess.

5          (Recess taken, 12:40 p.m. to 12:51 p.m.)

6          THE COURT:  All right.  Counsel, are we ready

7  to proceed?

8          MR. DOHERTY:  Yes, Your Honor.

9          THE COURT:  All right.  Mr. Doherty.

10          MR. DOHERTY:  Thank you, Your Honor.

11          Your Honor, Wilfredo Perez paid hit men to

12  kill Teddy Casiano.  Hit men pumped 14 bullets into

13  Teddy Casiano and in fact killed him.  For that, now

14  54-year-old Wilfredo Perez is serving three

15  concurrent life sentences along with a theoretical

16  ten-year sentence, consecutive sentence for a gun

17  offense.  Perez was convicted on -- convicted after

18  full jury trial on the merits over which, of course,

19  Your Honor presided.

20          But even in light of the defendant's

21  arguments, I submit that he cannot show that a

22  reduced sentence would be consistent with the

23  sentencing goals set forth in Section 3553(a).  And

24  he can't meet his burden to establish that he's a

25  suitable candidate for release.

1          Where here the defendant hired hit men to

2     kill a rival to protect his drug business, where a

3     lifetime of incarceration remains the minimum

4     sentence allowed by the statutes of conviction for

5     the defendants, at least three of the defendants'

6     counts of conviction, conspiracy to commit murder for

7     hire, aiding and abetting, interstate travel for

8     murder for hire and VCAR murder, life imprisonment

9     remains the appropriate sentence for Perez's crimes.

10          While the Court may in its discretion grant

11    Perez's motion for a reduction of sentence and now

12    can consider the full slate of extraordinary and

13    compelling reasons from release post-*Brooker*, the

14    Court may also in its discretion deny Perez's motion

15    for failure to overcome the 3553(a) factors.

16          I think, of course, Your Honor is well aware

17    of your statutory authority at this point, but I did

18    briefly want to look at the 3553(a) factors in this

19    case.

20          And before doing so, I did just want to reply

21    briefly to Mr. Ring about some of the facts in this

22    case.  I believe both the letter submitted by

23    Mr. Ring and Mr. Chen and Mr. Ring's statements

24    before the Court here run contrary to the facts of

25    this case.  I've reviewed the documents in this case,

1   both publicly filed and internal documents.  I've

2   spoken with the United States Attorney directly about

3   this case.  And, of course, I want the Court to have

4   accurate facts before it.

5        But without waiving any privileges associated

6   with internal deliberations related to this matter,

7   Mr. Perez as well as his co-defendants, I can

8   represent to the Court today that it was then, as it

9   remains now, that Mr. Perez was a driving force

10  behind these murders and that he remains as culpable,

11  if not more culpable, than other defendants.  And I

12  just wanted to make it clear to the extent that

13  Mr. Ring may have suggested that the government ever

14  held a different view, that's simply not the case.

15       But I would just briefly like to look at the

16  3553(a) factors, if I may.  And, first, I wanted to

17  look at the nature and circumstances of the offense.

18  And here the defendant's offense remains among one of

19  the most abhorrent that one can commit in our

20  society; that is, a hired killing.

21       Teddy Casiano was the rival to the Perez drug

22  trafficking organization.  He was a threat to the

23  defendant's business.  Casiano was disturbing

24  business, hindering the sale of cocaine, kilograms

25  that Perez was distributing throughout Hartford.

1    When Casiano stole from the Perez organization, he

2    attempted to take over a bar where the Perez

3    organization sold cocaine, he put the Perez

4    organization in a bind with the distributes.  They

5    owed money.  Wilfredo Perez was the leader of that

6    organization.

7            Plainly, Casiano had to be eliminated.

8    Casiano had to die, he had to be laid down.  Wilfredo

9    Perez, again, the leader, in effect, called the

10   shots.  Something had to be done about Casiano.  So

11   he, Wilfredo Perez, paid for Casiano's death.

12   Casiano is lured to the Perez garage in southwest

13   Hartford, and this was the front for the cocaine

14   trafficking organization.  Hit men had been hired

15   from New York City.  Casiano left the Perez garage

16   for the last time on May 24, 1996, and was soon dead.

17           As Casiano sat in his car on Newfield Avenue

18   and New Britain Avenues in Hartford, the hit men

19   approached on a motorcycle.  It was Friday around

20   lunchtime, broad daylight, and Your Honor certainly

21   knows and recalls what happened next.  Casiano was

22   shot 14 times at point-blank range as he sat in his

23   Cadillac on Newfield Avenue.  The hit men were paid

24   $6,000 in all for the mid-day Friday execution.

25   That's less than $500 for each round that pierced

1   Casiano's body and ended his life.

2       Wilfredo Perez, along with the rest of his

3   organization, had been selling about 20 kilograms of

4   cocaine per year throughout Hartford.  Casiano became

5   jealous of the Perez lifestyle, and he acted out

6   against the Perezes.  Eliminating Casiano was a

7   business decision in the cocaine trade.  Wilfredo put

8   a life -- or put a price, rather, on Teddy Casiano's

9   life, on his head.

10      To be sure, Casiano was a rival gang member.

11  Casiano had a criminal history.  He also led the gang

12  the Savage Nomads, but he was also Wilfredo Perez's

13  friend.  It was complicated.  The drug trade

14  certainly can be.

15      But in 1996, let's not forget that the worth

16  of Casiano's life to Wilfredo Perez ultimately

17  amounted to $6,000.  This was not a murder in the

18  heat of passion.  This was not a drug deal gone bad.

19  This was calculated.  Perez, the organization that he

20  was running, was also calculated.  They decided

21  Casiano had to go.  He had to die.  He was bad for

22  business.  So killers were hired.  They came from New

23  York.  They got ready.  They shot Casiano.  They

24  killed Casiano.  They fled.

25      And as we all know, Wilfredo Perez was later

1   arrested on drug offenses.  The Casiano murder went

2   unsolved until the early 2000s.

3        But the nature and circumstances of this

4   offense, there really are few crimes more detrimental

5   to our society than someone placing a price on

6   someone else's life for someone conducting a broad

7   day drive-by shooting in Hartford.  Those are just

8   simply acts that are vile, and to say dangerous would

9   be an understatement.  But conspiring and

10  contemplating the execution of a rival gang member so

11  that your drug trafficking can continue uninterrupted

12  is particularly contemptible.

13       The nature and the circumstances of the

14  murder-for-hire plot here, that Perez as the leader

15  of the organization, the one who paid for Casiano's

16  killing, weighs heavily against his release.

17       But look at Mr. Perez's history and

18  characteristics.  How did we get here?  How did

19  Casiano's death result?  And really what it amounted

20  to and what it boiled down to is a want for money and

21  lifestyle.  The things Casiano became jealous of, the

22  things Wilfredo Perez had:  cash, cars, motorcycles.

23       Mr. Perez, as we can clearly see here today,

24  came from a tight-knit family.  That certainly

25  remains true.  Surely his family loves and respects

him.  But they were either at the time unaware of his
involvement in the drug trade or simply unable to
steer him as well as his brother Tony in a different
direction.  And I believe Perez's father Juan even
was a part owner of the garage that served as the
front for the cocaine trafficking organization.

But Mr. Perez clearly was intelligent enough
to run a successful business.  It operated for over
four years.  But when he paid for Casiano's killing,
he was 29 years old.  He was a fully formed adult.
He was not a young man.  This was not a youthful
indiscretion.  Perez spoke with others about what had
to be done.  He told his drug supplier that he knew
what had to be done and that he knew how to do it,
and as the jury found, he was the leader.  This
wasn't the underlings taking over the boss.  This was
the boss giving the nod.  And a jury convicted him,
of course, for the murder-for-hire offenses here.

Before this case was tried, the defendant
pled guilty to the drug-related piece based on his
1996 arrest.  And there he had pled guilty for
conspiracy to possess and distribute five or more
kilograms of cocaine.  Of course, the Court found him
responsible for the distribution of between 50 and
150 kilograms.  This wasn't some small operation.

1   They were running significant weight through

2   Hartford.  And as drug trafficking organizations

3   often do, the organization guarded itself.  So it was

4   passing a lot of cocaine, and with a lot of cocaine

5   comes a lot of money.

6           So protection often entails the use and -- or

7   possession of firearms.  When Perez was arrested in

8   1996 shortly after the Casiano murder, based on

9   documents on that docket, he had three loaded

10  firearms on his person.  There were two more stashed

11  at the Perez automotive shop and another two at his

12  home.

13          So again, while Mr. Perez may have been

14  generous to the community with his drug profits as

15  written in letters that are now before the Court,

16  this purported generosity was surely fuelled by

17  cocaine profits, the cocaine trade, protected by

18  firearms and ultimately related in the public

19  execution of Teddy Casiano.

20          Moving to, however, the need to reflect the

21  seriousness of the offense and the factors related to

22  promotion of respect for the law and just punishment,

23  Congress mandated that the counts for which Mr. Perez

24  was convicted require, at minimum, a sentence of life

25  imprisonment, as Your Honor, of course, knows.

Perez's jury found unanimously that life imprisonment was the just verdict as opposed to the death penalty. Of course, it only had those two choices.  But life imprisonment remains just punishment for Perez.

Of course, he did not pull the trigger to the gun that ended Casiano's life.  But he paid to end his life.  He authorized the killing.  He endorsed the killing.  The seriousness, again, cannot be understated.  And life sentences for murder-for-hire plots show Congress's intent of how these crimes should be treated and just, really, how serious it is to finance hit men to kill another human being.

Perez's sentence promotes respect for our law, not just to prevent the murder of another human being but to prevent murder-for-hire conspiracies in communities ravaged by the drug trade.  Such a sentence provides just punishment, again, for leaders who give the nod to publicly end the life of rival and then foot the bill.  These acts require much more, for lack of a better phrase, in terms of punishment than that of an average murder.

I'd submit there is no average murder.  But, again, Perez's sentencing in 2005, as now, life imprisonment is the mandatory minimum sentence.  The need for the sentence reflects the seriousness of the

```
 1   crime, promotes respect for our law and adequately
 2   weighs punishment against the type of offense.  And
 3   so too do mandatory life sentences deter the
 4   commission of murder-for-hire plots from occurring in
 5   our society, and it protects our society from such
 6   plots.  When -- while the sentence for an average
 7   murder is around 255 months, murder-for-hire is
 8   specifically punishable by a mandatory minimum of
 9   life imprisonment.
10        As a society, we want to continue to deter
11   extrajudicial executions, particularly in the drug
12   trade.  Again, few acts are as abhorrent, even if the
13   victim is engaged themselves in criminal-related
14   activities.
15        And I do want to raise here the victim for a
16   moment.  As the government wrote in its response,
17   Teddy Casiano was not perfect by any stretch.  He was
18   a gang leader.  He stole kilograms of cocaine from
19   Perez.  He robbed an armored car.  But he was still a
20   living human being, and his life should not have been
21   snuffed out for $6,000.  Again, $6 ,000.  The PSR
22   makes reference to his sister as next of kin, and the
23   government attempted but was unsuccessful in
24   contacting anyone in his family to determine if they
25   wanted to speak here today.
```

```
 1            THE COURT:  I'm sorry.  Mr. Doherty, you
 2   remind me that I forgot to ask you in the beginning
 3   whether the victims had been notified or the victim's
 4   family had been notified of our proceeding and
 5   invited to attend or to participate.
 6            MR. DOHERTY:  Yes, Your Honor.  We were
 7   unable, unfortunately, based on the information that
 8   we currently have.  We attempted to reach out.  It
 9   seems as if the info we have for them now is no
10   longer good.  So attempts were made.  Attempts were
11   being continued as recently as yesterday, I believe.
12   But we were unable to contact anyone from the Casiano
13   family.
14            THE COURT:  Okay.  So there has been
15   attempted notification but no actual notification to
16   the victims; is that correct?
17            MR. DOHERTY:  That's correct, Your Honor.
18            THE COURT:  All right.
19            MR. DOHERTY:  Your Honor, as the defendant
20   himself wrote to this Court in the letter before the
21   Court, he noted that Casiano was in fact his friend.
22   Of course, they ran in the same criminal circle in
23   Hartford.  But at the same time, again, Perez
24   authorized and paid for the murder of someone he
25   referred to as his friend, someone whose family he
```

1  knew.

2       Society, of course, seeks to continue to

3  deter and protect the public from broad day drive-by

4  shootings and executions.  And, again, it's true that

5  the defendant did not pull the trigger, and it's

6  likely that if he gets released he would not be

7  involved in such another murder-for-hire plot.  But

8  life sentences also deter others in society thinking

9  of committing these crimes.  They do protect the

10  public.

11       And in this instance, again, there were

12  passersby on the street during this Friday midday

13  shooting.  It occurred at an intersection which had

14  several businesses and stores.  Today there's a pizza

15  shop, nail salon and grocery.  And in a 1996

16  newspaper article on the killing which is still

17  available online in the *Hartford Courant*, it said in

18  part, "The afternoon violence shook many of the

19  merchants, customers and residents of the southwest

20  neighborhood who heard loud, repetitive pops of

21  gunfire followed by cars crashing and people

22  screaming."

23       Again, this was a broad day execution in

24  public for-hire in front of our fellow citizenry.

25       As it was then, it remains now an offense

1    that we want to continue to deter against and protect

2    the public from.  And I'd submit that these factors

3    weigh heavily against a reduction in his sentence.

4        I'll just touch briefly on the defendant's

5    educational and vocational training.  And I say with

6    all sincerity that it's certainly good that Mr. Perez

7    has found purpose while incarcerated.  He is working,

8    of course, on electrical projects, received his GED

9    and has taken many courses since 1998.

10       The one thing that I wanted to point out

11   though is the rehabilitation on the table before us

12   as weighed against his offenses, I'd submit is just

13   not so extraordinary to warrant his sentence

14   reduction.  Specifically, there's a significant gap,

15   though I understand that he was working on other

16   projects at the time, but he was engaged in

17   educational programs from the time of his initial

18   incarceration, about 1996, until 2005 which was the

19   year he was sentenced on this matter.  And then it

20   looks like, from his records, he didn't take any

21   additional educational courses between 2005 and 2016,

22   which is a near eleven-year gap.  I'd submit in part

23   that his rehabilitation here can't be said to be an

24   atypical accomplishment.  Of course, with respect to

25   the course requirements or educational component,

1    it's not akin to other cases in this district where

2    individuals have taken thousands of hours of courses,

3    though I do respect and understand Mr. Perez's

4    mentorship components with other prisoners as well as

5    his employment in the trades.

6         Also with respect to his medical conditions,

7    I'd submit that FCI Otisville has and can continue to

8    care for Mr. Perez despite the ongoing pandemic based

9    on the types of medical conditions that he's

10   advancing; that's, again, of course, obesity and

11   hypertension.

12        And also his release to Vernon would not

13   necessarily protect him from the COVID-19 virus, as

14   we're all well aware that the virus continues to run

15   rampant in our communities here in Connecticut.  And

16   Vernon itself has had 47 cumulative deaths from

17   COVID-19, four since the government's filing on

18   January 28th with an additional 103 cases.  And I

19   know Your Honor is well aware of the fluid situations

20   both within our society when it comes to COVID-19 as

21   well as those faced by incarcerated individuals,

22   including Mr. Perez, at FCI Otisville.

23        And, again, as we've discussed, FCI Otisville

24   does not yet have the COVID-19 vaccine within their

25   facility.  I did check to see if they had a date of

when that would arrive. They did not yet have a date of when that particular facility would receive it, but I did just want to make sure that Your Honor had that information. And BOP is now updating on their website the total number of administered doses to both staff members and prisoners in facilities, also listing which facilities that's occurring in. And to date 45,000 doses have been administered, though, again, not in FCI Otisville.

But in any event, I'd submit respectfully that the defendant's required medical care is not so extraordinary to reduce or to warrant a reduced sentence here, particularly weighed against his offenses.

And, finally, moving back to the 3553(a) factors briefly before concluding, the Court is well aware that the kind of sentences here for Mr. Perez's offense, of course, were quite limited. It was either mandatory minimum of life imprisonment or death. But, again, those are the penalties prescribed by statute. So, again, it's not that the Court's hands were tied in a sense. It's what the statute allowed at the time in imposing sentence. And --

THE COURT: I don't understand that last

1   statement, that the mandatory life or death, those

2   are the two options, the Court has no other option.

3   Why that does not mean that the Court's hands are

4   tied; that is, the Court has no discretion as to

5   whether to impose the sentence that is voted on by

6   the jury.

7           MR. DOHERTY:  At the time of sentencing,

8   correct, Your Honor.

9           And I just, finally, would just like to

10  briefly note --

11          THE COURT:  I didn't understand.

12          MR. DOHERTY:  I'm sorry.

13          THE COURT:  Were the Court's hands tied at

14  the time of sentencing in your view?

15          MR. DOHERTY:  I believe Ms. -- I'm sorry.  I

16  believe Ms. Barrett referenced at one point the

17  Court's hands being tied at the time of sentence

18  where the only possible sentence after the jury had

19  rejected the death penalty could have been an

20  effectual mandatory minimum life sentence.

21          THE COURT:  Why is that not correct?

22          MR. DOHERTY:  It is correct, Your Honor.  So,

23  again, by statute, there are those only two options.

24  So, again, it's the limitation -- there's just simply

25  a limitation there.

1          But, moreover, I wanted to advance that there

2    still is, with the Court now having the discretion

3    and ability to reduce mandatory minimum life

4    sentences, even in instances where a murder has been

5    convicted or committed, rather, or there's been a

6    murder-for-hire, I did just want to note that there

7    still at this juncture can be sentencing disparities

8    as a result of compassionate release.  And it's

9    something that, of course, should be considered.

10          In the government's response on page 15, I

11   did note that one District Court Judge in the Eastern

12   District of Michigan wrote this past December that

13   there are relatively few reported cases of Courts

14   reducing sentences of inmates convicted of murder

15   under the compassionate release statute and even

16   fewer released inmates convicted of murder.  And

17   that's in *United States v. Hicks* which is cited on

18   page 15 of the government's response.

19          Of course, as the parties both briefed, there

20   have been some instances where a defendant convicted

21   of murder and sentenced to life imprisonment was

22   granted compassionate release, but most of those

23   instances the defendants were suffering from terminal

24   ailments or were of advanced age or both.

25          I do know that Your Honor -- and understand

1  your ruling in the *Rios* case where Your Honor found

2  remarkable factors including the victim's family

3  taking no position on Mr. Rios's release.

4      But here I would just want to highlight

5  *United States v. Arana*, an Eastern District of

6  Michigan case from May cited on page 18 of the

7  government's response, where Mr. Arana was similarly

8  situated to Mr. Perez and compassionate release or

9  sentence reduction was denied.  Mr. Arana was also

10  involved in the drug trade.  Mr. Arana also hired

11  killers to successfully murder a former partner.

12  Mr. Arana was older than Mr. Perez, also with a

13  limited criminal history mostly tied to the drug

14  trafficking offenses themselves and, like Mr. Perez,

15  had close family ties.  Mr. Arana also took many

16  educational programs while incarcerated, I believe 50

17  or more, and was not a disciplinary problem while in

18  jail.

19      But that Court, District Court Judge, again,

20  in the Eastern District of Michigan, found that

21  Mr. Arana committed the ultimate violence, the taking

22  of a human life, and that even with his medical

23  condition in light of the COVID-19 pandemic and his

24  purported rehabilitation, those factors just simply

25  could not outweigh the 3553(a) factors.

 1            And I'd submit that the result should be the

 2    same here, that it's the just result, and that

 3    Mr. Perez's life sentence remains the just sense for

 4    the for-hire killing of Teddy Casiano.

 5            I'd respectfully submit that his reasons for

 6    relief are not so compelling that they overcome the

 7    need for a life sentence for conspiracy to commit

 8    murder as well as VCAR murder, and that the defendant

 9    has failed to meet his burden and is unentitled to

10    sentence reduction.  His circumstances, I'd

11    respectfully submit, are not so changed that they

12    warrant a reduction in his current sentence.

13            So I'd urge the Court in its broad discretion

14    to deny the motion, the defendant's motion for a

15    sentence reduction.

16            THE COURT:  All right.  Now, there had been,

17    I thought, at least some dispute in the briefing

18    early on about whether under 3585 and *Brooker*, the

19    Court's discretion extended to mandatory life

20    sentences.  And I gather from your remarks today that

21    you do not believe it -- that a life sentence bars

22    relief if it's otherwise deemed appropriate.

23            MR. DOHERTY:  That's correct, Your Honor.

24    Post-*Brooker*, I do not believe that that bar is in

25    place.

1          THE COURT:  And I wanted to ask you something

2     else.  You said that the government doesn't view

3     Mr. Perez as a societal risk if he is released now

4     but that the goal of general deterrence to others who

5     would commit the heinous crime of paying to have

6     somebody killed.  I'm not sure I understand how in

7     the context that we are considering Mr. Perez's

8     motion, general deterrence applies.  Can you help me

9     on that?

10          MR. DOHERTY:  I think there are, with respect

11     to deterrence, two parallel tracks:  of course, the

12     deterrent or wanting to deter the defendant from

13     committing the same offense again but also an

14     understanding that the Court is going to consider the

15     entirety of the defense arguments and weigh whether

16     or not extraordinary and compelling reasons exist to

17     release this defendant.

18          I think there still also lies a certain

19     aspect of general deterrence where society as a whole

20     will review and look at essentially what happens down

21     the road to mandatory life sentences for crimes like

22     murder-for-hire.

23          And ultimately the general deterrence

24     component -- now, you have on one hand what the

25     statute reads, so the statute of conviction which is,

1    to be plain, if you commit murder-for-hire, you will

2    be sentenced to a mandatory minimum of life

3    imprisonment or death, but on the other hand, what

4    the effective result would be, particularly now

5    post-*Brooker*, at least in this circuit, when it comes

6    to compassionate release.

7           So that would alter, in my view, the general

8    deterrence component as society sees what the

9    ultimate sentences would shake out as being or if

10   Courts are receptive to essentially removing the

11   mandatory minimum of life imprisonment.  But I

12   certainly understand that the Court is going to look

13   at the defendant himself, the defendant's arguments

14   and weigh far more heavily the deterrence component

15   for a specific defendant versus that of general

16   deterrence.

17          THE COURT:  And in your view we don't have

18   that as a significant factor of concern here.  Did I

19   understand you correctly?

20          MR. DOHERTY:  That's correct, Your Honor.  I

21   think based, again, on his age, how he acted

22   throughout trial, as well as how he's conducted

23   himself while incarcerated, I believe there is only

24   one recent -- I believe in 1998, a fighting

25   disciplinary ticket that another inmate wrote a

1    letter referencing and essentially taking the blame

2    for.

3           But here we only have the record before us of

4    what the defendant did on the outside, you know,

5    until he was incarcerated on this case, which, of

6    course, was trafficking large scales -- large

7    quantities of cocaine and the resulting murder of

8    Casiano.  But I think in the two decades plus since,

9    I don't -- I wouldn't advance that I see him as a

10   significant risk to the public at this point and

11   would hope that that remains true.

12          THE COURT:  All right.  Thank you.

13          Ms. Barrett, do you have anything further

14   before I hear from Mr. Perez?

15          MS. BARRETT:  Just very briefly, Your Honor.

16          The seriousness of this offense is not in

17   dispute, and what I would say is that it is among the

18   most serious offenses.

19          We are, however, in 2021, not in 1996.  And

20   in 2021, Mr. Perez takes full responsibility for

21   Teddy's murder.

22          And at the time of the penalty phase, the

23   government talked a lot in closing about truth and

24   redemption.  It is possible to be redeemed.  And

25   everything that Mr. Perez has tried to do since has

```
1   been to try to atone for that wrongdoing.  Even among
2   the most seriousness -- serious of offenses, people
3   can qualify for a reduction in sentence.  And we have
4   cited those cases, at least eight in this district,
5   in different parts of the First Step Act.  There have
6   been at least seven for murder in other districts.
7   These are not people that had terminal conditions,
8   certainly not in this district.  The *Rodriguez* in the
9   Southern District with Judge Rakoff was not a
10  terminal condition.  These are cases, first and
11  foremost, where one of the prevailing considerations
12  was rehabilitation.  And there is nothing that can
13  ever take away the seriousness of this offense.  What
14  is true though is that Mr. Perez takes full
15  responsibility and has done everything he can to
16  atone for it.
17          And certainly the Court in its discretion has
18  the power to reduce his sentence.  There's no
19  evidence that mandatory minimums deter.  There's no
20  empirical evidence of that whatsoever.  There's
21  certainly no empirical evidence that life sentences
22  deter and that they deter any more effectively than
23  sentences of 26.4 years.
24          The government argues that Otisville can care
25  for him.  That is not borne out by the record before
```

this Court.  He suffered end-organ damage from improper handling of his hypertension.  His obesity has become worse over time.  The facility -- according to our declaration under Exhibit C, the facility is not administering the CPAP machine properly.  It's running the risk of infecting others. It's not addressing COVID testing properly.  He's not able to social distance in prison.  I haven't addressed that because I know the Court is well aware that prisoners are not able to socially distance and protect themselves in a prison environment.

The idea that releasing to Vernon, Connecticut, would be as dangerous as being in prison is simply not scientifically accurate.  In Vernon, Connecticut, Mr. Perez will be able to socially distance, quarantine himself.  He will have a room to himself in his sister's house.  The fact that people have died in Vernon has nothing to do with Mr. Perez.

In Otisville, he cannot protect himself. Just since we filed our papers at least seven people have died in the Bureau of Prisons, including one person on February 5th who died four days after being vaccinated.  These men cannot protect themselves. Adequate protocols are not being followed.  There is no evidence about when a vaccine is going to be

 1   available.  And even when it is, there are

 2   significant hurdles that we've outlined in our

 3   papers, including refusals to take the vaccine.  At

 4   least 50 percent of BOP staff have refused to take

 5   the vaccine.  Less than 5 percent of inmates have

 6   been offered it.  There is hurdles to achieving heard

 7   immunity.  There are hurdles related to whether the

 8   vaccine will be even be effective against mutations.

 9   And this is even when the vaccine is available to

10   inmates, which it is not available to Mr. Perez.  We

11   even have the recent example of an inmate dying four

12   days after being vaccinated.

13          So in terms of his record of rehabilitation,

14   I do want to clarify the record.  It is not accurate

15   that there has been a gap of eleven years of no

16   programming.  I think the issue is that the nature of

17   the programming has taken more of a creative approach

18   than simply checking the box of Bureau of Prisons'

19   programs.

20          Mr. Perez did a self-study on electrical

21   certification.  That's proven in the record at

22   Exhibit M and Exhibit C.  Bureau of Prisons staff

23   members attested to that in the Exhibit C.  That

24   required hundreds, if not thousands, of hours of

25   study and practical implementation of that.  So, you

1    know, I'm not sure what -- I don't think it's

2    accurate to say that there's been a gap in

3    programming, certainly not on this record which is

4    the most detailed record I've ever seen of not just

5    rehabilitation but extraordinary service to the

6    institution of Otisville.

7         One -- the final thing I would say about

8    disparities is the Second Circuit addressed

9    disparities in the *Johnson* decision which was a

10   decision under a different part of the First Step

11   Act.  It was under Section 404 which is the part that

12   has to do with retroactive penalty for crack.

13        But in the *Johnson* decision, the Second

14   Circuit said that essentially there shouldn't be a

15   leveling down.  Just because the First Step Act is

16   available now, other people may not have had it

17   available to them before.  People have served

18   whatever they've served up to this point in time,

19   that these are decisions that come within the Court's

20   discretion now given the factors that are available

21   to it, and there shouldn't be a leveling down just

22   because the First Step Act wasn't available sooner or

23   because some people may have served slightly longer.

24   It's a very fact-based analysis, and that's why the

25   nature of the First Step Act is to give the Court

1   discretion.

2          I don't have anything else, Your Honor, other

3   than to turn it over to Mr. Perez.

4          THE COURT:  All right.  Mr. Perez, you have

5   now heard everything that will be said in this

6   hearing, and I invite you to speak.

7          THE DEFENDANT:  Thank you, Your Honor.

8          First of all, I would like to start by saying

9   that I am deeply sorry for the pain I have caused the

10  Casiano family.  We all grew up together, and I

11  regret every day authorizing these guys to kill

12  Teddy.  I have lived with this pain for all these

13  years, and only God knows how much I regret it.

14         Your Honor, I didn't want Teddy to die.  I

15  tried to stop it so many times.  But my brother and

16  Berrios kept to me -- kept coming to me.  Towards the

17  end, Your Honor, I said yes, and today Teddy is not

18  here.  And I wish there was something I could do to

19  bring him back but I can't.

20         The only thing I got here, Your Honor, is to

21  do better.  And I have tried.  Every single day I get

22  up, and in Teddy's memory, I do what I do.  That's

23  why I do so good.  I try to help people.  Your Honor,

24  I wish I could just bring him back but I can't.

25         All I know is, Your Honor, I am sorry for

everything I've done.  I take full responsibility.
Your Honor, all I say, all I do is try to help every
person in here because it's a way for me to pay for
my crime.  I've tried every single day to be better.
Your Honor, I would like to say I'm sorry.  I have
tried so much, you know.  I tried not -- I didn't
want to get involved in that but I did, and I got to
live with it every single day.  I know I hurt so many
people, Your Honor, but for that I'm sorry.

        Your Honor, all I do is program.  I try to
help.  Even the administration have come to me
sometimes.  There was a guy, a young kid here, that
was suicidal.  They asked me for a favor, to bring
him to my room so I could mentor him.  And by the
time he left, he started crying because he said I was
like a father to him, Your Honor.

        Your Honor, I don't know what to say but just
that I'm sorry.  And if Teddy's family was here,
that's what I would be telling them too.  And I hope
that some day they find it in their hearts to forgive
me.

        Is David Ring still on?  I would like to tell
David Ring that I don't -- I don't hold no anger or
no resentment towards him neither.  I appreciate his
role.

```
 1              And I appreciate the time, Your Honor, you

 2   have taken.

 3              THE COURT:  Mr. Perez, I have a question.

 4              THE DEFENDANT:  Yes, ma'am.

 5              THE COURT:  You've described to me that your

 6   regret --

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  -- over authorizing the killing

 9   of a person who had been your friend, Teddy Casiano,

10   is with you every day and that helping everyone in

11   here is a way for me to pay for my crime, living each

12   day to be better.

13              The concept about what you do as your only

14   way of atoning for your crime, do you use that

15   message at all when you are mentoring or counseling

16   or talking to your fellow inmates, or is that

17   something that you keep as your own motivation?

18              THE DEFENDANT:  I use it when I mentor other

19   individuals, Your Honor.

20              THE COURT:  Does that seem for some people to

21   strike a chord?

22              THE DEFENDANT:  It does help them.  And I see

23   the change when I talk about my case to them and I

24   tell them how much I regret it.  I've seen changes in

25   them, Your Honor.
```

1            As a matter of fact, this morning I was

2      talking to individuals that had -- had a murder case,

3      and he was asking me how I do it.  And I told him, I

4      said, "All I do is try to better myself, help other

5      inmates."  You know what I mean.  I told him he's got

6      to forgive.  And he actually thanked me when we

7      finished the conversation, Your Honor.

8            THE COURT:  All right.  Anything else that

9      you want to say?

10            THE DEFENDANT:  No, Your Honor.  I'm just

11      sorry.  I wish I can take back what I did but I

12      can't.

13            THE COURT:  Well, that's the problem with

14      murder, isn't it?

15            THE DEFENDANT:  Yes, it is, ma'am.

16            THE COURT:  Mr. Doherty, did you have any

17      questions for Mr. Perez?

18            MR. DOHERTY:  No, Your Honor.

19            THE COURT:  And, Ms. Barrett, I assume you

20      said everything you want to say?

21            MS. BARRETT:  Yes, Your Honor.

22            THE COURT:  Or did you have any questions for

23      him?

24            MS. BARRETT:  No.  I have no questions.

25            THE COURT:  All right.  Mr. Perez, this is,

1    of course, a very difficult decision.  Your crime is
2    terrible, as you well know.
3           If the Court denies your motion, is that
4    going to impact your work that you've been doing
5    within the prison?
6           THE DEFENDANT:  No, it's not, Your Honor.  I
7    will continue doing everything I've done until this
8    day.  Every day is a learning day for me, Your Honor.
9           THE COURT:  So the buffers will stay fixed?
10          THE DEFENDANT:  Yes, Your Honor.
11          THE COURT:  All right.  If there is nothing
12   else then, we will conclude this hearing.  I thank
13   the institution for making this remote hearing
14   possible, and I thank counsel for their thoughtful
15   presentations in this case.
16          If there is nothing further, we stand in
17   recess.
18          (Proceedings concluded, 1:37 p.m.)
19
20
21
22
23
24
25

```
 1                 C E R T I F I C A T E

 2

 3     RE: UNITED STATES OF AMERICA v. WILFREDO PEREZ
                 No. 3:02-CR-00007-JBA-1
 4

 5            I hereby certify that the within and

 6     foregoing is a true and accurate transcript taken in

 7     the aforementioned matter to the best of my skill and

 8     ability.

 9

10          /s/_Melissa J. Cianciullo_____

11        MELISSA J. CIANCIULLO, RDR, CRR, CRC
                Official Court Reporter
12          United States District Court
            141 Church Street, Room 147
13          New Haven, Connecticut  06510
                 (203) 606-1794
14

15

16

17

18

19

20

21

22

23

24

25
```